# IN THE COURT OF COMMON PLEAS
## DELAWARE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, ex rel. DAVE YOST ATTORNEY GENERAL OF OHIO, 30 East Broad St., 17th Floor Columbus, Ohio 43215 | : : : : | CASE NO: _____ JUDGE _____ |
| Plaintiff, | : : : | **COMPLAINT FOR DISGORGEMENT, INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT** |
| v. | : : : | |
| ASCENT HEALTH SERVICES LLC, c/o The Corporation Trust Company Corporation Trust Center 1209 Orange St. Wilmington, DE 19801 | : : : : : : | |
| EXPRESS SCRIPTS, INC., One Express Way St. Louis, MO 63121 | : : : : | |
|     Also serve: Express Scripts Inc. c/o C T Corporation System 4400 Easton Commons Way Suite 125 Columbus OH 43219 | : : : : : : : | |
| CIGNA GROUP, 900 Cottage Grove Road Bloomfield, CT 06002 | : : : : | |
|     Also serve: Cigna Group c/o The Corporation Trust Company Corporation Trust Center 1209 Orange St. Wilmington, DE 19801 | : : : : : : | |
| EVERNORTH HEALTH, INC., One Express Way St. Louis, MO 63121 | : : : : | |

                                          :

       Also serve: :
       Evernorth Health, Inc. :
       c/o C T Corporation System :
       4400 Easton Commons Way :
       Suite 125 :
       Columbus, OH 43219 :
        :

PRIME THERAPEUTICS LLC, :
2900 Ames Crossing Road :
Eagan, MN 55121 :
  :

       Also serve: :
       Prime Therapeutics LLC :
       c/o Corporation Service Company :
       3366 Riverside Drive, Suite 103 :
       Upper Arlington, OH 43221 :
  :

HUMANA PHARMACY SOLUTIONS, :
INC., :
500 West Main St. :
Louisville, KY 40202 :
  :

       Also serve: :
       Humana, Pharmacy Solutions, Inc.. :
       c/o The Corporation Trust Company :
       Corporation Trust Center :
       1209 Orange St. :
       Wilmington, DE 19801 :
  :

and :

  :

HUMANA INC. :
500 West Main St. :
Louisville, KY 40202 :
  :

       Also serve: :
       Humana Inc. :
       c/o C T Corporation System :
       4400 Easton Commons Way :
       Suite 125 :
       Columbus OH 43219 :
  :

Defendants. :

1.      The State of Ohio, acting on the relation of its Attorney General Dave Yost, brings this action to obtain equitable and injunctive relief, and statutory forfeiture against Defendants.

## INTRODUCTORY STATEMENT

2.      Like the importation of kudzu to stop soil erosion, the creation of the pharmacy benefit manager ("PBM") was a solution that has become the problem.  Through industry consolidation, the PBM landscape is dominated by three big players – including Defendant Express Scripts, Inc. ("Express Scripts" or "ESI").  With this dominance, they have created a black box that holds a complex administration system that allows the PBMs, including Express Scripts, to enrich themselves in multiple ways.  This is all at the expense of consumers and other industry participants.

3.      These ways include a complex "pay to play" rebate system that, perversely, pushes manufacturers to *increase* drug prices in order to be placed on or receive preferred placement on PBM formularies.  The costs of Express Scripts' supracompetitive profits have been pushed onto those with the least power – including individuals whose prescription costs are calculated at, or as a percentage of, those same rising list prices.  To paraphrase President Reagan, the scariest words in the pharmaceutical industry have become "I'm the PBM, and I'm here to help."

4.      At one point, "Big Pharma" was justly criticized for overpricing medications.  PBMs were created as a market response to that criticism.  PBMs were introduced to negotiate drug prices on behalf of payors, or "Plan Sponsors," such as employers, and the individuals receiving the medications, the "insureds."  This intermediary negotiator system worked until PBMs grew powerful enough to themselves extract exorbitant fees – and they did so.  The solution became the problem.

5.      Through industry consolidation, major PBMs affiliated with, and often became owned by, large health insurers and pharmacies.  Now, the three largest PBMs – including Defendant Express Scripts – control more than 75 percent of the prescription drug market.  The next three largest PBMs control the bulk of the rest.  Because of the nature of this market, both drug buyers and sellers have little choice but to play the game by the PBMs' rules, allowing PBMs to extract both monopoly profits from individuals and monopsony profits from the market.  The individual drug buyer faces a Hobson's choice of either buying medications through the insurer/PBM selected by their employer or paying an inflated "list" price.  From the drug manufacturer's perspective, the insurer/PBM controls access to millions of covered lives.  Moreover, pharmacies are often left not knowing whether they will book a profit or a loss on a transaction until long after they fill a prescription.  The insurer/PBM controls it all.

6.      As part of an ever-evolving effort to add complexity and opacity to the market, Express Scripts formed Ascent, a group purchasing organization or "GPO," in 2019.  Ascent functions primarily to further expand Express Scripts' stranglehold on the price of medications.  It also allows Express Scripts to coordinate pricing and other activities with its competitors.

7.      Also in 2019, Express Scripts invited its putative competitor, Prime Therapeutics LLC ("Prime Therapeutics"), into Ascent's ownership.  Express Scripts remains the majority and controlling owner of Ascent.  Ascent's owners use it as a vehicle to share pricing, to the detriment of the other market participants, including individual purchasers of medications like insulin.  Through Ascent, it is believed that Express Scripts, Prime Therapeutics, and Ascent customer Humana Pharmacy Solutions are able to share drug pricing and rebate information with one another, as well as to fix rebate prices among them.  It is further believed that – contrary to their stated business purpose – Ascent, Express Scripts, and Prime negotiate with manufacturers

with the intent of increasing the price of pharmaceuticals, including insulins, biologics, and cancer-fighting drugs.

8.      PBMs also use their market power to hurt competing pharmacies, and particularly independent pharmacies.  In order to stay in insurance networks – and remain able to service patients with private insurance – pharmacies are often forced to accept drug reimbursement rates significantly below what the pharmacies have to pay for those drugs.  Little, if any, of these cost savings are passed on to the Plan Sponsors or covered individuals.  Instead, those customers pay contracted rates, which generally exceed what the pharmacy is paid for the drug.  The PBM then pockets the "spread" between the prices, or diverts these funds to PBM-owned or affiliated pharmacies through so-called performance payments.

9.      Moreover, pharmacies in under-served areas or rural communities in Ohio, which often operate as a patient's first line of treatment, are struggling to stay in business due to these punishing price demands by the PBMs.  PBMs with affiliated pharmacies – either brick-and-mortar or mail-order – further benefit by pushing customers away from their local pharmacies into one that the PBM, or a company related to the PBM, controls.

10.     Defendants know that Ohioans in need of medication, particularly life-saving medication, will pay the asking price.  The choice is binary – pay or suffer.  Defendants also know that because of the predominance of prescription insurance, pharmacies and manufacturers will agree to the pricing demands of large PBMs and GPOs to gain access to the lives that the latter entities control.  Defendants have morbidly manipulated both sides of the market, demanding higher drug prices while negotiating larger fees from the manufacturers.  Patients pay more, manufacturers get less, and the PBMs profit.  Handsomely.

11. This process also drastically reduces the sales of generic medications and bio-similars because those inexpensive medications are excluded from PBM formularies precisely because low prices leave less room for rent-seeking.

### NATURE OF THIS ACTION

12. Express Scripts, one of the nation's three largest PBMs, sits in a powerful and lucrative position at the center of the prescription drug distribution system.  For nearly 40 percent of the Ohioans covered by commercial insurance, Express Scripts effectively controls which drugs will be covered by insurance and what portion of the price of those drugs will be covered, as well as how much the pharmacies that fill those prescriptions will be reimbursed for doing so.

13. Express Scripts, in marketing its PBM services to Ohio health insurers and employers that offer prescription drug coverage to their employees, touts its ability to leverage its significant market power to extract lower drug prices from drug manufacturers.  Express Scripts' promise is that it will deliver cost savings to those health insurers and employers.  But a look at Express Scripts' business model reveals that this promise is knowingly false. Conversely, Express Scripts increases prices to employers and patients.

14. Shrouded by a veil of non-disclosure agreements and confidentiality clauses, Express Scripts has instituted a profitable pay-to-play system in which it uses its market power as a sword to force drug manufacturers to play a perverse game.  Rather than use its bargaining power to place drugs on formularies based on lower price and better efficacy, Express Scripts effectively forces brand-name drug manufacturers to set *higher* list prices in exchange for desirable formulary positions, while limiting patients' access to low-cost generics and other cheaper alternatives.

6

15.     Express Scripts' counterintuitive demand for higher priced drugs can be understood only from Express Scripts' unique vantage point. In simple terms, Express Scripts demands "rebates," "value," or "fees" from drug manufacturers, which it claims to pass on to its clients. Whatever these payments are called, one thing remains constant – they are tied to a list price, and higher list prices bring higher payments into Express Scripts' black box. Vague contract terms permit Express Scripts to pass on to the health insurers and employers it serves only that portion of the rebates that it – in its sole discretion – chooses, keeping the rest for itself. By charging those clients additional fees calculated on those rebates, Express Scripts reaps even more profits from the higher list prices. Clients, for their part, do not know the mechanism or extent of all of these self-payments; only Express Scripts can see each part of the transaction.

16.     Express Scripts' covert practices harm other participants in the prescription drug market in Ohio. For many Ohioans, insurance co-pays are derived from a drug's "List Price." List Price is generally expressed through some version of the "wholesale acquisition cost" or WAC, defined by federal law as "the manufacturer's list price for [a] drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). In those cases, the higher the price – inflated by Express Scripts' demands – the higher the co-pay charged to the consumer. In addition, health insurers, employers, and other plan sponsors in Ohio face rising prescription drug costs, due to the fees, costs, and other charges that never escape Express Scripts' black box. Finally, Express Scripts uses its bargaining leverage to force pharmacies, which play a crucial role providing pharmaceutical drugs and care to underserved parts of the State, to accept ever-decreasing reimbursement rates for pharmaceutical drugs. Often, these

reimbursement rates are below what Express Scripts charges the plan for those same drugs, and Express Scripts pockets the difference.

17.     While the semantic game-playing and dearth of transparency that are a part of this scheme harm health insurers and employers by denying them the value promised by Express Scripts, the true harm is far more insidious. For the roughly 758,000 Ohioans who are uninsured, those who are underinsured, those with high deductible plans, or those whose out-of-pocket drug costs are calculated as a percentage of List Price, the prices yielded by Express Scripts' demands in exchange for formulary placement create a sometimes unbearable financial burden by increasing their cash outlay exponentially for what is often life-sustaining medication.

18.     For example, an estimated 1.1 million Ohioans are diabetics. For hundreds of thousands of them, daily insulin injections are essential to their survival. Express Scripts' well-concealed scheme to force drug prices upward has resulted in insulin prices that have increased from around $20 per unit in the late 1990s to between $300 and $700 per unit today, even though there seems to be near universal agreement that the per unit price to a patient should be around $35.

19.     The impact on diabetics who are uninsured, underinsured, or whose co-pays increase with List Price has been devastating, ranging from financial hardship to insulin-rationing, resulting in severe health consequences or even death.

20.     Having hobbled the competitive process through its black box system of pricing and fees and its coerced agreements with drug manufacturers that force List Prices upward, Express Scripts uses its unique position to pressure retail pharmacies into accepting often below-cost reimbursements for the drugs they dispense. Express Scripts also forces those retail pharmacies to agree to pay exorbitant "administrative" fees and acquiesce to contract terms that

give Express Scripts virtually unbridled audit rights, including Express Scripts' rights to "claw back" reimbursements paid to the pharmacies.  Many pharmacies have no real choice but to accept Express Scripts' take-it-or-leave-it contracts, driving many to the brink of insolvency or closure.

21.     These egregiously one-sided contracts restrain and neutralize the competitive process by yielding windfall revenues to Express Scripts at the expense of community pharmacies.  When local community pharmacies close their doors, Express Scripts benefits yet again by leaving patients with no feasible options other than Express Scripts' mail order pharmacies.

22.     So confident is Express Scripts in its market power that it regularly and flagrantly charges pharmacies millions of dollars in illegal "clawbacks."

23.     The closure of independent or small chain pharmacies is a growing health crisis. These pharmacies are often the "front line" of patient care in underserved parts of Ohio.

24.     Having tapped a rich vein of revenue from both drug manufacturers and pharmacies through a series of opaque and anticompetitive agreements, Express Scripts' profits soared.

25.     But when public outcry about runaway drug prices led to adverse media attention and Congressional hearings about the role of Express Scripts and other PBMs in the drug pricing and distribution system, Express Scripts feared its scheme was being threatened.

26.     In response, Express Scripts created an entity – Ascent Health Services ("Ascent").  Self-described as a group purchasing organization or "GPO," Ascent took over Express Scripts' pricing and rebate negotiations with Manufacturers.  Prime Therapeutics, a rival PBM, joined the ownership of Ascent later in 2019, pushing Express Scripts' bargaining power

even higher. Ascent boasts publicly that it controls negotiations for 100 million covered lives in the United States. But the creation of Ascent has yielded two additional important advantages to the companies that control it.

27. First, Express Scripts and Prime Therapeutics have been able to move large portions of their respective black box rebate and discount operations into the new company. Express Scripts relocated much of these operations from St. Louis to Switzerland, further concealing the ongoing pricing and rebate schemes by making them even less transparent and even more difficult for their clients to audit.

28. Second, on information and belief, Ascent has provided a convenient vehicle for Express Scripts, Prime Therapeutics, and Ascent's PBM customers to aggregate and access each other's pricing, discount, rebate, and negotiations information. These PBM customers have included some of the most powerful healthcare companies in the world, such as Humana.

29. Armed with this wealth of competitively-sensitive pricing and negotiations information about each other and additional rivals, Express Scripts, Prime Therapeutics, and Ascent's PBM customers have been able to act in concert to harmonize their Manufacturer negotiations and demands, effectively eliminating all competition between themselves and further ensuring that they continue to profit from supracompetitive drug prices.

30. Under the Valentine Act, the Ohio Attorney General is charged with combating Defendants' pervasive abuses of the marketplace. The Valentine Act holds that any "combination of capital, skill, or acts by two or more persons" is an unlawful trust if the combination is for one or more of the improper purposes enumerated in the statute. *Any* person who enters into a combination of capital, skill, or acts for an improper subjective purpose has

violated the Valentine Act. The Valentine Act authorizes the Attorney General to bring an action to restrain and enjoin *any* violation of the Valentine Act.

31. Thus, the Ohio Attorney General is empowered to restrain or enjoin corrupt combinations even if such combinations have not yet achieved their desired effects – the participants' *intent* to harm the competitive marketplace in Ohio is sufficient. Of course, as alleged herein, Defendants' actions have already caused substantial and serious harm to Ohio's citizens, and through this action the Attorney General is drawing a line in the sand: This is where it stops.

32. The Attorney General brings this action to put a stop to Defendants' secret and anticompetitive conduct and strong-arm tactics that have prevented free market forces from ensuring that Ohio's most vulnerable citizens can afford the prescription drugs on which their lives depend. The Defendants have harmed not just markets and pocketbooks, but Ohioans' health and lives.

## JURISDICTION AND VENUE

33. The State of Ohio brings this action to prevent and restrain violations of Ohio Revised Code §§ 1331.01, *et seq.* The Court has subject matter jurisdiction over this action pursuant to Ohio Revised Code §§1331.03, 1331.06 and 1331.11.

34. The State of Ohio further brings this action for declaratory and injunctive relief pursuant to Ohio Revised Code §§109.81 and 2721.02 et seq.

35. The Court has personal jurisdiction over the Defendants because they regularly transact business in the State of Ohio, contract to supply goods and services within the State of Ohio, have caused tortious injury by acts or omissions in the State of Ohio, and have caused tortious injury in the State of Ohio by acts or omissions outside the State directed at this State

11

while regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods used or consumed or services rendered in the State of Ohio.

36. Venue is proper in this county pursuant to Ohio Revised Code §1331.11, R. Civ. Pro. 3(C)(3), 3(C)(5), 3(C)(6), 3(F), 4(B), and Ohio Revised Code §2721.14.

37. Plaintiff, having reasonable cause to believe that violations of Ohio's antitrust laws have occurred, brings this action in his sovereign and quasi-sovereign capacity as *parens patriae* pursuant to Ohio Revised Code §109.81 to protect the State of Ohio, its markets, and its citizens.

38. An actual controversy exists between the State of Ohio and Defendants within the meaning of Ohio Revised Code §2721.02, et seq., regarding whether Defendants' practice of imposing clawbacks on Ohio retail pharmacies constitutes a violation of Ohio Revised Code §3959.20(C)(2) and Ohio Revised Code §§1331.01 et seq.

## THE PARTIES

39. The State of Ohio brings this action in its sovereign and quasi-sovereign capacity on relation of the Ohio Attorney General as the chief law enforcement officer of the State of Ohio.

40. The State of Ohio has an interest in ensuring that its citizens who pay out-of-pocket for prescription drugs because they are uninsured, underinsured, or have co-pays or deductibles calculated on the basis of list price of the prescribed drugs, pay no more for prescription drugs than they would pay in a competitive market. The State of Ohio has an interest in ensuring that employers in the state pay no more for providing prescription drug benefits to their employees than they would pay in a competitive market. The State of Ohio has

an interest in ensuring that lives and the health of Ohioans and competitive markets in the State are not impeded by unlawful activities, and that such activities do not harm the general economy of the State or the economic or physical well-being of its citizens.

41.    Pursuant to Ohio Revised Code §1331.11, the Ohio Attorney General is authorized to institute and prosecute actions on behalf of the State to enforce the provisions and remedies of Ohio's antitrust laws, codified in Ohio Revised Code Chapter 1331. Pursuant to Ohio Revised Code §109.81, the Ohio Attorney General is authorized to do all things necessary to properly conduct any antitrust case and to seek equitable relief as provided in Revised Code §§109.81 and 1331.11.

42.    Express Scripts, Inc. ("Express Scripts") is a corporation organized and existing under the laws of Delaware, with its principal place of business in St. Louis, Missouri. Express Scripts is a subsidiary of Evernorth Health, Inc. ("Evernorth"), which is a wholly-owned subsidiary of Cigna Group ("Cigna"). Express Scripts is engaged in the business of, *inter alia,* providing PBM and mail order pharmacy services to commercial health plans, self-insured employers, and government programs in the State of Ohio and elsewhere. Evernorth is engaged in the business of, *inter alia*, offering PBM services provided by Express Scripts for sale.

43.    Prime Therapeutics LLC ("Prime Therapeutics") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Eagan, Minnesota. Prime Therapeutics is engaged in the business of, *inter alia,* providing PBM services to commercial health plans, self-insured employers, and government programs in the State of Ohio and elsewhere. Prime Therapeutics is owned jointly by numerous Blue Cross and Blue Shield Plans, subsidiaries or affiliates.

44.     Humana Pharmacy Solutions, Inc. ("Humana Pharmacy Solutions") is a corporation organized and existing under the laws of Kentucky, with its principal place of business in Louisville, Kentucky.  It is a wholly-owned subsidiary of Humana Inc. ("Humana"). Humana Pharmacy Solutions is engaged in the business of, *inter alia*, providing PBM and mail order prescription services.

45.     Ascent Health Services LLC ("Ascent") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Schaffhausen, Switzerland.  Ascent is engaged in the business of, *inter alia*, acting as a group purchasing organization for the negotiation of rebates with drug manufacturers on behalf of PBMs.  Ascent's ownership includes, among others, both Defendants Express Scripts and Prime Therapeutics. Humana Pharmacy Solutions is an Ascent customer.  Based upon the composition of its membership, Ascent is considered a citizen of the State of Ohio.

46.     At all relevant times herein, Ascent, Express Scripts, Prime Therapeutics, Evernorth, Cigna, Humana Pharmacy Solutions, and Humana have transacted business in or affecting the State of Ohio.

47.     Various drug manufacturers, retail pharmacies, and individuals not named here as defendants have been parties to the agreements and combinations that form the basis of the violations alleged in this Complaint.

## FACTUAL ALLEGATIONS

### *The pharmaceutical distribution system*

48.     PBMs first appeared in the 1960s, when they served predominantly as claims processors for the transactions that arose when an individual covered by a prescription drug insurance benefit had a prescription filled at a retail pharmacy ("Retail Pharmacies"). Gradually,

they began to fill additional roles, including handling negotiations with the manufacturers of brand name prescription drugs ("Manufacturers") on behalf of the employers who paid for the purchase of those drugs.

49.     Today, PBMs contract with commercial health insurers and with employers ("Plan Sponsors") who offer prescription drug benefit plans to their employees to provide a variety of services ("PBM Services").  The mix of PBM Services provided under such contracts varies by PBM and Plan Sponsor.  Among the PBM Services commonly provided by PBMs to Plan Sponsors are:  (1) creation and maintenance of networks of Retail Pharmacies at which covered employees can fill their prescriptions ("Pharmacy Networks"); (2) design of the list of drugs that will be covered by a Plan Sponsor's pharmacy benefit plan, including the extent of coverage for each drug (the "Formulary"); and (3) negotiation of drug prices, discounts, and other terms of sale with Manufacturers on behalf of Plan Sponsors.

*Pharmacy Networks*

50.     Most employer-provided prescription drug benefit plans set forth a list of preferred pharmacies at which employees and their families ("Covered Lives" or "Covered Patients") who are covered by a Plan Sponsor's prescription drug benefit can have prescriptions filled for a lower co-pay than would be required at non-preferred pharmacies.  These groups of pharmacies – Pharmacy Networks – often include a mix of large Retail Pharmacies owned by PBMs or related companies, small-to-medium-sized chains, independent pharmacies, grocers, big box stores, and the like.  PBMs negotiate with Retail Pharmacies for inclusion in these Pharmacy Networks, demanding in return discounts on the amount of reimbursement and dispensing fees the PBM will pay to the pharmacy for each prescription dispensed, as well as other fees.

51. Retail Pharmacies that are part of a PBM's Pharmacy Network purchase drugs from a Manufacturer or wholesaler, and after these drugs are dispensed to a Covered Patient, the PBM reimburses the Retail Pharmacy under the pharmacy's contract with the PBM.

52. Inclusion in the Pharmacy Networks of a large PBM provides a Retail Pharmacy with access to significant numbers of Covered Lives who have strong financial incentives to have their prescriptions filled at in-network pharmacies. Conversely, exclusion from the Pharmacy Networks of a large PBM can be financially devastating to Retail Pharmacies, especially small chains or independents, as it deprives them of an essential source of potential customers.

53. Each of the nation's largest and most dominant PBMs – Defendants Express Scripts and Humana Pharmacy Solutions, in addition to Caremark and Optum – also owns and operates an in-house mail-order pharmacy that Covered Patients may opt to use, or in some cases may be required by their PBM to use, to fill their prescriptions for chronic drug therapies. These mail-order pharmacy operations compete with Retail Pharmacies.

*Formularies*

54. PBMs often design, create, and maintain Formularies for the Plan Sponsors with which they contract as a part of the PBM Services they agree to provide. A PBM's national or default Formulary has a large degree of clout in determining which drugs are generally covered throughout its Covered Lives.

55. PBMs generally offer both standard Formularies and customized Formularies to Plan Sponsors. In light of the complexities involved in Formulary development and maintenance, nearly three-quarters of all Plan Sponsors cede control to their PBMs by selecting

the standard Formulary.  Even for those Plan Sponsors that opt for a customized Formulary, the PBM has huge influence and control over the process of creating and revising that Formulary.

56.     Drugs appearing on a Plan Sponsor's Formulary generally have a lower co-pay than those not on the Formulary, a fact that tends to drive Covered Patients to preferred drugs.

57.     Many Formularies are structured with multiple tiers, providing graduated co-pays among the various tiers, which further drives Covered Patients to preferred drugs. Most Formularies have between two and five tiers, with drugs appearing in the lowest tier having the lowest out-of-pocket cost to the Covered Patient, and drugs in the highest tier requiring the Covered Patient to be responsible for a far greater percentage of the price.

58.     Plan Sponsors enlist the services of PBMs in connection with Formulary design and maintenance both to keep their drug costs in check and to provide high quality care to their employees.  As such, Plan Sponsors rely on the understanding that PBMs typically develop their Formularies on the advice and input of a pharmacy and therapeutics committee ("P&T Committee") comprised of pharmacists, doctors, and nurses who consult the latest FDA protocols and published clinical trials in providing their recommendations.

59.     Plan Sponsors, therefore, rely heavily on PBMs to construct Formularies that provide the best possible combination of efficacy and price for the prescription drugs available to those covered by the plans.

*Negotiations with Manufacturers*

60.     Another facet of the total package of PBM Services that most PBMs agree to provide, pursuant to their contracts with Plan Sponsors, is the negotiation of drug prices with Manufacturers.  As a part of such negotiations, PBMs commonly seek discounts in the form of a refund of a portion of the purchase price paid for the drug (a "Rebate").  Rebates are paid by the

Manufacturer to the PBM. They are commonly calculated as a percentage discount off of the Manufacturer's price for a given drug as reported in wholesale price guides or similar industry publications, which is often referred to as the wholesale acquisition cost or "WAC," or simply as the Manufacturer's list price (herein "List Price"). Formulary placement is often conditioned on or correlated with the amount of the rebate offered, with the highest rebates often reserved to the most exclusive placement.

61.     Some portion of these Rebates is usually retained by the PBM, with the remainder passed on to the Plan Sponsor. The portion of the Rebates that may be retained by the PBMs is typically spelled out in contracts between the PBM and the Plan Sponsor.

62.     Frequently, however, Rebates do not lower the cost for prescription drug benefits. Instead, the PBMs take the lion's share of the financial rewards from the Rebates.

*Consolidation in the PBM industry has given Express Scripts immense power in the marketplace*

63.     Express Scripts began operations in 1986.

64.     By 2010, it had one of the top three highest market shares among PBMs nationwide, along with competitors Medco Health Solutions and Argus Health Systems. Those three PBMs controlled approximately 48% of U.S. Covered Lives. And yet, more than half of the Covered Lives in the nation were served by a myriad of other PBMs at that time.

65.     The PBM market has undergone rampant consolidation over the past two decades. Express Scripts has been a significant contributor to that consolidation, consummating multiple mergers and acquisitions of rival PBMs, including its April 2012 merger with industry giant Medco Health Solutions. By the end of 2017, Express Scripts described itself as the "largest independent PBM company in the United States." Its $67 billion merger with Cigna Corp.,

consummated in late 2018, took another rival – Cigna's PBM – out of the market and exponentially enhanced its power through vertical integration with a massive health insurer.

66. Cigna and its subsidiary Evernorth participate in their own capacities in Express Scripts' business and operations. By way of example, Evernorth and its employees are directly involved in the sale of Express Scripts' PBM services to plan sponsors.

67. By 2020, the nation's top three PBMs (Express Scripts, CVS Caremark, and OptumRx) controlled 77% of the Covered Lives in the U.S., with all other competitors battling for the scant remaining 23%. Express Scripts remained firmly entrenched in the top three at that time, and remains so today.

68. In 2021, Express Scripts controlled one-quarter of all adjusted pharmaceutical claims in the U.S.

69. In 2022, Express Scripts controlled 88 million Covered Lives in the United States, compared to CVS Caremark's 81.3 million and OptumRx's 40.1 million.

70. In October 2022, Express Scripts announced an agreement with managed care organization Centene Corporation that will put Express Scripts in control of the pharmacy benefits for 20 million Centene members starting in January 2024. The deal will push the total number of Covered Lives controlled by Express Scripts nationwide to well over 100 million.

71. Today, Express Scripts controls access to roughly 38% of the rebate negotiations in the State of Ohio. In nearly every metropolitan statistical area (MSA) in Ohio, Express Scripts dominates over its rivals in the delivery of PBM services such as rebate negotiation, retail pharmacy network management, and claims adjudication, controlling nearly 60% of those markets in the Cleveland-Elyria and Weirton-Steubenville MSAs, and well in excess of 40% in numerous others, according to a 2020 study by the American Medical Association.

72.     Thus, for Manufacturers and Retail Pharmacies alike, access to the Covered Lives controlled by Express Scripts is a "must have."

*Express Scripts coerces Manufacturers to alter their pricing models by threatening to deny formulary placement, resulting in higher List Prices*

73.     Drug Manufacturers generally need their drugs to be placed on a PBM's Formulary in order to be covered by insurance. When a patient is prescribed a drug that is excluded from their PBM's Formulary, they have three options: (1) pay the entire cost of the drug out-of-pocket; (2) appeal the denial of coverage; or (3) obtain a prescription for an alternative drug from her physician.  For many patients, switching to an alternative drug is the least painful option.  Thus, Formulary exclusion can be the death-knell to a prescription drug. This fact gives large PBMs like Express Scripts great leverage over Manufacturers.

74.     Even the mere demotion of a drug to an inferior tier – where the patient's co-pay is much larger than it would be on a more favorable tier – can have a massive negative impact on adoption of, and thus revenue from, that drug.

75.     In other cases, patient access to a prescribed drug can be blocked or delayed even if the drug is not excluded from the formulary, through barriers such as "fail first" requirements. Under such requirements, patients must first attempt an alternative drug treatment before they can obtain the drug prescribed by their provider.  In many cases, the initial drug required in this "fail first" therapy is favored because it has a higher nominal price and, by extension, offers higher rebates to the PBM.

76.     In its January 2021 report, the United States Senate Finance Committee recognized that "[p]harmaceutical companies are sensitive to the sheer size of PBMs and the resulting product volumes they can affect, which allows the middlemen to extract higher rebates from manufacturers through the use of formulary exclusion tactics."

77.     Express Scripts is no exception, wielding its size and market power to effectuate a pay-to-play system that awards Formulary placement to the highest bidder.  The "payment" that Express Scripts extracts includes Rebates that, in theory, benefit the Plan Sponsors by lowering their net price for the drugs prescribed to their Covered Lives.

78.     But while Express Scripts touts publicly that the system it has established is the embodiment of competitive forces at work, the opposite is true.

79.     Express Scripts has structured its contractual relationships with Manufacturers around the concept of List Price.  It requires the Manufacturers – as a condition of appearing on Express Scripts' Formularies – to pay administrative fees and Rebates, frequently calculated with List Price as a material part of the equation.

80.     During its negotiations with Manufacturers, Express Scripts threatens to deny favorable Formulary tier position to – or to outright exclude from the Formulary – any drug on which the Manufacturer will not pay the demanded level of fees and Rebates.

81.     The result is a matter of simple math – because Express Scripts' contracts with Manufacturers set Rebates through calculations in which List Price is a material factor, the only way that Manufacturers can satisfy Express Scripts' demand for higher Rebates is to raise List Prices.

82.     The higher List Prices that Express Scripts extracts from Manufacturers in exchange for Formulary placement raise out-of-pocket costs for Covered Patients, often resulting in reduced compliance with medication regimens, and thus a sicker overall population for Plan Sponsors.

83.     The carrot of favorable Formulary placement, combined with the stick of Formulary exclusion that Express Scripts uses to force List Prices upward, constrict the choices

of medications available to Covered Patients, in a way that frequently excludes more reasonably-priced drugs. Express Scripts has also excluded more affordable "authorized generic" forms of medications, significantly increasing cash outlays by patients needing those life-saving drugs.

84. Express Scripts' use of outright Formulary exclusion has accelerated rapidly in recent years. From 2014 to 2022, the number of brand drugs excluded from its Formularies increased from 57 to 563 – a stunning 888% increase. Express Scripts' exclusionary Formulary tactics force Manufacturers to compete *to enter the market in the first place*, according to rules set by Express Scripts, rather than compete *in* the market for patients, according to patient needs and preferences. The power to exclude is the power to destroy, allowing PBMs to extract massive rebates from Manufacturers fearful of exclusion and even larger rebates from Manufacturers seeking to exclude others.

85. If Express Scripts were to use its market power to secure the best combination of low cost and high efficacy for Plan Sponsors as it claims, the result would be an example of the proper functioning of a competitive market. But that is not how Express Scripts leverages its power. On the contrary, Express Scripts squeezes off the air supply of the competitive process – information and transparency – thus insulating itself from the competitive pressures that would result if Plan Sponsors were able to assess accurately the true quality-adjusted price of its services.

86. Smaller, less powerful PBMs that might challenge Express Scripts' position in the market by offering a more favorable combination of cost and efficacy in the Formularies they create are foreclosed by this contortion of the competitive process, and therefore have limited chance to compete.

87.     Inside the secret, opaque, protective shell that Express Scripts maintains, its contracts and negotiations with Manufacturers fix and increase the price of drugs to Covered Patients, increase the quality-adjusted price of PBM Services to Plan Sponsors, and thus preclude the free flow of trade and commerce among all participants in this complex drug distribution system.

*Express Scripts' pay-to-play scheme pushes insulin prices to extreme levels and denies Ohio diabetics access to lower-priced alternatives*

88.     There is no clearer illustration of Express Scripts' contortion of the competitive process and the devastating impact of that contortion on vulnerable Ohioans than in the distribution and pricing of insulin.

89.     Approximately 1.1 million Ohioans are diabetics.

90.     Diabetes is a disease characterized by abnormally high blood glucose, or blood sugar.  While the pancreas normally secretes sufficient quantities of the hormone insulin to control the rate at which food is converted to glucose that provides energy to human cells, a lack of insulin or a suppressed ability for cells to respond to insulin means glucose is unable to enter the cells, leading to high blood sugar levels.

91.     Roughly 90-95% of diabetics develop the disease when their bodies stop producing sufficient amounts of insulin or become resistant to the insulin they do produce.  This form of the disease is known as Type 2 diabetes and can be treated in early stages by medication. Most Type 2 diabetics eventually require insulin injections, however.

92.     For the remaining 5-10% of the diabetic population, their bodies do not produce any insulin, and thus regular insulin injections are essential to life.  This form of the disease is known as Type 1 diabetes.

93.     Disruptions in an insulin regimen often have severe consequences for Type 1 diabetics and insulin-dependent Type 2 diabetics.  Missed injections or injections of less than the prescribed dosages can cause hypoglycemia and possibly diabetic ketoacidosis.  If untreated, diabetic ketoacidosis can lead to death within a matter of days.

*The development of insulin products*

94.     In 1996, Eli Lilly developed the first rapid-acting analog insulin, Humalog. Analog insulin is laboratory-grown and genetically-altered insulin. Analogs make the injected treatment act more like the insulin naturally produced and regulated by the body than human insulin. Moreover, it allowed for substantially faster absorption times.

95.     Other rapid-acting analogs are Novo Nordisk's Novolog and Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus (introduced in 2000) and Novo Nordisk's Levemir (introduced in 2005).

96.     In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

97.     In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

98.     Eli Lilly, Novo Nordisk, and Sanofi remain the only manufacturers of insulin in the United States today.

99.     For Type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for Type 1 patients.

100.    For patients with Type 2 diabetes, the ADA describes long-acting analog insulin as the most convenient initial insulin regimen. Likewise, doctors prefer to prescribe analog

insulins to Type 2 patients. As of 2010, among adults who filled more than one prescription for insulin, 91.5% filled prescriptions for insulin analogs. Type 2 patients use human insulin less frequently: only 18.9% of Type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000. In the wake of analog insulin, human insulin, like Novolin or Humilin, has nearly become obsolete.

101.    In 2020, the top three selling insulins in the United States were all analogs: Sanofi's long-acting Lantus garnered $1.14 billion in U.S. net revenue; Novo Nordisk's rapid-acting Novolog earned $1.18 billion in U.S. net revenue; and Eli Lilly's rapid-acting Humalog earned $1.67 billion in U.S. net revenue.

*Express Scripts' scheme pushes insulin prices sharply upward*

102.    In 2012, infused with the exponential increase of its market power as a result of the Medco merger, Express Scripts approached drug Manufacturers with a new form agreement ("Master Agreement") governing their relationship.

103.    The Master Agreement and its amendments over the coming decade required that the Manufacturers pay per-unit Rebates to the PBM for each prescription dispensed for their products.  In a section entitled "Rebate Calculations," the Master Agreement further dictated that Formulary placement would be tied to the amount of the Rebates, providing "Rebates will be based upon Product utilization *and the corresponding Formulary Positioning* and the Benefit Control (each as defined above) applicable to each Plan and in place on the date the applicable Product is dispensed or administered." (Emphasis added).

104.    Moreover, Express Scripts' Master Agreement required that "[a]ll Rebates percentages shall be stated as a percentage of WAC [List Price]."

105.     Accordingly, the Pricing Grid appended to each Manufacturer's Master Agreement with Express Scripts specified in detail a different percentage Rebate – stated as a percentage of WAC/List Price – based upon the Formulary position that that Rebate would allow the product to have.

106.     Since then, prices for analog insulins have skyrocketed. Some prices have increased 172%, from $144.84 to $248.51, in about one and a half years' time. These extremely high prices are unique to the United States. Indeed, many of these exact same insulins are sold in Canada for less than 25% of the U.S. price.

107.     Recently, some manufacturers – including Eli Lilly, Novo Nordisk, and Sanofi – have announced programs to, at some future date, limit the out-of-pocket monthly costs for patients who need insulin to a set figure, such as $35 a month.  These programs come in the wake of efforts in both state and federal government to provide similar cost limitations.  These programs represent drastic efforts to limit the harms of systemic PBM abuses on patients' reasonable access to necessary treatment.

108.     The ultimate effectiveness of these programs will not be known for some time.  In the past, attempts to provide discounts to patients have met resistance from insurers and PBMs, thus reducing the effectiveness of those programs.  In addition, it is not clear how these programs will affect the overall cost of pharmacy benefits for Plan Sponsors or the continuing problems the PBM industry imposes on local and independent pharmacies.

109.     But attempts to limit patients' out-of-pocket costs on only one category of treatment are akin to putting a band-aid on a wound that is already infected.  The rising price of insulin is but one symptom of the harms that PBMS have inflicted upon the marketplace, and these remedial measures do not reach the root cause of the disease.

*Express Scripts favors more expensive drugs through step therapy or "fail first" requirements*

110.    PBMs, including Express Scripts, also use the Rebates scheme to favor higher-priced drugs through "step therapy" or "fail first" requirements.  These requirements often favor drugs with higher nominal prices – and by extension higher Rebates – over drugs that have lower net costs or that might be more appropriate for a patient's particular therapy.  In many cases, step therapy and Formulary restrictions that favor the most profitable medications for PBMs – those with the highest Rebates – result in patients having delayed access to treatment prescribed by the patients' physicians.

111.    The result of these schemes is that the first-line treatment decision can be driven by the financial interests of the PBM and not the evidence-based judgment of a qualified physician.  A 2021 study regarding 10 diseases commonly subject to step therapy by commercial health plans concluded that only 34 percent of the step therapy protocols for those diseases were consistent with corresponding clinical guidelines.

112.    Beyond simply delaying the prescribed treatment, step therapy can also result in increased disease activity, disability, or irreversible disease progression.

113.    A February 6, 2023, *Washington Post* article provided some illustrative examples of how step therapy – a one-size-fits-all system – can negatively affect patients.  A seventh grader in Arizona with juvenile rheumatoid arthritis was forced to stay on a Formulary-favored drug – which was not the drug prescribed by her physician – for six months, while her symptoms worsened and her arthritis spread through her body.  A dermatologist at the University of Pennsylvania observed that frequently patients with severe, debilitating skin conditions are required to undergo step therapy, leading to months of delayed treatment while their symptoms worsen.

114.     Patients also experience these costs in lost time.  By one estimate, 28 percent of patients who experienced step therapy spent three or more hours trying to obtain second-line drugs from their physicians.  In other cases, cost savings from the step therapy treatment are more than offset by increased costs for treatment that might have been prevented if the patient had access to appropriate treatment from the beginning.  For example, a study found that step therapy regarding pharmaceutical treatment for schizophrenia saved $20 per month in drug costs on average but also incurred an average of $32 per month in additional outpatient service costs.  And finally, the step therapy process can be so discouraging to patients – whether due to worsened symptoms, treatment delays, the burden of frequent doctor visits, the costs of already having paid for drugs that were not effective, or a frustrating appeals process – that many stop seeking treatment entirely.

115.     But these effects are perhaps most starkly illustrated in the context of cancer drugs, where delays in treatment can have the most dire consequences.  Treatment delays after a cancer diagnosis have been linked to worse or prolonged symptoms, spread of the disease, and even an increased risk of death.  A 2016 study noted that treatment delays of eight or more weeks decreased overall survival for patients with stage I breast cancer, and delays of 12 or more weeks decreased overall survival for patients with stage II breast cancer.

116.     For example, patients with bone metastases or hypercalcemia may be prescribed Denosumab to prevent skeletal-related events.  In order to obtain access to that drug, however, patients are often required to fail to the level of serious, bone-related complications – such as broken bones – that might have been prevented if they had obtained the appropriate treatment initially.  In addition, a "double step" therapy is often required by chemotherapy-induced nausea

drugs, requiring patients to experience violent vomiting before they can obtain the more effective anti-nausea drug.

117.    Moreover, the rise of step therapy has coincided with rapid growth in the prices among cancer drugs.

118.    Gleevec, a drug used to treat chronic myeloid leukemia, was priced in 2020 at $123,000 for a standard annual course of treatment, and sales of the drug generated $330 million in net revenue in 2019.  In 2003, a 400 mg tablet of Gleevec was priced at $68.16.  This price increased 22 times through 2020, for a cumulative price increase of 395 percent.  The 100 mg tablet cost $93.64 in 2020, a similarly large increase from its 2001 price of $17.04.

119.    Rebates for Gleevec have kept pace with this growth.  From 2009 to 2015, the average of all discounts, Rebates, returns, and copayment amounts totaled just 15% of gross sales.  This number suddenly rose to 40.8% in 2016, but no real savings were realized – the average net price for Gleevec in 2016 was almost double the average net price in 2009.  By 2018, the average net price was *more* than double the average net price in 2009.

120.    Imbruvica, which treats mantle cell lymphoma and five other cancers or conditions, experienced similar price increases in the same time period.  In 2013, a single tablet of Imbruvica cost $91.11.  This cost grew to $165.78 in 2020, after nine separate price increases. In 2020, Imbruvica generated $4.3 billion in U.S. net revenue.

*Express Scripts' Rebate scheme also limits competition from lower-cost generics*

121.    Generic drugs play an important role in providing affordable health care to patients by providing cheaper, effective alternatives to brand-name drugs.  There is a significant public interest, therefore, in avoiding delays in the adoption of effective generic alternatives by health plans.

122.    Historically, generics have been adopted at a rate of 80%or more within only a few months.  In 2021, however, the top 10 new generics averaged 70% market share of total prescriptions.  This slower adoption is a result of PBM influence.  Due to the Rebates system, PBMs, including Express Scripts, are incentivized to prefer higher-priced brand name drugs over their more affordable generic counterparts.

123.    In 2016, first generics – the first approval that allows a manufacturer to market a generic drug in the United States – were covered only 46% of the time.  Those drugs reached 90%coverage in 2022, six years after they first came to market.  These delays restrict patient access to lower-priced generics and expose patients to unnecessarily high cost-sharing.

124.    PBMs limit access to generic drugs through a number of strategies.  PBMs often have "do not substitute" or "DNS" strategies that prevent consumers from obtaining low-cost generics in favor of more profitable brand-name drugs with high Rebates.  In addition, PBMs may decide not to stock generic equivalents of drugs in the pharmacies that they or an affiliated company own.  Further, PBMs have been known to train call center representatives to discourage beneficiaries from filing Formulary exceptions for generic drugs.

125.    For example, generic versions of Advair Diskus – used to treat people with asthma and chronic obstructive pulmonary disease – took five years to exceed 30% adoption.  When a generic version of the Advair inhaler was made available at a 70% discount, Express Scripts continued to require pharmacies to dispense the more expensive brand.  Individuals covered by Express Scripts whose payments were based on the net price of the drug – for examples, those with high-deductible health plans – were therefore forced to purchase the more expensive brand over the effective, approved generic.  Broadly, new generics on average take up to seven years to reach more than 80%Formulary coverage on commercial plans.

*Express Scripts conceals its scheme from Plan Sponsors*

126.     Keenly aware that the veil of secrecy that keeps competition at bay and its power unchecked is pivotal to maintaining its massive revenue stream, Express Scripts uses its market power to maintain opacity through multiple means.  Each of the means described below has the purpose of suppressing the competitive process and fostering the pay-to-play agreements that Express Scripts uses to force drug prices upward.

*Renaming Rebates*

127.     Prior to 2017, more than half of the Plan Sponsors that contracted with Express Scripts allowed Express Scripts to retain some portion, often impossible to quantify, of their Rebates through the PBM's opaque black box process.

128.     Beginning around 2017, some Plan Sponsors began to push back on the mysterious withholding of a portion of the Rebates to which their contracts with Express Scripts entitled them.  By 2021, in an effort to pacify its clients, Express Scripts had upped the percentage of its clients receiving full pass-through of Rebates to 75%.  This apparent victory for Plan Sponsors, however, was a fiction – produced by a semantic sleight-of-hand by Express Scripts.

129.     Fearing that Plan Sponsors' suspicions about its practice of withholding sizeable chunks of their Rebate dollars would threaten this steady and highly lucrative revenue stream, Express Scripts began to rename and recategorize large portions of the monies flowing in from Manufacturers. Suddenly, Express Scripts was receiving more "administrative service fees," "inflation fees," "service fees," or similarly labeled payments from Manufacturers.

130.     Once again, Express Scripts' impenetrable black box prevented Plan Sponsors from seeing the value that they were getting – or more accurately, the value they were not getting

– from their contracts with the powerful PBM.  Having denied Plan Sponsors this vital piece of information, Express Scripts severely hamstrung the competitive process.

*Refusal to give Plan Sponsors access to their own data*

131.    Plan Sponsors heavily rely on Express Scripts to negotiate favorable drug prices and create Formularies that include cost-effective drugs for their members. But Express Scripts refuses to readily provide Plan Sponsors with the necessary data for Plan Sponsors to make fully informed cost decisions. This data revolves around Express Scripts' Rebate agreements with Manufacturers and the cost-effectiveness of the drugs placed on Express Scripts' Formularies. This guarded data is often data that Plan Sponsors are promised the ability to access (via audits) under their contracts with Express Scripts.

132.    Plan Sponsors need access to claim-level Rebate information to understand exactly how their contractual Rebates are working for their plans and their covered members. But PBMs like Express Scripts do not naturally provide Plan Sponsors with itemized billing statements that show how the Rebates were applied at the claim level. Instead, Express Scripts requires Plan Sponsors to undergo onerous audit protocols to access that data.

133.    Depending on the Plan Sponsors' contracts with Express Scripts, Plan Sponsors may be required to travel to Express Scripts' St. Louis headquarters for an on-site audit visit. The Express Scripts contract may require Plan Sponsors to hire a CPA from a top 100 accounting firm to perform the Rebate audit. Once presented with the data, Plan Sponsors may be prevented from taking detailed notes of their analysis. Express Scripts claims that rigorous audit protocols are necessary to protect sensitive information, but in reality, they exist to hinder Plan Sponsors from assessing their Formulary drug Rebates and holding Express Scripts accountable for muddying the drug pricing waters.

134.    Express Scripts also prevents Plan Sponsors from understanding Express Scripts' contractual relationships with drug Manufacturers and Retail Pharmacies. By concealing drug utilization and Rebate data and Maximum Allowable Cost lists, Express Scripts ensures that Plan Sponsors cannot accurately measure the cost and efficacy of their Formulary drug plans.

135.    Express Scripts passes on drug utilization data to Manufacturers, but Plan Sponsors have no way of knowing how their plan's utilization data is then used by Express Scripts and the Manufacturers. Plan Sponsors' Rebates may be tied to drug utilization, but only Express Scripts has access to the full pricing picture involving Manufacturer contracts and the Plan Sponsors' drug claims and utilization data. This lack of transparency means that Plan Sponsors do not have the information necessary to adequately choose Formularies that are cost-effective and obtain Rebates that work best for their plans and members.

136.    Express Scripts also shrouds its Maximum Allowable Cost (MAC) lists in secrecy. These MAC lists represent the amount a PBM will reimburse a Retail Pharmacy for dispensing generic drugs and the amount it charges Plan Sponsors for drugs. PBMs control MAC lists and ensure that only the drugs they are making money on remain on the lists.  These lists can change by the hour or even by the minute.  Without access to these lists and reimbursement data, Plan Sponsors cannot understand the value of Express Scripts' drug pricing, making Plan Sponsors even more dependent on how Express Scripts sets and enforces drug prices.  By keeping Plan Sponsors in the dark, Express Scripts can comfortably maintain higher drug prices which then harms Plan Sponsors' members with high-deductible plans.

137.    But the self-serving renaming of revenue received from Manufacturers but not passed on to Plan Sponsors and the refusal to give Plan Sponsors access to their own utilization

33

data are not Express Scripts' only deceptions, and are certainly not the ones that do the most harm to competition and to Ohioans that purchase and rely upon prescription drugs.

*Misrepresentations about cost-effectiveness*

138.    Throughout the period covered by this Complaint, Express Scripts has made repeated misrepresentations to Plan Sponsors and to the public about its use of its clout in the marketplace to place the most cost-effective drugs on its Formularies for the benefit of Plan Sponsors and their employees.  Express Scripts' statements are patently false, as it knowingly omits any mention of its pay-to-play system involving coercion of List Price hikes by Manufacturers and its frequent denials of Formulary placement to the most cost-effective drugs.

139.    Express Scripts actively promotes its PBM Services to Ohio Plan Sponsors as being an effective tool to help them navigate the complex prescription drug distribution system to find the best possible combination of lower costs and healthy outcomes for their employees. On its website, Express Scripts makes the following promise to Plan Sponsors: "The challenges you face in improving the health of your members may seem daunting. From ensuring quality care while managing cost, to keeping up with emerging therapies and technology, we're here for you."

140.    Also on its website, Express Scripts maintains a five-page white paper explaining its Formulary development process.  That white paper states, *inter alia,* "The processes Express Scripts uses to develop formularies have been constructed to ensure that clinical considerations are paramount and fully taken into account *before* cost considerations."  White Paper: Formulary Development at Express Scripts, December 2020 (emphasis in original).

141.   In 2021, an Express Scripts spokesperson issued a statement to the *Managed Healthcare Executive* publication claiming that "[c]linical appropriateness of the drug – not cost – is our foremost consideration."

142.   Express Scripts' misrepresentations that conceal its pay-to-play schemes' elevation of dollars over drug quality and efficacy are made not only to Plan Sponsors, but also directly to Covered Patients themselves.  For example, in its 2022 Formulary document prepared for and distributed to members of an Ohio public employee retirement plan, Express Scripts tells members that it has chosen the drugs on the Formulary "in consultation with a team of healthcare providers, which represents the prescription therapies believed to be a necessary part of a quality treatment program."

143.   Contrary to these lofty promises, Express Scripts not only imposes a higher dollar net cost on Ohio Plan Sponsors than their contracts require through stealthy unilateral renaming of Rebates received, but also systematically and secretly subjugates considerations of drug efficacy and patient well-being to the well-being of its own corporate bottom line.

*Express Scripts coerces non-PBM-affiliated Retail Pharmacies to agree to accept extremely low reimbursement rates and harsh, one-sided contract terms*

144.   Express Scripts' immense power in the pharmaceutical distribution system is evidenced equally clearly in its heavy-handed, take-it-or-leave-it contract negotiations with regional and local Retail Pharmacy chains and independents.  It wields the threat of exclusion from its pharmacy networks – and thus foreclosure from access to its pharmacy customers in the State of Ohio – to extract severely lop-sided contract terms from the Retail Pharmacies who need those customers in order to remain in business.

145.    As is the case with respect to its Rebate and fees negotiations with Manufacturers, Express Scripts uses opacity and confidentiality requirements to hide its anticompetitive practices towards Retail Pharmacies and to prevent market forces from working to correct this egregious imbalance.

146.    Express Scripts extracts these one-sided agreements from Retail Pharmacies for two purposes.  For those Retail Pharmacies that manage to remain in business on the scant margin that the Express Scripts contract terms allow, Express Scripts earns even greater revenue on each prescription filled there.  And for those Retail Pharmacies that end up shuttered because of these onerous contract terms, many of their customers are left no choice but to turn to Express Scripts' mail order pharmacy.  The Retail Pharmacy agreements, therefore, reinforce and amplify Express Scripts' already vast market power, reduce consumer choice, and restrain trade in Ohio Retail Pharmacy services markets.

147.    Express Scripts uses a three-pronged attack against Retail Pharmacies.  First, it under-reimburses Retail Pharmacies by coercing them into contracts with exceedingly low – often below-cost – reimbursement rates.  Second, Express Scripts imposes exorbitant and constantly-increasing administrative fees and other egregious contract terms upon them.  Third, it regularly imposes oppressive and often mysterious fees and adjustments that are assessed and "clawed back" weeks or months after the drug is dispensed to the consumer with little or no explanation or notice.

*Under-reimbursement*

148.    Express Scripts' position as a massive buyer prompts Ohio Retail Pharmacies to agree to reimbursement levels far lower than they would ever entertain in a competitive market.

36

149. Moreover, through the manipulation of generic drug rates – or MAC pricing – Retail Pharmacies are actually often dispensing drugs below cost.

150. The magnitude of Express Scripts' market power and the devastating effect of its practice of forcing Retail Pharmacies to swallow below-cost reimbursement rates was revealed with striking clarity in September 2022, when large national grocer and Retail Pharmacy chain The Kroger Co. announced its withdrawal from all Express Scripts networks for commercial customers effective December 31, 2022. Kroger's announcement explained that "[t]he Express Scripts contract would have required Kroger to fill our customers' prescriptions below our cost of operation…." Significantly, Kroger estimated that the loss of Express Scripts Covered Lives for the remainder of the fiscal fourth quarter – *only one month* – would reduce sales revenue by approximately $100 million.

151. Upon information and belief, Express Scripts is coordinating with Ascent to remove Kroger, as a PBM exclusively for its own employees, from being an Ascent customer in retaliation for Kroger withdrawing from Express Scripts networks.

152. While Kroger's position as one of the nation's largest grocery chains, with over 2,700 stores and more than $137 billion in revenue in 2021, allows it to survive the loss of $100 million in revenue in a single month in order to stand up to Express Scripts' onerous demands, there are few Retail Pharmacies that can do so.

153. Not only are the reimbursement rates that Express Scripts demands that Retail Pharmacies accept exceedingly low in the first instance, but the problem is compounded by Express Scripts' customary reservation of a contractual right to lower these rates even further – without notice – at its whim. For example, a 2019 rate amendment to a Retail Pharmacy's

Provider Agreement contains the following term: "ESI has the right to passively amend any portion or all of any rate exhibit with prior written notice."

*Fees, audits, and other onerous contract terms*

154.    The great imbalance in bargaining power in Express Scripts' favor also yields contracts with Retail Pharmacies that contain egregious fees and penalty provisions that the latter are powerless to reject due to the devastating consequences of losing access to Express Scripts' Covered Lives.

155.    Express Scripts demands that Retail Pharmacies agree to give it virtually unbridled audit rights.  It frequently audits the pharmacies in its networks with little or no notice, and often withholds significant funds on the basis of small, hyper-technical errors.

156.    Many of the fee and penalty provisions to which Express Scripts requires Retail Pharmacies to acquiesce are far too vague for the Retail Pharmacy to have any meaningful way of assessing the real costs and benefits of the provision.  But the Retail Pharmacies cannot push back and insist on more certainty, as Express Scripts' market power allows it the luxury of taking a take-it-or-leave-it stance.  For example, one 2015 Pharmacy Provider Agreement between Express Scripts and an Ohio Retail Pharmacy included this murky fee provision: "…for every transaction a Provider (or its Pharmacy(ies)) transmits to ESI, ESI shall charge such Provider a service fee of *up to an average of* $0.15 per transaction." (Emphasis added.)  By 2021, Express Scripts had not only maintained this vague and self-serving language, but had doubled the maximum charge to $0.30.

*Clawbacks*

157.    The third tactic Express Scripts uses to extract supracompetitive revenue from Retail Pharmacies and to steer more Covered Patients to its mail order pharmacy is known as a "Clawback."

158.    A Clawback occurs when a PBM demands the return of money that has been paid, or has been promised to be paid, to Retail Pharmacies after the point of sale to a Covered Patient (or "Adjudication").

159.    Express Scripts, using its bargaining leverage as one of the nation's largest PBMs, has been able to force Retail Pharmacies to turn over increasing Clawbacks, which further contribute to Express Scripts' bottom line.  At all relevant times addressed in this Complaint, it has regularly and frequently engaged in Clawbacks in its dealings with the Retail Pharmacies in its networks.  Express Scripts' Clawbacks generally take one of the following three forms.

160.    *Clawbacks attributed to a specific claim:*  Express Scripts pays or promises to pay a Retail Pharmacy an amount certain at Adjudication via a computer transaction that occurs when a Covered Patient appears at the pharmacy counter to pick up a prescription.  But on numerous occasions during the time period addressed in this Complaint and continuing to the present, Express Scripts reduces the amount to which the Retail Pharmacy is entitled for that particular adjudicated claim at some date after Adjudication, either by requiring a payment back from the Retail Pharmacy, or by reducing Express Scripts' next payment to the Retail Pharmacy.

161.    Clawbacks of specific claims often occur weeks or months after Adjudication and constitute a fee that cannot be determined at the time of Adjudication.

162.    *Clawbacks assessed on a lump-sum basis:*  On numerous occasions during the time period addressed in this complaint and continuing to the present, Express Scripts reduces

the amount to which a Retail Pharmacy is entitled to be paid for an aggregated set of prescriptions with a variety of assessed amounts and reasons comprising a lump-sum Clawback. The prescriptions, amounts, and reasons are not itemized or identified.

163.    Lump-sum Clawbacks often occur weeks or months after Adjudication and constitute a fee that cannot be determined at the time of Adjudication.

164.    *Clawbacks assessed pursuant to a BER or GER contract provision:*  Some Express Scripts contracts with Retail Pharmacies set reimbursement rates using BER (brand effective rate) or GER (generic effective rate) methodologies.  A BER provision dictates that claims for branded drug reimbursement from a pharmacy or a group of pharmacies will be reimbursed at an effective rate of Average Wholesale Price ("AWP") minus a stated percentage.

165.    At the end of the year, or at other regular intervals, Express Scripts examines whether the pharmacy or group of pharmacies have been underpaid or overpaid relative to the BER.  If the Retail Pharmacy or group of pharmacies has been reimbursed at an effective rate of AWP minus *less than* the stated percentage on brand drugs over the past year, it is deemed to have been overpaid and Express Scripts requires it to repay the difference between the amount it received and an aggregate payment of AWP minus the stated percentage in the contract.

166.    Express Scripts' GER provisions operate in the same manner for generic drugs.

167.    Agreements containing BER and GER provisions may make assessments on the basis of data aggregated from numerous Retail Pharmacies and numerous payor types.  For this reason, it is extremely difficult for an individual pharmacy or group of pharmacies to trace the effect of a particular provider, payor type, or claim on any amount that is ultimately clawed back by Express Scripts long after Adjudication of any of the individual claims that are rolled up into the BER or GER calculation.

168.     An Ohio statute, R.C. §3959.20 (the "Claims Statute"), prohibits a PBM from doing either of the following: (1) Retroactively adjusting "a pharmacy claim for reimbursement for a prescription drug unless the adjustment is the result of . . . (a) A pharmacy audit conducted in accordance with R.C. §§3901.811 to 3901.814 [or] (b) A technical billing error" (R.C. §3959.20 (C)(1)); or (2) Charging "a fee related to a claim unless the amount of the fee can be determined at the time of claim adjudication."  (R.C. §3959.20(C)(2)).

169.     All three of the types of Clawbacks employed by Express Scripts against Ohio Retail Pharmacies violate both subparts of the Claims Statute (R.C. §3959.20 (C)(1) and (C)(2)).

170.     Express Scripts' brazen use of Clawbacks, an unlawful means of extracting supracompetitive revenues from Ohio Retail Pharmacies, and driving some of them from the market entirely, in order to capture more Covered Lives for its mail order pharmacy business demonstrates that it believes its market power to be impenetrable, and reveals the lengths to which it will go to ensure that it remains so.

171.     As a direct result of Express Scripts' exercise of market power – its extreme market power over the purchase of pharmaceutical medications – Retail Pharmacies in Ohio are struggling to survive.  Many are exiting the market entirely, creating "pharmacy deserts" in the State where vulnerable populations – the poor, the elderly, the chronically or seriously ill – are deprived of reasonable access to a local pharmacy and the guidance of a local pharmacist.

172.     One Retail Pharmacy chain with 45 stores in Ohio has halted all plans to include pharmacies in its future Ohio locations in part because plummeting reimbursements and skyrocketing administrative fees have made the losses from its pharmacy operations simply too unprofitable to be viable.

173.    Express Scripts' ability to dictate price and terms to Retail Pharmacies and to change the rules of the game at its whim, along with the Retail Pharmacies' acquiescence to those often financially disastrous terms and actions, are striking evidence of Express Scripts' unbridled power.

*Express Scripts and its competitor Prime Therapeutics band together to form Ascent to preserve the scheme when Congress and media attention threaten to undermine it*

174.    In early 2019, Express Scripts sensed a threat to its chokehold on the pharmaceutical distribution and payment system, and hence to its rich revenue stream.  In January, the U.S. Department of Health and Human Services proposed a rule that would eliminate the safe harbor exemption from anti-kickback rules for post-point-of-sale Rebates for prescription drugs.  Moreover, at that time the Lower Health Care Costs Act was under debate in Congress.  That legislation included transparency language that further threatened Express Scripts' lucrative, opaque business model.

175.    Express Scripts actively and vehemently opposed these proposals, as its highly-profitable business model was in jeopardy.

176.    But in addition to lobbying against these proposed statutory and regulatory changes, Express Scripts scrambled to find a way to protect its revenue stream in the event such changes came to fruition.  In May 2019, it launched Ascent, a group purchasing organization ("GPO") that it hoped would shield the Rebate system from being upended by looming governmental action.  In order to further shield its activities, portions of Ascent's operations were moved to Switzerland.  In addition to sheltering Express Scripts from the fallout from possible PBM reform in Congress, Ascent served as another middleman inserted into the

already-complicated drug distribution process, making the negotiation and pass-through of Rebates even less transparent and harder for Plan Sponsors to audit.

177. Express Scripts soon realized Ascent's potential to magnify its pay-to-play revenue even more. It began talks with rival PBM Prime Therapeutics to join forces in a "three-year collaboration" that was announced on December 19, 2019. Prime Therapeutics joined Ascent's ownership at or about that time. The joint press release described the combination as enhancing "pharmaceutical manufacturer value" – in other words, the companies' combined Covered Lives would create increased clout that would intensify the pressure on Manufacturers to pay even greater Rebates or "value." Despite the original three-year term, the collaboration agreement contemplated that there would be multiple extensions, carrying the deal forward indefinitely.

178. Just one month before announcing that Prime Therapeutics joined Ascent's ownership, Express Scripts assigned its commercial rebate agreement with at least one major manufacturer to Ascent.

179. Express Scripts and Prime Therapeutics trumpeted their new alliance as an important step towards delivering "more affordable health care." But in reality, the alliance between these two competitors has further escalated out-of-pocket drug costs to many Ohioans, while Express Scripts and Prime Therapeutics reap the true benefits. It added roughly 28 million Covered Lives to Express Scripts' bargaining leverage, making Express Scripts' power in the marketplace even more formidable than before.

180. Ascent has played a key role in the Express Scripts/Prime Therapeutics arrangement from the outset. The terms of the collaboration provide that Rebate negotiations

with Manufacturers for drugs covered by a commercial Plan Sponsor's pharmacy benefit are handled jointly by Ascent.

181.    The practical function of Ascent is largely to help Express Scripts, Prime Therapeutics, and potentially other PBMs to consolidate their Rebate scheme and grant the PBMs even greater bargaining leverage, with the benefits flowing to the PBMs' bottom lines. This fact is perhaps best illustrated by the fact that the Ascent Rebate agreements contain substantially the same framework that Express Scripts so successfully utilized.

182.    First, Ascent is compensated through administrative fees and Rebates paid by Manufacturers that are calculated as a percent of List Price.

183.    Second, Rebate amounts depend upon a product's Formulary status, and Formulary eligibility and status depends upon a Manufacturer's Rebate bid.

184.    Third, Ascent protects its Rebates and margins by requiring Manufacturers to sign inflation agreements or provide inflation guarantees that ensure Ascent – and by extension, the PBMs – is shielded from rising prices.

185.    Fourth, Ascent requires parties to agree to broad confidentiality provisions that extend to wide categories of information, including the terms of the Rebate agreement and even the existence of the agreement itself.

186.    Having joined forces to increase their marketplace clout with both Manufacturers and Retail Pharmacies, Express Scripts and Prime Therapeutics saw an opportunity for even greater power.  Under their ownership and control, Ascent solicited other PBMs to become customers, further ratcheting their negotiating leverage upward by adding more and more Covered Lives.

187.    Through Ascent, Express Scripts and other PBMs can continue to obscure the fees contained in the black box by further complicating the web of relationships and adding additional layers to shield their behavior from customer and regulatory scrutiny.

*The Express Scripts-Prime Therapeutics alliance provides an effective price-fixing tool*

188.    After uniting under the Ascent banner, Express Scripts and Prime Therapeutics soon learned that increased leverage in the marketplace was not the only profitable by-product of the collaboration.  Ascent was, they realized, the perfect vehicle with which to harmonize and increase drug prices, Rebates, fees, and Retail Pharmacy reimbursements.  Eventually, certain Ascent customers – such as Defendant Humana Pharmacy Solutions – also participated in and benefited from this combination.

189.    In 2021, Prime Therapeutics President and CEO Ken Paulus, stated publicly in an interview with *Managed Healthcare Executive:* "We were 15% behind the marketplace on cost of goods sold, easily, maybe more.  So we needed a crystallizing event.  This [the formation of Ascent] definitely served as that event."  Moreover, Paulus made clear that the formation of Ascent allowed Prime Therapeutics to harmonize its prices and terms with those of its rival Express Scripts with respect to both Manufacturers and Retail Pharmacies, explaining: "Cost of goods sold is broken into two pieces.  It's the rebates in pharmacy and buying medications and its pharmacy dispensing and the networks, if you will.  We were off on both of those."

190.    Paulus's statements in that interview leave little doubt that a significant purpose of the collaboration with Express Scripts was to depress reimbursement rates paid to Retail Pharmacies and to increase the administrative fees charged to those pharmacies by Prime Therapeutics.  He stated that Prime Therapeutics was "…the highest paying retail pharmacy

network pharmacy payer in the marketplace.  We realized, wow, we probably need to sharpen our pencil there a little bit."

191.    The process of harmonizing and increasing prices and fees (and suppressing reimbursement rates) was not a one-time adjustment by Prime Therapeutics upon joining forces with its competitor.  On the contrary, Paulus described an ongoing process of harmonizing prices and terms between the competitors that has continued after the "crystallizing event," saying: "Again, it's not that we're sitting down and strategizing with [Express Scripts], but we are taking advantage of alignment when it occurs, opportunistically."  Clearly, the creation of Ascent has allowed these two rivals and other competitors to "align" their prices and terms with ease, eliminating competition between them, without the need for lengthy strategy sessions or exchanges of price lists.

*Harm*

192.    Express Scripts exercises its power to restrain and prevent competition for PBM services and Retail Pharmacy services, thus harming Ohio's uninsured, underinsured, and those whose co-pays are calculated based upon a percentage of List Prices of the prescription drugs they purchase. This harm comes in the form of higher out-of-pocket prices for these drugs. As of 2019, roughly 30% of Americans who had prescription drug coverage through their employers were enrolled in high-deductible health plans (HDHP), which (according to the IRS definition) carry with them an annual deductible of at least $1,400 for an individual or at least $2,800 for a family, a heavy burden for employees who likely enrolled in HDHPs mainly for the purpose of making their premiums more affordable.

193.    The collusive conduct of Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent described herein has denied Ohio's

uninsured, underinsured, and those whose co-pays are calculated based upon a percentage of List Prices of the prescription drugs they purchase, the benefits of free and unrestricted competition in the marketplace by suppressing the information and transparency that would allow meaningful comparisons among competing PBMs, and by forming and carrying out agreements with Manufacturers that have the purpose and effect of fixing and increasing the out-of-pocket prices these individuals must pay for their prescription drugs, and denying these individuals access to the most efficacious and best-in-class medications.

194. The collusive conduct of Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent described herein has denied Ohio Plan Sponsors the benefits of free and unrestricted competition in the marketplace by suppressing the information and transparency that would allow meaningful comparisons among competing PBMs, and by forming and carrying out agreements with Manufacturers that have the purpose and effect of fixing and increasing the quality-adjusted prices paid by Plan Sponsors.

195. Higher out-of-pocket obligations create serious risks to the health of Ohio's uninsured, underinsured, and those whose co-pays are calculated based upon a percentage of List Prices of the prescription drugs they purchase. As out-of-pocket obligations increase, adherence to medication routines often decreases, including non-compliance or drug rationing. Studies show that if out-of-pocket obligations increase by $50.00, patients are four times more likely to stop taking their medication completely. Ohioans have, therefore, suffered significant physical harm – even death – as a result of Defendants' conduct described herein.

196. Express Scripts' exercise of its market power and the collusive conduct of Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent involving Formulary exclusions and the pay-to-play system of which they are a part

at times lead to non-medical switching – the change from a patient's originally prescribed drug to another medication for reasons other than efficacy.  In some cases, patients who are stable and responding favorably on a prescribed drug cannot be switched to an alternative drug without negative health consequences.  While patients can, in theory, get coverage for excluded drugs, Defendants generally require prior authorization – a lengthy and difficult process that the sickest and most vulnerable Ohio patients find difficult or impossible to endure.  Thus, Defendants' conduct described herein has caused physical harm to such individuals.

197.  Express Scripts' exercise of its market power and the collusive conduct of Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent involving the pay-to-play system and the denial of favorable Formulary tier placement to more efficacious, safer, more innovative, or more cost-effective drugs at times leads to patients being denied the benefits of the best drug for their health and well-being.

198.  Express Scripts' exercise of its market power, and the collusive conduct of Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent have caused harm to competitive pharmaceutical markets in Ohio by destroying transparency and eliminating the proper flow of information needed for markets to operate an allocate resources efficiently.

199.  Express Scripts' exercise of its market power has harmed competitive pharmaceutical markets in Ohio by causing a drastic loss of independent and small regional pharmacies in the state, reducing consumer choice and creating significant hardships to those Ohioans in rural communities where the only pharmacy within a reasonable distance was an independent driven out of the market by Express Scripts' oppressive and abusive exercises of power.

200.    For example, Kaiser Health News recently reported:

"In 2018, Novo Nordisk, amid public rancor over rising insulin prices, considered a 50% cut, according to the report.  But the company's board decided against it, noting that 'many in the supply chain will be negatively affected ($) and may retaliate.' The company also feared that irate insurers might retaliate against Novo's blockbuster diabetes and weight-loss drugs like Ozempic, which compete against Lilly's Mouniaro."  (*Why Does Insulin Cost So Much? Big Pharma Isn't the Only Player Driving Prices*, Mar. 9, 2023, available at https://khn.org/news/article/insulin-costs-pharmacy-benefit-managers-drug-manufacturers/)

201.    Express Scripts' powerful position at or near the top of this highly-concentrated market and its anticompetitive acts and agreements – solely and in combination with its co-Defendants – have not only inflicted the forgoing harms on Ohio and its markets, but they have also allowed it to reap supracompetitive profits.  Its gross profit on an adjusted prescription averaged $4.16 in 2012, and $6.68 in 2015, an increase of roughly 62% in just three years following the Medco merger and the institution of the new Master Agreement with Manufacturers.  Its gross profits skyrocketed from $3.2 billion in 2011 (the year before the Medco merger and the start of the new Master Agreement) to $8.4 billion in 2015.  The other Defendants have similarly enjoyed supracompetitive process due to the above-referenced combination.

202.    Defendants' actions as described in this Complaint are continuous and inflict continuing and accumulating harm.

## CAUSES OF ACTION

### Count I
### Combination by Express Scripts, Cigna, and Evernorth
### to fix prices for prescription drugs in violation of the Valentine Act

203.    Plaintiff incorporates by reference each and every allegation contained the above

Paragraphs as if fully set forth herein.

204.    Plaintiff brings this action pursuant to Sections 109.81, 1331.01, 1331.03, 1331.04,

1331.06, and 1331.11 of the Ohio Revised Code and the common law of Ohio for equitable and

injunctive relief.

205.    The Defendants Express Scripts, Cigna, and Evernorth have engaged in a

combination of capital, skill, or acts to create or carry out restrictions in trade or commerce or to fix

and raise prices of numerous drugs, including but not limited to insulin.

206.    This combination had the purpose of creating or carrying out restrictions in trade or

commerce and establishing the List Price of such drugs so as to preclude free competition in the sale

of these drugs.

207.    This combination constitutes an unlawful trust under Ohio's Valentine Act, R.C.

Section 1331.01(C)(1)(a), (d) and (e).

208.    This combination constitutes a conspiracy against trade under R.C. Section 1331.04

and thus is illegal.

209.    Ohio purchasers of drugs who are uninsured, under-insured, or have co-pays or

deductibles calculated on the basis of List Price of the prescribed drugs have been injured because

of the supracompetitive prices of drugs set by this combination.

210.    Defendants Express Scripts, Cigna, and Evernorth have realized and enjoyed ill-

gotten gains as a direct result of the increased Rebates the Manufacturers are required to pay under

agreements with Defendant Express Scripts, resulting in supracompetitive List Prices, and as a further direct result of Defendant Express Scripts' deceptive tactics in mischaracterizing Rebates received in order to avoid passing those Rebates on to Ohio Plan Sponsors.

211.    Defendant Express Scripts' agreements that are the result of an illegal trust are void pursuant to R.C. §1331.06.

212.    Defendants Express Scripts, Cigna, and Evernorth have engaged in one or more overt acts in furtherance of the combination alleged herein.

213.    Such conduct will likely continue or recur in the absence of appropriate injunctive relief.

## Count II
## Combination by Defendant Prime Therapeutics to fix prices for prescription drugs in violation of the Valentine Act

214.    Plaintiff incorporates by reference each and every allegation contained in the above Paragraphs as if fully set forth herein.

215.    Plaintiff brings this action pursuant to Sections 109.81, 1331.01, 1331.03, 1331.04, 1331.06, and 1331.11 of the Ohio Revised Code and the common law of Ohio for equitable and injunctive relief.

216.    Defendant Prime Therapeutics has entered into, maintained, and acted in accordance with a combination of capital, skill, or acts to create or carry out restrictions in trade or commerce or fix and raise prices of numerous drugs, including but not limited to insulin.

217.    Defendant Prime Therapeutics' combination had the purpose of establishing the List Price of such drugs so as to preclude free competition in the sale of these drugs.

218.    Defendant Prime Therapeutics' combination constitutes an unlawful trust under Ohio's Valentine Act, R.C. Section 1331.01(C)(1)(a), (d) and (e).

219. Defendant Prime Therapeutics' combination constitutes a conspiracy against trade under R.C. Section 1331.04 and thus is illegal.

220. Ohio purchasers of drugs who are uninsured, under-insured, or have co-pays or deductibles calculated on the basis of List Price of the prescribed drugs have been injured because of the supracompetitive prices of drugs set by Defendant Prime Therapeutics' combination.

221. Defendant Prime Therapeutics has realized and enjoyed ill-gotten gains as a direct result of the increased Rebates the Manufacturers are required to pay under agreements with Defendant Prime Therapeutics, resulting in supracompetitive list prices, and as a further direct result of Defendant Prime Therapeutics' deceptive tactics in mischaracterizing Rebates received in order to avoid passing those Rebates on to Ohio Plan Sponsors.

222. Defendant Prime Therapeutics' agreements that are the result of an illegal trust are void pursuant to R.C. §1331.06.

223. Defendant Prime Therapeutics has engaged in one or more overt acts in furtherance of the conspiracy alleged herein.

224. Such conduct will likely continue or recur in the absence of appropriate injunctive relief.

**Count III**
**Unlawful combination among Express Scripts, Prime Therapeutics, Humana Pharmacy Solutions, Humana, and Ascent to increase the price of prescription drugs, to place the management and control of such combination in the hands of a trustee, and to preclude free and unrestricted competition among themselves in violation of the Valentine Act**

225. Plaintiff incorporates by reference each and every allegation contained in the above Paragraphs as if fully set forth herein.

226.     Plaintiff brings this action pursuant to Sections 1331.01, 1331.02, 1331.03, 1331.04, 1331.06, and 1331.11 of the Ohio Revised Code and the common law of Ohio for equitable and injunctive relief.

227.     Beginning at least as early as December 2019 and continuing in some cases through the present, the Defendants Express Scripts, Prime Therapeutics, Humana Pharmacy Solutions, Humana, and Ascent have engaged in a combination of capital, skill, or acts to create or carry out restrictions in trade or commerce or to fix, harmonize, and raise prices of numerous drugs, including but not limited to insulin.

228.     Defendants' combinations had the purpose of creating or carrying out restrictions in trade or commerce for the purpose of establishing the List Price of such drugs so as to preclude free competition in the sale of these drugs.

229.     Defendants' combinations constitute unlawful trusts under Ohio's Valentine Act, R.C. Section 1331.01(C)(1)(d), (e), and (f).

230.     Defendants' combinations have the purpose and effect of placing the management and control of their trusts, and the products and services controlled by them, in the hands of a trustee – Defendant Ascent – with the intent of restraining trade, fixing the price of drugs and diminishing the output of retail pharmacy services, in violation of R.C. Section 1331.02.

231.     Defendants' combination also is established for the purpose of excluding from their Formularies the drugs of Manufacturers that refuse to increase the Rebates, fees or "value" paid to Defendants, and to increase the List Prices of their drugs, thus violating R.C. Section 1331.01(C)(1)(f).

232.     Defendant Ascent is a foreign corporate entity under R.C. Section 1331.01(C)(1)(f).

233. Defendants' combinations constitute conspiracies against trade under R.C. Section 1331.04 and thus are illegal.

234. Ohio purchasers of these drugs who are uninsured, under-insured, or have co-pays or deductibles calculated on the basis of List Price of the prescribed drugs have been injured because of the supracompetitive prices of these drugs set by Defendants' agreements.

235. Defendants have realized and enjoyed ill-gotten gains as a direct result of the increased Rebates, fees, or "value" the Manufacturers are required to pay under agreements with Defendants, resulting in supracompetitive List Prices, and as a further direct result of Defendants' deceptive tactics in mischaracterizing Rebates received in order to avoid passing those Rebates on to Ohio Plan Sponsors.

236. Defendants' agreements that are the result of an illegal trust are void pursuant to R.C. §1331.06.

237. Defendants have engaged in one or more overt acts in furtherance of the conspiracy alleged herein.

238. Such conduct will likely continue or recur in the absence of appropriate injunctive relief.

### COUNT IV
### Deceptive Acts by Express Scripts
### in violation of the Deceptive Trade Practices Act

239. Plaintiff incorporates by reference each and every allegation contained in the above Paragraphs as if fully set forth herein.

240. Defendant Express Scripts, at all times relevant to this action, is and was a "person" as defined by R.C. 4165.01(D).

241. The State of Ohio and its public entities, including all public entities that offer employee benefit plans that include prescription drug benefits, are "persons" as defined by R.C. 4165.01(D).

242. Defendant Express Scripts has knowingly and willfully made repeated misrepresentations to Ohio Plan Sponsors regarding the characteristics and benefits of the PBM Services that it sold to such Ohio Plan Sponsors.

243. On information and belief, Defendant Express Scripts has knowingly and willfully made repeated misrepresentations to Ohio Plan Sponsors regarding the quality of the PBM Services that it sold to such Ohio Plan Sponsors.

244. On information and belief, Defendant Express Scripts has knowingly and willfully made false statements of fact to Ohio Plan Sponsors concerning the reasons for, existence of, or amounts of price reductions it was securing on behalf of, and passing on to, Ohio Plan Sponsors.

245. Defendant Express Scripts' misrepresentations and misleading statements constitute deceptive trade practices which are in violation of R.C. 4165.02.

246. The Attorney General has standing to bring this action in his capacity as *parens patriae* to enjoin and remedy the wrongful and deceptive acts described herein that have been perpetrated upon Ohio Plan Sponsors that have resulted in harm to the State's general economy and to a substantial segment of its natural person residents.

247. Unless enjoined, Defendant Express Scripts is likely to continue to commit the wrongful and deceptive acts described herein against Ohio Plan Sponsors, and such acts will likely continue to result in harm to the State's general economy and to a substantial segment of its natural person residents.

**Count V**
**Declaratory Judgment and Injunctive Relief**

248.     Plaintiff incorporates by reference each and every allegation contained in the above Paragraphs as if fully set forth herein.

249.     As alleged in detail in this Complaint, Defendant Express Scripts regularly and systematically adjusts pharmacy claims for reimbursement for prescription drugs retroactively under circumstances other than a pharmacy audit conducted in accordance with R.C. §§ 3901.811-3901.814 or a technical billing error.

250.     As alleged in detail in this Complaint, Defendant Express Scripts regularly and systematically charges fees related to pharmacy claims in a manner in which the amount of the fee cannot be determined at the time of the claim adjudication.

251.     The Attorney General is entitled to a declaration that such retroactive adjustments and fees constitute violations of R.C. §3959.20(C)(1) and (2).

252.     Defendant Express Scripts should be permanently enjoined from obtaining illegal Clawbacks in violation of Ohio law.

253.     Declaratory relief from this Court will resolve these controversies and limit the uncertainties created by Defendant's actions.

**Count VI**
**Unjust Enrichment**

254.     Plaintiff incorporates by reference each and every allegation contained in the above Paragraphs as if fully set forth herein.

255.     As a result of the conduct described in this Complaint, Defendants Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent have received certain funds to which they were not entitled.

256.     By their acts described in this Complaint, Defendants Ascent, Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, and Humana have been unjustly enriched at the expense of uninsured and underinsured consumers in the State of Ohio, as well as at the expense of Ohio consumers whose out-of-pocket expenditures for prescription drugs are calculated on the basis of Manufacturers' List Prices, under circumstances dictating that, in equity and good conscience, the money should be returned to such consumers.

**Count VII**
**Civil Conspiracy**

257.     Plaintiff incorporates by reference each and every allegation contained in the above Paragraphs as if fully set forth herein.

258.     The conduct described in this complaint, engaged in in concert by Defendants Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent, constitutes a malicious combination and conspiracy with the purpose and effect of injuring uninsured and underinsured consumers in the State of Ohio, as well Ohio consumers whose out-of-pocket expenditures for prescription drugs are calculated on the basis of Manufacturers' List Prices.

259.     Defendants have engaged in one or more overt acts in furtherance of the conspiracy alleged herein.

260.     Such conduct will likely continue or recur in the absence of appropriate injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff State of Ohio prays as follows:

A.     That the Court adjudge that the combinations and agreements engaged in by and among Defendants to raise the List Price of prescription drugs in exchange for preferred Formulary

placement constitute unlawful combinations or conspiracies in unreasonable restraint of trade in violation of the Valentine Act, R.C. 1331.01 and 1331.04;

B.      That the Court adjudge that the combinations and agreements engaged in by and among Defendants and their co-conspirators to constitute an unlawful combination or conspiracy in violation of the Valentine Act, R.C. 1331.01 and 1331.04;

C.      That the Court adjudge that Defendant Express Scripts has willfully engaged in a trade practice listed in division (A) of R.C. 4165.02 knowing it to be deceptive;

D.      That the Court enter a declaratory judgment finding that Express Scripts' practice of extracting Clawbacks from pharmacies violates R.C. §3959.20(C)(1) and (2);

E.      For an award of attorneys' fees, costs, and interest as permitted by law;

F.      That the Court enter a permanent injunction in such form that the Court deems just and proper and reasonably necessary for the purpose of restraining Defendants and anyone acting in concert with them from further violating the Valentine Act, R.C. 1331.01 *et seq.*;

G.      For a permanent injunction restraining Defendant Ascent from:  Communicating or agreeing to communicate competitively sensitive information of any PBM to a competing PBM unless such information is: (a) greater than three months old, (b) is communicated to the competitor(s) in a manner that does not identify the party conveying the information, and (c) is aggregated or summary information;

H.      For an order requiring Defendant Express Scripts to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were in effect;

I.      For an order requiring Defendant Prime Therapeutics to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were

in effect;

J.      For an order requiring Defendant Cigna to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were in effect;

K.      For an order requiring Defendant Evernorth to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were in effect;

L.      For an order requiring Defendant Humana Pharmacy Solutions to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were in effect;

M.      For an order requiring Defendant Humana to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were in effect;

N.      For an order requiring Defendant Ascent to forfeit to the State, pursuant to R.C. §1331.03, the sum of $500 per day for each day that the combinations described herein were in effect;

O.      For an Order requiring each Defendant to disgorge all ill-gotten proceeds said Defendant derived from engaging in the unlawful conspiracies against trade described in this Complaint; and

P.      Such other relief as the Court may deem appropriate.

Dated: March 27, 2023

Respectfully Submitted,
DAVE YOST
Ohio Attorney General (0056290)
SHAWN BUSKEN (0083585)
Deputy First Assistant Attorney General

   /s/Charles M. Miller
CHARLES MILLER (0073844)
Deputy Attorney General for Major Litigation
   (Trial Attorney)
JENNIFER L. PRATT (0038916)
Director of Major Litigation
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Telephone: (614) 752-8237
Fax: (614) 466-5087
Charles.Miller@OhioAGO.gov
Jennifer.Pratt@OhioAGO.gov

Beth A. Finnerty (0055383)
Section Chief, Antitrust Section
Edward J. Olszewski (0082655)
Principal Assistant Attorney General, Antirust
Section
Jason W. Palmer (0088336)
Senior Assistant Attorney General,
Antitrust Section
30 East Broad Street, 26th Floor
Columbus, Ohio
Telephone; (614) 466-4328
Fax: (614) 995-0266
Beth.Finnerty@OhioAGO.gov
Edward.Olszewski@OhioAGO.gov
Jason.Palmer@OhioAGO.gov


*Counsel for the State of Ohio, ex rel., Attorney
General Dave Yost*