UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| STATE OF OHIO, ex rel. DAVE YOST ATTORNEY GENERAL OF OHIO;<br><br>*Plaintiff,*<br><br>v.<br><br>ASCENT HEALTH SERVICES LLC, *et al.,*<br><br>*Defendants*. | Case No. 2:23-cv-01450-MHW-CMV<br><br>Judge Michael H. Watson<br><br>Magistrate Judge Chelsey M. Vascura |

## DEFENDANTS HUMANA INC. AND HUMANA PHARMACY SOLUTIONS, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendants Humana Inc. and Humana Pharmacy Solutions, Inc. ("HPS") (together, "the Humana defendants") respectfully move to dismiss the Complaint filed by Plaintiff State of Ohio, *ex rel*. Dave Yost, Attorney General of Ohio ("the State") under Fed. R. Civ. P. 12(b)(6).[1] A memorandum in support accompanies this motion.

Respectfully submitted,

*/s/ Sommer L. Sheely*
Shawn R. Johnson (*pro hac vice*)
Justin D. Kingsolver (*pro hac vice*)
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
(202) 624-2500
srjohnson@crowell.com
jkingsolver@crowell.com

Jason C. Murray (*pro hac vice*)
**CROWELL & MORING LLP**
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 622-4750
jmurray@crowell.com

---

[1] Pursuant to an agreement between the State and all Defendants, the Humana defendants separately filed their motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) on June 2, 2023. ECF No. 41.

1

Anne Marie Sferra (0030855)
Sommer L. Sheely (0076071) (Trial Attorney)
**BRICKER GRAYDON LLP**
100 South Third Street
Columbus, OH 43215
(614) 227-2300
asferra@brickergraydon.com
ssheely@brickergraydon.com

*Counsel for Defendants Humana Inc. and Humana Pharmacy Solutions, Inc.*

**MEMORANDUM IN SUPPORT OF THE HUMANA DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

## INTRODUCTION

The State's Complaint against Humana Inc. and HPS should be dismissed on standing grounds and for failure to state a claim under any section of Ohio's Valentine Act ("Act") and for unjust enrichment. First, the State seeks monetary relief on behalf of a class of persons for whom no such right exists under the Act: indirect purchasers of prescription drugs whose alleged injuries have been passed down from drug manufacturers and retail pharmacies in the form of higher insurance premiums, co-pays, and out-of-pocket costs. Complaint ("Compl."), ECF No. 12, at PageID 1359. Ohio has exercised its discretion to follow the rule established by the United States Supreme Court in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977) that only direct purchasers have standing to recover damages for antitrust violations. *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 10 (limiting standing to bring an antitrust claim to "the injured party—the retailer who contracted directly with the manufacturer and paid the overcharge."). While the State brings this action pursuant to its *parens patriae* authority, when indirect purchasers are denied standing under antitrust law, the state is also denied standing to obtain monetary relief in a *parens patriae* suit. *Cf. Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 218 (1990) (rejecting argument that federal antitrust law "authoriz[es] [state attorneys general] to sue on behalf of consumers even though the consumers, as indirect purchasers, have no cause of action of their own.").

Second, even if the State had standing here, the Complaint falls woefully short of plausibly alleging that Humana violated the law. The Complaint lacks any allegations to support its quasi-contractual unjust enrichment theory, and its allegations of anticompetitive conduct comprise a few scattered allusions to HPS, none of which support the State's claims that HPS created a trust

1

with co-Defendants to harmonize drug pricing and placed management of that trust in the hands of Ascent. Compl., ECF No. 12, at PageID 1350, 1358. Instead, the State's threadbare claims against HPS are wholly predicated on its allegation that HPS has been an Ascent customer, and therefore *potentially* able to align "pricing, discount, rebate, and negotiations" with its pharmacy benefit manager ("PBM") competitors. *Id.* at PageID 1315. Its claims against Humana Inc. are even thinner: an incorrect statement that Humana Inc. is a customer of Ascent (*see id.* and Declaration of Justin Kingsolver ("Kingsolver Decl."), ECF No. 41-1, at PageID 1508-9); and (2) conclusory statements about "collusive conduct" in which Humana Inc. was allegedly involved (*see* Compl., ECF No. 12, at PageID 1351-53).

To allow the State's claims against HPS and Humana Inc. to survive this motion would treat naked allegations of conspiratorial conduct predicated solely on the existence of a customer relationship as actionable under antitrust law. This outcome would turn *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) on its head. The Court should decline the State's invitation to do so, and dismiss the State's Complaint against the Humana defendants.

## FACTS[2]

Across 60 pages containing 260 allegations, fewer than 5 allege any anticompetitive conduct with respect to the Humana defendants—mere extras in a movie featuring other PBMs and their group purchasing organization ("GPO"), Ascent Health Services LLC ("Ascent"). The Complaint alleges that Express Scripts created Ascent in 2019 and subsequently invited Prime Therapeutics ("Prime") to join forces by taking an equity stake in Ascent. Compl., ECF No. 12, at PageID 1347-48.

---

[2] Additional relevant procedural history and factual background can be found in the Humana defendants' Motion to Dismiss for Lack of Jurisdiction. *See* ECF No. 41, at PageID 1499-1501.

2

Allegations about Express Scripts and Prime dominate the Complaint. HPS is an afterthought. The State's only substantive allegation as to HPS is that HPS is a "customer" of Ascent pursuant to a contract executed years after Ascent was formed. *Id.* at PageID 1319. From there, the remainder of the State's allegations as to HPS are a few vague, repetitive, and conclusory allegations that Ascent provided a "vehicle" for Express Scripts, Prime, and Ascent's customers, including HPS, to "aggregate and access each other's pricing, discount, rebate, and negotiations information," (*id.* at PageID 1315), as well as similarly vague claims that Humana "participated in and benefited from" the creation of Ascent by virtue of being a customer, *id.* at PageID 1309-10, 1315, 1350.

How HPS allegedly colluded with Express Scripts and Prime through Ascent, and how HPS benefited from this alleged collusion, is conveniently missing from the State's Complaint. Nowhere does the State describe HPS's alleged involvement in any conspiracy with Express Scripts and Prime. The Complaint is devoid of any facts suggesting that HPS, for example: (1) negotiated with drug manufacturers over rebates and fees, (2) imposed onerous reimbursement conditions on Retail Pharmacies, (3) discussed or even shared drug pricing information with Express Scripts and Prime, or (4) more generally aligned any of its PBM practices with any competitor to engage in any form of collusive activity. Notably, while the Complaint alleges that HPS is Ascent's customer, the Complaint lacks any allegations that HPS had any awareness of any such practices—let alone has conspired or coordinated in them. These factual allegations, which are all missing from the Complaint, are crucial to stating an antitrust conspiracy claim.

3

# ARGUMENT

## I. The State Lacks Standing to Seek Monetary Relief on Behalf of Indirect Purchasers.

The State brings this action against the Humana defendants pursuant to its *parens patriae* authority and on behalf of "Ohio purchasers" of drugs who allegedly paid supracompetitive prices for prescription drugs due to Ascent's alleged anticompetitive conduct. *Id.* at PageID 1359; *see also* Ohio Rev. Code Ann. ("R.C.") § 109.81 (defining the State's *parens patriae* authority in relation to "natural persons" only). While the State alleges that it seeks "to prevent and restrain violations of Ohio Revised Code §§ 1331.01, *et seq*" of the Valentine Act," (*id.* at PageID 1316), tucked in its claim for injunctive relief is an inchoate request that the Court also disgorge Humana of "ill-gotten gains" arising from "increased Rebates, fees, or 'value' the Manufacturers are required to pay under agreements with Defendants, resulting in supracompetitive List Prices" that are allegedly passed on to Ohio citizens. *Id.* at PageID 1359; *see also* Count VI—Unjust Enrichment, *id.* at PageID 1361-62.

But indirect purchasers cannot seek monetary relief under Ohio's Valentine Act, and the State's *parens patriae* authority is not an antidote for their lack of standing.

### A. The State's *Parens Patriae* Authority Cannot Circumvent the *Illinois Brick* Direct Purchaser Rule.

Indirect purchasers do not have recourse under the Valentine Act. *See, e.g.*, *Johnson*, 106 Ohio St.3d at 285, 834 N.E.2d 798, ¶ 15 ("[A]n indirect purchaser of goods may not assert a Valentine Act claim for alleged violations of Ohio antitrust law."); *Aladdins Lights Inc. v. Eye Lighting Int'l*, 2017-Ohio-7229, 96 N.E.3d 864, ¶ 14 (9th Dist.) (same). In *Johnson*, the Ohio Supreme Court held that the Valentine Act adhered to the *Illinois Brick* rule barring recovery by indirect purchasers under Section 4 of the Clayton Act. *See* 106 Ohio.St.3d at 284, 834 N.E.2d at

4

798, ¶ 15. The *Johnson* Court reasoned that because "Ohio has long followed federal law in interpreting the Valentine Act," and in light of the similarities between Section 4 of the Clayton Act and R.C. 1331.08, which governs the status of those who may bring a state-law antitrust action, *Illinois Brick*'s direct purchaser requirement applied to the Valentine Act. *Id.* at 795, ¶ 8; *see also Aladdins Lights*, 96 N.E.3d at 868, ¶ 14.

Because the Valentine Act is coextensive with federal antitrust law, the *Johnson* Court noted that relief for indirect purchasers in the wake of *Illinois Brick* could only occur if the Ohio legislature passed a law that provided standing to indirect purchasers. *Johnson*, 106 Ohio St.3d at 284, 834 N.E.2d at 798, ¶ 15 (observing that "the overwhelming majority of states that have addressed the issue of whether indirect purchasers may assert state antitrust claims have done so through legislative enactments, *i.e.*, statutes explicitly rejecting *Illinois Brick*, rather than judicial declaration."). While "the Ohio General Assembly ha[d] amended the Valentine Act several times since the announcement of the *Illinois Brick* decision, including several changes specifically designed to bring the Act into conformity with federal antitrust statutes . . . [it] ha[d] never amended the law with respect to the *Illinois Brick* direct-purchaser requirement." *Id.* at 797, ¶ 12. The Court held that this "inaction" on behalf of the General Assembly represented "legislative satisfaction with the direction taken by this court in signaling our intent to follow federal law." *Id.* Since the *Johnson* decision in 2005, the Ohio legislature's "inaction" has continued. While most states have adopted *Illinois Brick* repealer statutes, Ohio has not. *See, e.g.*, *Aladdins Lights*, 96 N.E.3d at 868, ¶ 14 ("In sum, an indirect purchaser of goods may not assert a Valentine Act claim for alleged violations of Ohio antitrust law" (internal quotation marks and citation omitted)).

Nor does the State of Ohio vest its attorney general with unique statutory power to bring state antitrust claims on behalf of indirect purchasers. *See Johnson v. Microsoft Corp.*, 155 Ohio

5

App.3d 626, 632-33, 2003-Ohio-7153, 802 N.E.2d 712, ¶ 10-11.  Section 109.81 of the Ohio Revised Code provides that the State attorney general may act "as *parens patriae*, for any natural person residing in the state" and "shall do all things necessary *under the laws of any state or the federal government* . . . including the bringing of an action for equitable relief or for the recovery of damages."  R.C. § 109.81 (emphasis added).  The statute's plain language prevents the State attorney general from deviating from *Illinois Brick* and pursuing recovery for indirect injuries.

Federal antitrust law further makes clear that the State's *parens patriae* power in enforcing the Valentine Act is not more expansive than the rights of natural persons suing as private plaintiffs.  In *Illinois Brick* itself, the U.S. Supreme Court rejected the claim that state attorneys general could sue as *parens patriae* on behalf of indirect purchasers for damages under Section 4.  *See Illinois Brick,* 431 U.S. at 735 n. 14.  As the Court noted, the state attorney general's *parens patriae* authority acts as an alternative vehicle for enforcing "existing rights" – and not as a means for "increas[ing] any defendant's liability."  *Id.*  The Court reiterated this position in *Kansas v. UtiliCorp United, Inc.*, noting that "Section 4 . . . affords relief only to a person 'injured in his business or property by reason of anything forbidden in the antitrust laws" and that state attorneys general may only "bring actions on behalf of consumers *who have such an injury*."  *Kansas,* 497 U.S. at 219 (citations omitted and emphasis added).  In other words, the scope of the State attorney general's enforcement authority aligns with the scope of rights held by private litigants under federal antitrust law.  Nor may the State maintain *parens patriae* standing based solely on injury to its general economy.  *Cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) (stating that "injury to a state's total economy, for which the state sought redress in its *parens patriae* capacity, was not cognizable under § 4").

6

Therefore, since the Valentine Act cannot conflict with the *Illinois Brick* rule, the State must assert claims on behalf of a *direct* purchaser even to exercise its *parens patriae* authority under R.C. 109.81. But the State asserts no such claim, and instead pleads two theories of harm that are archetypal *indirect* injuries. First, the State claims that Ascent coerces drug manufacturers to change their pricing models by successfully threatening unfavorable placement on formularies, thereby leading to higher List Prices of drugs, which the State claims indirectly harms Ohio citizens in the form of inflated insurance co-pays, premiums, and out-of-pocket costs. *See* Compl., ECF No. 12, at PageID 1349. Second, the State claims that Ascent has harmed Retail Pharmacies by "depress[ing] reimbursement rates" and increasing "administrative fees," leading Retail Pharmacies to shutter their businesses, which indirectly harms Ohio citizens who rely on such pharmacies for prescription coverage. *Id*. at PageID 1350-51. Here, too, the State's antitrust allegations conjure the same "intractable problem of tracing and apportioning damages between different purchasers in the chain of distribution" that led the U.S. Supreme Court in *Illinois Brick* to "enunciate a bright-line rule that only the purchaser immediately downstream" may bring an antitrust action. *Aladdins Lights*, 96 N.E.3d at 868, ¶ 14.

*Illinois Brick*'s direct purchaser requirement applies to the State's *parens patriae* power, as U.S. Supreme Court caselaw makes clear. Therefore, the State lacks standing to bring any claims under its *parens patriae* authority for what the State calls "ill-gotten gains" on behalf of Ohio consumers. Compl., ECF No. 12, at PageID 1359.

## II.     The State Fails to Plead Any Plausible Valentine Act Claim against the Humana Defendants.

Even if the State had standing to pursue its antitrust claims under the Valentine Act, it has failed to plausibly plead such a claim as required by *Twombly*. The sections of the Valentine Act under which the State seeks to recover invariably require proof of a conspiracy and a combination

7

in restraint of trade through the creation of a "trust," and placing the "management and control" of that "trust" in the hands of a "trustee" (here, Ascent). *See* Compl., ECF No. 12, at PageID 1358 (citing R.C. 1331.01(C)(1)(d-f) and 1331.02). Yet the State's threadbare allegations against Humana come nowhere close to stating a plausible claim for relief under that section (or any other section of the Valentine Act). Indeed, the Complaint lacks a *single* factual allegation to support its claim that HPS conspired with its co-Defendants with the "intent of restraining trade, fixing the price of drugs and diminishing the output of retail pharmacy services" in violation of state antitrust law. *Id.*; *see also Johnson v. Chambers-Smith*, No. 22-CV-4179, 2023 WL 2555446, at *25 (S.D. Ohio Mar. 17, 2023) ("[S]imply labelling behavior as a conspiracy is not enough."). At most, the Complaint constructs a "guilt by association" antitrust theory predicated on HPS status as Ascent's customer.

When determining whether parties have sufficiently pled an agreement or conspiracy in restraint of trade under the Valentine Act, courts look to interpretations of its federal counterpart, the Sherman Act, which likewise "prohibits agreements that unreasonably restrain trade by restricting production, raising prices, or otherwise manipulating markets to the detriment of consumers." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015)*; see Johnson v. Microsoft Corp.*, 156 Ohio App.3d 249, 251, 2004-Ohio-761, 805 N.E.2d 179, ¶ 5 (stating that "the Valentine Act is 'patterned' after the Sherman Antitrust Act and as a consequence this court has interpreted the statutory language in light of federal judicial construction of the Sherman Act[]" (citation omitted)); *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012) (same). To plausibly plead a claim under the analogous section of the Sherman Act, the State must sufficiently allege that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite*

8

*Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks and citation omitted). Without plausible, non-conclusory allegations of "a unity of purpose or a common design and understanding," or allegations supporting "a meeting of minds in an unlawful arrangement," courts hold that the analogous Sherman Act claim must fail. *See Re/Max Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 151 (N.D. Ohio 1995), *aff'd sub nom.* 173 F.3d 995 (6th Cir. 1999) (internal quotation marks and citation omitted); *Twombly*, 550 U.S. at 557.

An agreement or conspiracy to restrain trade can be "established by either direct or circumstantial evidence." *Hyland v. HomeServs.*, 771 F.3d 310, 318 (6th Cir. 2014). Because direct evidence of an "agreement" is uncommon, courts routinely look to allegations of circumstantial evidence when assessing whether this type of antitrust claim has been plausibly pled. But as discussed below, the Complaint does not even provide circumstantial allegations as to HPS to support the State's claims.

> **A.   The State Fails to Allege Evidence of an Agreement in Restraint of Trade Through the Creation of a Trust in Relation to HPS.**

The State's case against HPS fails to support a plausible inference that HPS had a "meeting of the minds" with its co-Defendants regarding carrying out an unlawful scheme in restraint of trade. First, the State does not allege direct evidence of an actual agreement to restrain trade. While the Complaint involves a GPO agreement to which HPS is a party, GPOs are neither anticompetitive nor illegal. Quite the contrary: GPOs consolidate the purchasing power of their members to achieve the *procompetitive* purpose of driving down prices, and they exist in many industries, especially in healthcare. *Cf. Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 286 (1985) (stating that joint-purchasing organizations "would seem to be designed to increase economic efficiency and render markets more, rather than less, competitive." (internal quotation marks and citation omitted)); 42 C.F.R. § 1001.952(j)(2)

9

(defining GPOs for purposes of the Medicare, Medicaid, and other federal health programs—all of which are offered by Humana Inc.'s health plan subsidiaries). That HPS and other PBMs joined the Ascent GPO is, therefore, inconsequential to stating an antitrust conspiracy claim.

Second, the State fails to allege plausible circumstantial evidence of an agreement between HPS and Ascent's other PBM members to fix prices and align anticompetitive practices. Instead, with respect to HPS specifically, the State alleges that Ascent solicited other PBMs to join the GPO, and that "[t]hrough Ascent, *it is believed* that Express Scripts, Prime Therapeutics, and Ascent customer Humana Pharmacy Solutions *are able to* share drug pricing and rebate information with one another, as well as to fix rebate prices among them." Compl., ECF No. 12, at PageID 1390-10 (emphasis added). Relatedly, the State alleges that Ascent "provided a convenient vehicle for . . . Ascent's PBM customers [like HPS] to aggregate and access each other's pricing, discount, rebate, and negotiations information." *Id*. at PageID 1315; *see also id*. at PageID 1350 ("Ascent was . . . the perfect vehicle with which to harmonize and increase drug prices, Rebates, fees, and Retail Pharmacy reimbursements. Eventually, certain Ascent customers—such as Defendant Humana Pharmacy Solutions—also participated in and benefited from this combination."). These are precisely the "type[s] of naked conspiratorial allegations . . . rejected by the Supreme Court in *Twombly*." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009).

Indeed, the State's HPS-specific allegations do not even rise to the level of a "*hypothetical* construct of a conspiracy." *Erie Cnty. v. Morton Salt, Inc.*, No. 11-cv-00364, 2011 WL 4361615, at *4 (N.D. Ohio Sept. 19, 2011), *aff'd but criticized sub nom.*, 702 F.3d 860 (6th Cir. 2012) (emphasis added). There is not a single allegation regarding HPS's knowledge of Ascent's alleged negotiations with drug manufacturers or any other PBM's negotiations with retail pharmacies. Nor

10

does the State allege any facts regarding HPS's rebate and fee negotiations with drug manufacturers that allegedly align with their fellow PBMs, or discussions between HPS and other Ascent members regarding rebates, administrative fees, and formulary placements. These omissions are particularly striking when viewed in the context of other cases where courts in this Circuit have dismissed antitrust complaints containing far more robust factual allegations. *See, e.g.*, *Travel Agent*, 583 F. 3d at 899 (dismissing antitrust claim despite allegations of "a series of uniform base commission cuts adopted by defendants over a seven-year period" including descriptions and precise dates of each defendant making each cut); *Erie Cnty.*, 702 F. 3d at 864 (dismissing antitrust claim despite allegations that two companies allocated specific markets for specific products during a specified time period); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F. 3d 430, 436 (6th Cir. 2008) (dismissing antitrust claim and observing that "[s]imple allegations in the amended complaint, such as a general date of when the conspiracy likely began and that parties are acting in a similar fashion, are insufficient to establish an agreement . . . Plaintiffs give no explanation of where or when during this multiple-year time frame any unlawful agreements or understandings might have occurred").

Instead of alleging a "meeting of the minds," then, the Complaint's allegations establish that HPS *perhaps* had an opportunity to conspire. But this is insufficient to state an antitrust claim. *See Travel Agent*, 583 F. 3d at 905 (stating that allegations suggesting an "opportunity to conspire" were insufficient to state a claim under the analogous Sherman Act provision). The Court should reject the State's claims against HPS.

### B. The State Has Not Pleaded that HPS Improperly Exchanged Competitively Sensitive Information.

The State's allegations regarding the opportunity to exchange competitively sensitive information are also unavailing. Rather than alleging any actual collusive information exchange,

11

as discussed above, the States merely claims that Ascent was a "vehicle" for a potential information exchange. Compl., ECF No. 12 at PageID 1315. To be clear, the State's Complaint fails to identify *any* specific instance where HPS passed or received competitive or sensitive information to Express Scripts or Prime.

By failing to substantiate allegations of information exchanges regarding negotiations with drug manufacturers and retail pharmacies, the State's allegations against HPS are wholly speculative. *See Hobart-Mayfield v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 667-68 (6th Cir. 2022) (finding no confidential information exchanged where plaintiffs only alleged that defendants attended the same trade shows and had an unrelated conversation about the products at issue). If parties could survive a motion to dismiss with threadbare allegations about the potential for information exchanges, then virtually any commercial relationships—trade association meetings, industry conferences, and benign social events—would be presumptively unlawful. That is plainly not the law. *See, e.g.*, *Travel Agent*, 583 F.3d at 910–11; *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015) ("The Plaintiffs' evidence is essentially that the executives from the [Defendant]s were in the same place at the same time, which is insufficient to support a reasonable inference of concerted activity.").

Indeed, even had the State adequately pled an exchange of price information, that without more is not an antitrust violation. *See U.S. v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects . . . For this reason, we have held that such exchanges of information do not constitute a per se violation of the Sherman Act."); *see also Continental Cablevision of Ohio, Inc. v. American Elec. Power Co.,* 715 F. 2d 1115, 1119 (6th Cir. 1983) (stating that "in the absence of a purpose or effect to restrain competition, or some other evidence of an actual

12

agreement to restrain competition, . . . the exchange of price data does not offend § 1 of the Sherman Act."). Rather, courts recognize that competitors "naturally are interested in surveying the market to determine what [competitors] are charging in order to make strategic competitive decisions." *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995). Therefore, in order to make out a violation of the antitrust laws, a plaintiff must plead both an "[e]xchange of price data" *and* "a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain competition". *Cablevision,* F. 2d at 1119. The State pleads no such agreement by HPS here.

Moreover, the Complaint itself dispels the notion that HPS exchanged competitively sensitive information with competitors. As the State alleges, "Ascent requires parties to agree to broad confidentiality provisions that extend to wide categories of information." Compl., ECF No. 12, at PageID 1349. Thus, the GPO's plain terms forbid Ascent from receiving—much less sharing with Express Scripts and Prime—HPS's competitively sensitive information.

The State's claims under the Valentine Act as to HPS should be dismissed.

      **C.    The State's Humana Inc. Allegations are Even More Threadbare.**

The allegations as to Humana Inc., specifically, are even more sparse. The sum total of allegations against Humana Inc. comprise an incorrect statement that Humana Inc. is a customer of Ascent, *see id.* at PageID 1315; Kingsolver Decl., ECF No. 41-1 at PageID 1508-9; and conclusory statements about "collusive conduct" in which Humana Inc. was allegedly involved. Compl., ECF No. 12, at PageID 1351-53. These are not proper allegations of anything, let alone an antitrust conspiracy. Finally, to the extent the State alleges that Humana Inc. and HPS conspired with each other, that claim fails as a matter of law; because HPS is a wholly owned subsidiary of Humana Inc., the two parties constitute a single entity for antitrust purposes under *Copperweld*

13

*Co. v. Indep. Tube Co.*, 467 U.S. 752, 771 (1984). *See* Compl., ECF No. 12, at PageID 1319; Kingsolver Decl., ECF No. 41-1, at PageID 1508.

### III. The State Has Not Stated a Civil Conspiracy Claim.

The State's civil conspiracy claim should be dismissed on three grounds. First, a civil conspiracy claim is not an independent offense: "[a]n underlying unlawful act is required before a party can prevail on a civil conspiracy claim." *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 145 Ohio App.3d 155, 165, 762 N.E.2d 388 (6th Dist. 2001); *see also W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 914 (S.D. Ohio 2014). Because the State's claims under the Valentine Act fail, its civil conspiracy claim also fails. *Lanzer v. Louisville*, 2016-Ohio-8071, ¶ 47, 75 N.E.3d 752, 761 ("[I]f all of the substantive claims underlying the conspiracy are without merit, the conspiracy claim must also fail.").

However, even if civil conspiracy did not require an underlying predicate act to be actionable, the State's claim would fail on the merits. In Ohio, a "civil conspiracy" constitutes "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Liberty Aviation Museum, Inc. v. JRM Marine Consulting, LLC*, 2023-Ohio-2982, ¶ 64 (6th Dist.) (quoting *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 1995-Ohio-61, 650 N.E.2d 863. A plaintiff must plead a "'common understanding' to commit an unlawful act" in order to state a claim for civil conspiracy. *Bash v. Textron Fin. Corp.*, 575 B.R. 814, 818 (N.D. Ohio 2017). However, for the same reasons discussed above, the State's allegations with respect to Humana allege, *at most*, a customer relationship with Ascent in which, *at most*, Humana had the opportunity to "harmonize . . . drug prices, Rebates, fees, and Retail Pharmacy reimbursements." Compl., ECF No. 12, at

14

PageID 1350. Such bare facts do not satisfy the requisites of a "malicious combination" under Ohio's civil conspiracy law, and therefore this Count should be dismissed.

Third, the Complaint as pled alleges that Humana Inc. formed an antitrust conspiracy with all of its co-Defendants, including its wholly-owned subsidiary HPS. Black-letter law forbids such a claim, because "[i]t is well settled that 'wholly-owned subsidiaries of a single parent company are legally incapable of conspiring because a single legal entity cannot conspire with itself.'" *Williams v. New Day Farms, LLC*, No. 10-CV-00394, 2011 WL 1256059, at *12 (S.D. Ohio Mar. 31, 2011) (citation omitted); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010) ("[A] parent corporation and its wholly owned subsidiary 'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act'" (citing *Copperweld*, 467 U.S. at 777)).

## IV.    The State Has Not Stated an Unjust Enrichment Claim.

The State's common law claim for unjust enrichment fails as a matter of law. To establish unjust enrichment under Ohio law, a plaintiff must demonstrate: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment[]" *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (1984) (internal quotation marks and citation omitted). The Ohio Supreme Court has made clear that the purpose of an "unjust enrichment" claim "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393, 397 (1954). The Court in *Johnson* clarified that an unjust enrichment claim requires an "economic transaction" between parties through which a plaintiff confers something of value on a defendant. *See Johnson*, 106 Ohio St.3d at 186, 834 N.E. 2d at 799, ¶ 22. In *Johnson*, the Court held that the parties did not make this required showing

15

precisely because that case – like this one – involved only claims brought by indirect purchasers. *Id.* at 801, ¶ 27 ("[T]o establish a claim for restitution, a plaintiff must demonstrate that he or she conferred a benefit on a defendant without compensation, and since Johnson has not engaged in any transaction with Microsoft, she cannot establish such a claim.").

Indeed, in indirect purchaser antitrust cases involving separate claims for unjust enrichment, courts have dismissed unjust enrichment claims on the merits where the state law required a plaintiff to confer a benefit on a defendant, as it does in Ohio. *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918, 2021 WL 4306018, at *26 (N.D. Cal. Sept. 22, 2021). Here, the Complaint lacks allegations that plausibly suggest Ohio citizens conferred quasi-contractual benefits on HPS or Humana Inc., the value of which they are now entitled to recover. *See Auto Chem Lab'ys, Inc. v. Turtle Wax, Inc.,* 07-cv-15, 2008 WL 4372697 at *17 (S.D. Ohio Sept. 23, 2008) (dismissing unjust enrichment claim where "[n]owhere in the Complaint is there an indication of the *value* of these benefits allegedly conferred.").

Because Defendants had no direct real or implied contract with the real parties in interest in this matter, Ohio citizens, the Court should deny the State's vague claims for unjust enrichment.

## CONCLUSION

For the foregoing reasons, the State's Complaint against Humana Inc. and HPS should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,

*/s/ Sommer L. Sheely*
Shawn R. Johnson (*pro hac vice*)
Justin D. Kingsolver (*pro hac vice*)
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
(202) 624-2500
srjohnson@crowell.com

jkingsolver@crowell.com

Jason C. Murray (*pro hac vice*)
**CROWELL & MORING LLP**
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 622-4750
jmurray@crowell.com
Anne Marie Sferra (0030855)
Sommer L. Sheely (0076071) (Trial Attorney)
**BRICKER GRAYDON LLP**
100 South Third Street
Columbus, OH 43215
(614) 227-2300
asferra@brickergraydon.com
ssheely@brickergraydon.com

*Counsel for Defendants Humana Inc. and Humana Pharmacy Solutions, Inc.*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2023, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.

                                                    */s/ Sommer L. Sheely*
                                                    Sommer L. Sheely