# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| STATE OF OHIO, ex rel. DAVE YOST ATTORNEY GENERAL OF OHIO<br><br>*Plaintiff,*<br><br>v.<br><br>ASCENT HEALTH SERVICES LLC; EXPRESS SCRIPTS, INC.; CIGNA GROUP; EVERNORTH HEALTH, INC.; PRIME THERAPEUTICS LLC; HUMANA PHARMACY SOLUTIONS, INC.; HUMANA INC.<br><br>*Defendants.* | Civil Action No. 2:23-cv-1450<br>Judge Michael H. Watson<br>Magistrate Judge Chelsey M. Vascura<br><br>**ORAL ARGUMENT REQUESTED** |

## MOTION TO DISMISS

Defendants Express Scripts, Inc. ("Express Scripts"), The Cigna Group ("Cigna"), Evernorth Health, Inc. (Evernorth), and Ascent Health Services, LLC ("Ascent") (collectively, the "Moving Defendants"),[1] through the undersigned counsel, request that the court dismiss the State of Ohio, ex. rel. Dave Yost Attorney General of Ohio's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Moving Defendants request oral argument on this Motion given the complexities of the industry at issue and the intricacies of the arguments that follow.

---

[1] The Cigna Group, Evernorth Health, Inc., Express Scripts, Inc., and Ascent Health Services, LLC are referred to collectively as "Moving Defendants" in this Motion and accompanying memorandum solely for ease of reference.

Dated:  September 20, 2023

RULE GARZA HOWLEY LLP

Charles F. Rule
Daniel J. Howley
Emily M. Renzelli
Benjamin Z. Bergmann
Erica N. Baum
1701 Pennsylvania Ave. NW, Suite 200
Washington, D.C. 20006
Telephone: (202) 843-9280
rule@rulegarza.com
howley@rulegarza.com
renzelli@rulegarza.com
bergmann@rulegarza.com
baum@rulegarza.com

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

*/s/ David J. Butler*
David J. Butler (0068455), Trial Attorney
41 South High Street, Suite 1800
Columbus, Ohio 43215
Telephone: (614) 221-2838
dbutler@taftlaw.com

Jeanne M. Cors (0070660)
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Telephone: (513) 381-2838
cors@taftlaw.com

*Counsel for Ascent Health Services LLC, Express Scripts, Inc., The Cigna Group, and Evernorth Health, Inc.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| STATE OF OHIO, ex rel. DAVE YOST ATTORNEY GENERAL OF OHIO<br><br>*Plaintiff,*<br><br>v.<br><br>ASCENT HEALTH SERVICES LLC; EXPRESS SCRIPTS, INC.; CIGNA GROUP; EVERNORTH HEALTH, INC.; PRIME THERAPEUTICS LLC; HUMANA PHARMACY SOLUTIONS, INC.; HUMANA INC.<br><br>*Defendants.* | Civil Action No. 2:23-cv-1450<br>Judge Michael H. Watson<br>Magistrate Judge Chelsey M. Vascura<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

In a colorful Complaint, Plaintiff purports to identify antitrust conspiracies around every corner and lay the blame for high prescription drug prices at the feet of companies that work to negotiate to lower drug prices for their clients, sponsors of prescription drug plans. The Complaint goes on at length with exaggerated comparisons of American companies to invasive weeds from Asia (Compl. ¶ 2.) and conclusory statements about allegedly "secret and anticompetitive conduct and strong-arm tactics" (*Id.* ¶ 32.). Plaintiff filed the Complaint without any pre-filing investigation that involved contact with—much less subpoenas for documents or

1

data from—Moving Defendants.[1]  The filing of the Complaint was then quickly followed by a press release declaring the Moving Defendants to be "modern gangsters" in a "shadowy business."[2]  While all this bluster may help some in the world of public relations, it does not help a complaint survive a motion to dismiss in federal court.  For that, name calling and sweeping conclusions do not suffice: a plaintiff must allege facts that make out plausible legal claims.  And that is where Plaintiff's Complaint falls short.  Dismissal of all claims against the Moving Defendants is warranted.[3]

Plaintiff's first Valentine Act claim (Count I) fails because it attempts to allege an antitrust conspiracy among Cigna and certain of its subsidiaries.  It is hornbook law that a company cannot conspire with itself in violation of the antitrust laws, including the Valentine Act.  Therefore, Count I should be dismissed on that basis alone.

Count I fails for other independent reasons as well.  It asserts that Cigna and its subsidiaries—none of which make drugs—somehow conspired to fix the price of "numerous" unspecified drugs at some unspecified time.  (Compl. ¶ 205.)  But there are no plausible allegations of such an agreement, an unreasonable restraint, or antitrust injury, each of which are

---

[1] For ease of reference, Ascent Health Services LLC ("Ascent"), Express Scripts, Inc. ("Express Scripts"), The Cigna Group ("Cigna"), and Evernorth Health, Inc. ("Evernorth") are referred to collectively as "Moving Defendants."

[2] Dave Yost, Yost Sues Express Scripts, Prime Therapeutics and 5 Others, Blaming Exorbitant Drug Prices on Their Collusion, Mar. 27, 2023, https://www.ohioattorneygeneral.gov/Media/News-Releases/March-2023/Yost-Sues-Express-Scripts-Prime-Therapeutics-and-5.

[3] The Complaint includes seven counts, six of which include Moving Defendants: Count I (Valentine Act) against Express Scripts, Cigna, and Evernorth; Count II (Valentine Act) against Prime Therapeutics LLC ("Prime"); Count III (Valentine Act) against Express Scripts, Ascent, Prime, Humana Pharmacy Solutions, Inc ("Humana Pharmacy Solutions"), and Humana Inc.; Count IV (Ohio's Deceptive Trade Practices Act) against Express Scripts; Count V (Declaratory Judgment and Injunctive Relief under Ohio's Insurance Code) against Express Scripts; Count VI (unjust enrichment) against all Defendants; and Count VII (civil conspiracy) against all Defendants.

required to sustain Plaintiff's Valentine Act claim.  Furthermore, pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), Plaintiff lacks standing under the Valentine Act to seek any monetary relief on behalf of consumers who are not alleged to have purchased prescription drugs directly from any Defendant.

Plaintiff's next Valentine Act claim against the Moving Defendants (Count III) posits a similar antitrust conspiracy—this time involving Express Scripts, Ascent, Prime, and two Humana entities.  Plaintiff alleges this antitrust conspiracy has the same supposed purpose: Count III (like Count I) alleges these entities—none of which make drugs—also somehow fixed the price of "numerous" unspecified drugs at some unspecified time.  (*Id.* ¶ 227.)  Count III's purported conspiracy likewise fails because there are no plausible allegations of such an agreement, an unreasonable restraint, or antitrust injury.  Plaintiff's claims for monetary relief for Count III on behalf of consumers who are not alleged to have purchased prescription drugs directly from any Defendant are also barred by *Illinois Brick*.

Plaintiff's claim under Ohio's Deceptive Trade Practices Act ("DTPA") (Count IV) against Express Scripts should be dismissed because Plaintiff has no standing to bring such a claim on behalf of consumers.  Any cause of action under that law is for competitors to make, not consumers.  Furthermore, even if Plaintiff had standing, Count IV still fails because it does not comport with Rule 9(b)'s heightened pleading requirement for such claims—indeed, there are no allegations of the time, place, or content of the alleged misrepresentation that was relied upon, much less a sufficient factual basis to support an inference that those unidentified misrepresentations were knowingly made.

Plaintiff's remaining claims—Count V against Express Scripts seeking declaratory and injunctive relief related to pharmacy audit laws and Counts VI and VII against all Defendants

claiming unjust enrichment and civil conspiracy respectively—should be dismissed for similar reasons.  Namely, the Complaint—while long on bombast—is short on facts that support the elements of any of these claims.

## THE DEFENDANTS

*PBM Defendants.*  Express Scripts, Prime, and Humana Pharmacy Solutions operate PBMs.  (Compl. ¶¶ 42, 43, 44.)  PBM's clients, plan sponsors, have a number of different PBM options, including CVS Caremark, OptumRx, and many others.  (*Id.* ¶¶ 5, 67–71.)[4]

*Ascent.*  Ascent is a group purchasing organization ("GPO") formed in 2019 by (i) Cigna Spruce Holdings GmbH, a wholly-owned subsidiary of Cigna formed under the laws of Switzerland, (ii) Prime, and (iii) The Kroger Co. ("Kroger"), an Ohio corporation that was not named as a Defendant in the Complaint.  (Compl. ¶¶ 6–7; 26, 45; ECF No. 3 at PAGEID 1280.)  Kroger, Humana Pharmacy Solutions, Prime, and Express Scripts have GPO participation agreements with Ascent.  (Compl. ¶¶ 7, 26, 45; ECF No. 1 at PAGEID 8; ECF No. 3 at PAGEID 1280.)  Ascent was formed with, and continues to have, the purpose of "delivering more affordable health care."  (Compl. ¶ 179.)  On behalf of the GPO participants, Ascent negotiates and contracts with pharmaceutical manufacturers regarding drug pricing, rebates, and other fees. (*Id.* ¶¶ 26, 181, 186, 188.)

*Corporate Parent Defendants*.  Although this is a case about PBMs, Plaintiff has also sued three entities that are neither PBMs nor GPOs negotiating on their behalf.  (*See* ECF Nos. 41, 42.)  As noted in their pending motions to dismiss for lack of personal jurisdiction, the

---

[4] Some large plan sponsors may opt to maintain some traditional PBM functions in house.  *See generally J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-cv-704, 2005 WL 1396940, at *2 (S.D. Ohio June 13, 2005).

Complaint includes Cigna, Evernorth, and Humana Inc. without identifying any reason other than their parent company relationship to Express Scripts and Humana Pharmacy Solutions.[5]

## FACTUAL BACKGROUND[6]

*Industry Overview.* Pharmaceutical manufacturers set the price of the drugs they make and sell. (Compl. ¶¶ 3, 14, 107.) Pharmacies then acquire drugs from the manufacturer or wholesalers and sell the drugs onto individuals with and without insurance. (*Id.* ¶¶ 8, 49–53, 192.) Individuals with insurance typically look to their prescription drug benefit plan to cover most of the cost of drugs they obtain from a pharmacy.

The entities that sponsor prescription drug benefit plans for individuals—e.g., unions, employers, health plans, municipalities, and federal and state government agencies—are known as "Plan Sponsors." Plan Sponsors determine the benefit design for the plans they offer. For example, subject to applicable law, Plan Sponsors decide the premiums, the deductibles, the co-pays, the co-insurance, and the nature of any coverage rules. (*Id.* ¶¶ 16, 49–50, 56–57, 192.) For each plan, the Plan Sponsors also select formularies (lists of covered drugs) and pharmacy networks (pharmacies that recognize and agree to abide by the plan design). (*Id.* ¶¶ 49, 54–61.)

PBMs are a "market response" to the problem of skyrocketing drug costs. (*Id.* ¶ 4.) Plan Sponsors have turned to PBMs to help manage and contain the cost of providing prescription drug benefits for these individuals (often referred to as members or beneficiaries). (*Id.* ¶¶ 4, 49, 54–61.) In this complex healthcare environment, PBMs perform many different functions. These include:

---

[5] Cigna is a holding company and the ultimate corporate parent of Evernorth and Express Scripts. Evernorth is the corporate parent of Express Scripts and other subsidiaries. (ECF Nos. 4, 5.)
[6] For purposes of this Motion, Moving Defendants assume as true the sufficiently alleged factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Administrative functions.*  PBMs can perform essential administrative functions for Plan Sponsors, such as processing member prescription claims and appeals, including with respect to any utilization requirements a Plan Sponsor requires.  (*Id.* ¶¶ 48–49, 75.)

*Pharmacy networks.*  PBMs also offer Plan Sponsors access to networks of participating pharmacies; depending on the Plan Sponsor's objectives, a Plan Sponsor may opt to offer members access to all or only a portion of these pharmacies.  (*Id.* ¶ 50.)  Many pharmacies— including national pharmacy chains, regional pharmacy chains, grocers, independent pharmacies, and others—seek to be included in pharmacy networks assembled by PBMs and offered by Plan Sponsors to their members.  (*Id.* ¶¶ 49, 50, 52.)

Pharmacies—not PBMs—acquire and dispense pharmaceutical drugs to individuals. Contracts between pharmacies and PBMs generally set reimbursement amounts that a PBM will pay a participating pharmacy for filling a covered beneficiary's prescription, including any dispensing fees charged by the pharmacy.  (*Id.* ¶¶ 8, 20, 49, 50); *see also Wyeth-Ayerst Labs.*, 2005 WL 1396940, at *3 (contracts between PBMs and pharmacies typically "specify a reimbursement rate composed of the drug cost and a dispensing fee" charged by the pharmacy). For covered medications, Plan Sponsors may require members filling prescriptions to pay for a portion of a drug's cost at point-of-sale (which is often referred to as a copayment).  Pharmacies, in turn, seek reimbursement from PBMs for the differential between the amount paid by a member and the contracted-for rate.  (Compl. ¶¶ 50–51); *see also Rutledge v. Pharma. Care Mgmt. Assoc.*, 141 S. Ct. 474, 478 (2020) ("After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment.  The prescription-drug plan, in turn, reimburses the PBM.").

PBMs also help ensure participating pharmacies do not overcharge Plan Sponsors or their members and that pharmacies comply with other Plan Sponsor requirements and applicable laws. (Compl. ¶¶ 155–61.) Thus, pharmacy network contracts typically include audit and other compliance provisions. (*Id.*) These contracts, including audit provisions, are regulated by Ohio and other state laws. (*Id.* ¶¶ 155–57, 168); Ohio Rev. Code Ann. § 3901.811.; *see also, e.g.,* Fla. Stat. Ann. § 624.491; Cal. Bus. & Prof. Code § 4430 et seq.

For pharmacies, being included in a PBM's pharmacy network has value, as insured consumers are more likely to use an in-network pharmacy to fill a prescription. (Compl. ¶¶ 5, 50, 52.) However, pharmacies can and do decline to participate in PBM pharmacy networks. For example, Kroger, which owns both a PBM and a retail pharmacy chain, exited Express Scripts' retail pharmacy network in December 2022, arguing that Express Scripts' proposed reimbursement rates did not yield the chain sufficient profits. (*Id.* ¶¶ 150–52.)

***Drug formularies.*** Designing and maintaining drug formularies is another service that PBMs provide to many Plan Sponsors. (*Id.* ¶¶ 49, 54.) Plan Sponsors can choose between a PBM's standard formularies or opt for a customized formulary. (*Id.* ¶ 55.) Standard formularies are developed based on input from pharmacists, doctors, and nurses serving on a PBM's pharmacy and therapeutics committee; clients with custom formularies rely on their own pharmacy and therapeutics committees. (*Id.* ¶ 58.) For standard formularies, clinical considerations are paramount and fully taken into account before cost considerations. (*Id.* ¶¶ 58–59, 140–42.)

Formulary placement can also help steer a Plan Sponsor's members to the most cost-effective option. (*Id.* ¶¶ 56-59, 73, 84.) A drug that is designated as "preferred" is generally placed in a "lower tier" on the formulary. (*Id.* ¶¶ 49–50, 73–77.) Conversely, a non-preferred

drug is generally placed on a "higher tier" in the formulary. (*Id.*) Plan Sponsors can link different financial incentives to different tiers on the formularies; for example, a Plan Sponsor could link drugs on a preferred tier to a lower co-pay or require patients to try those lower cost drugs before trying more expensive alternatives. (*Id.* ¶¶ 56–59.) A Plan Sponsor can also elect to require that a member obtain "prior authorization" before obtaining coverage for a particular drug or impose step therapy or "fail first" requirements on its members, which require a beneficiary to use an alternative treatment that is clinically effective, but less costly, first. (*Id.* ¶¶ 75, 113–114, 196.) Formularies may also designate some drugs for exclusion from the formulary altogether; exclusion can occur because a drug has documented safety issues, is not deemed efficacious, or has a higher net cost than other products within its therapeutic class. (*Id.* ¶¶ 73-75, 84.) Patients can generally still obtain "excluded" drugs through prior authorization and appeals processes. (*Id.* ¶¶ 73, 196.) Also, formularies are not static, in part because new drugs, including generic and biosimilar products, are coming to market each year. (*Id.* ¶¶ 94– 101.)

*Rebate Negotiations.* PBMs can also provide Plan Sponsors with access to lower drug pricing by negotiating rebates from drug manufacturers. Rebates "are a widespread industry practice." *Wyeth-Ayerst Labs.*, 2005 WL 1396940, at *2.

In many cases, pharmaceutical manufacturers have little to no competition and they are able to set very high prices. In those instances, PBMs generally are not able to obtain lower costs in the form of rebates. But in instances when a manufacturer is forced to compete— whether against a rival branded medication, a generic medication, or a "biosimilar" biological product—PBMs are often able to negotiate with drug manufacturers for rebates to lower the net cost of the medications to the PBM's clients. Fortunately, for certain health conditions, such as

diabetes, there are multiple, clinically-effective pharmaceutical products on the market.  (Compl. ¶¶ 84, 94–101.)

Because exclusion from a formulary, or placement on a non-preferred tier, can negatively impact a manufacturer's profits, manufacturers are incentivized to lower the net cost of their drugs, either by cutting the list price or by offering a rebate.  (*Id.* ¶¶ 60, 73-74, 76, 80.)  Courts have previously found that rebate agreements negotiated by PBMs with manufacturers are "pro-competitive" because "[r]ebates effectively lower the cost paid for the product by the plan sponsor" and "PBM rebates, when passed on to the plan sponsor, lower the sponsor's cost of providing the [prescription] benefit."  *Wyeth-Ayerst Labs.*, 2005 WL 1396940, at *8–9.

By increasing the number of covered lives a manufacturer can access, such as by participating in a GPO with other PBMs, PBMs can enhance their ability to bargain with manufacturers for lower prices.  (Compl. ¶¶ 10, 26.)  Ascent, for example, negotiates on behalf of multiple participating PBMs to achieve better pricing for its participants.  (*Id.* ¶¶ 26, 186.)

*   *   *

The cost saving strategies employed by PBMs have been adopted by numerous Plan Sponsors.  Indeed, *the State of Ohio* employs similar tactics to contain the cost of prescription drugs to those attacked by Ohio's Attorney General in this case, including tiered-formularies, prior authorization and other utilization requirements, and rebate agreements with manufacturers.

***Ohio's Conduct.***  Federal law allows Ohio's Medicaid programs to establish Medicaid drug formularies and a "prior authorization program" for certain non-preferred drugs.  42 U.S.C. § 1396r-8(d)(4).  Ohio, like many other states, uses this technique to obtain "supplemental rebates" from manufacturers, with the "default rebate level" established in the manufacturer's agreement with the Department of Health and Human Services acting as a "floor."  *Pharm. Res.*

9

& *Mfrs. of Am. v. Thompson*, 259 F. Supp.2d 39, 67–68 (D.D.C 2003), *aff'd*, 362 F.3d 817 (D.C. Cir. 2004).

At present, as reflected by the Ohio Department of Medicaid's current Unified Preferred Drug List ("PDL"), Ohio imposes prior authorization, step therapy, and other utilization requirements on *many* drugs otherwise eligible for coverage under Department of Health and Human Services rules.[7] Ohio's Medicaid PDL also steers patients and providers towards certain "brand name drugs" over a "generic equivalent," presumably because of a supplemental rebate payment negotiated by the state with a manufacturer.[8] In the same vein, Ohio, like many non-governmental employers, offers state employees (including counsel for the state) a prescription drug benefit featuring tiered-formularies, prior authorization, and other utilization management requirements.[9]

## ARGUMENT

### I. Count I Should be Dismissed Because Plaintiff Has Not Pled a Valid Antitrust Conspiracy Claim

Count I—which alleges an antitrust conspiracy between Express Scripts, Cigna, and Evernorth—fails for the following independent reasons:

- A corporation and its subsidiaries are incapable of conspiring with one another in violation of the antitrust laws. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).

- The Complaint does not contain facts sufficient to allege an illegal conspiracy under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

---

[7] *See* Ohio Dep't of Medicaid, Pharmacy Benefit Management Program, Unified Preferred Drug List (July 1, 2023), at 20, available at https://medicaid.ohio.gov/static/PHM/drug-coverage/20230701_UPDL_FINAL_ODM.approved.v2.pdf.

[8] *Id.* at 2, 20.

[9] *See generally* Ohio Dep't of Admin. Servs., Benefits Admin., Prescription Drug, available at https://das.ohio.gov/employee-relations/benefits-administration/prescription-drug/03-prescription-drug. The benefit is managed by one of the nation's largest PBMs, OptumRx, (Compl. ¶ 53), which is also a member of a GPO.

- The Complaint does not set forth facts to support any of the required elements to show an unreasonable restraint under the applicable rule of reason: there are no market definition allegations, no plausible market power allegations, and no plausible allegations of anticompetitive effects.

- The Complaint does not allege any antitrust injury.

In addition, as explained below, Plaintiff may not seek monetary relief under the Valentine Act on behalf of consumers alleged to have overpaid for prescription drugs. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

Plaintiff's Valentine Act claims must be construed in accordance with the Sherman Act. *See, e.g.*, *Nilavar v. Mercy Health Sys.-W. Ohio*, 494 F. Supp. 2d 604, 621 (S.D. Ohio 2005), *aff'd*, 244 F. App'x 690 (6th Cir. 2007) ("The Valentine Act was patterned after the federal Sherman Act and, therefore, the Ohio Supreme Court interprets its language in light of federal judicial construction of the Sherman Act."); *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 8, 834 N.E.2d 791, 794–95 (Ohio 2005) ("[T]he Ohio General Assembly patterned Ohio's antitrust provisions in accordance with federal antitrust provisions. . . . Due to the similarity of these provisions, Ohio has long followed federal law in interpreting the Valentine Act."). A failure to prove a claim under the Sherman Act amounts to a failure to prove a claim under the Valentine Act. *Richter Concrete Corp. v. Hilltop Basic Res.*, 547 F. Supp. 893, 920 (S.D. Ohio 1981), *aff'd sub nom. Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818 (6th Cir. 1982).

## A. Count I Fails Because Express Scripts, Cigna, and Evernorth are Legally Incapable of Conspiring with One Another

Plaintiff's Count I—alleging a "[c]ombination by Express Scripts, Cigna, and Evernorth to fix prices for prescription drugs in violation of the Valentine Act," (Compl. ¶¶ 203–13), fails because Express Scripts is a wholly-owned subsidiary of Evernorth, which is a wholly-owned subsidiary of Cigna, (*Id.* ¶ 42). As such, they are "incapable, as a matter of law, of conspiracy." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th

11

Cir. 2008) (citing *Copperweld*, 467 U.S. at 769); *see also In re Title Ins. Antitrust Cases*, 702 F. Supp.2d 840, 878, 906–08 (N.D. Ohio 2010) (Plaintiff's Sherman and Valentine Act claims could not succeed based "solely on an agreement between a corporate parent defendant and any of its affiliates or subsidiaries").

It is a fundamental principle of both federal and Ohio antitrust law that an entity is incapable of conspiring with itself. *Copperweld*, 467 U.S. at 752; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010); *Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d 859, 890 (S.D. Ohio 2000) (applying *Copperweld* to Valentine Act claim). This includes, *inter alia*, an entity's parents, subsidiaries, and sister companies. *Id.*; *see also Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611 (6th Cir. 1987) (explaining that beyond the parent-subsidiary relationship, "*Copperweld* [also] precludes a finding that two wholly-owned sibling corporations can combine for the purposes of section 1").

*Copperweld* rejected the notion that the antitrust laws may be used to attack so-called "intra-enterprise conspiracies," holding that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise" for the purpose of the antitrust laws. *Copperweld*, 467 U.S. at 771-72. This is because "[t]heir objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id.* Thus, Evernorth, and its wholly-owned subsidiary, Express Scripts, are incapable of conspiring with one another or with their parent, Cigna. *Id.*; *see also Directory Sales Mgmt. Corp.*, 833 F.2d at 611; *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp.2d 869, 883 (N.D. Ohio 2008) (dismissing antitrust claim alleging that parent and affiliated companies "conspired amongst themselves"). *Copperweld* thus wholly bars Count I.

**B.  Count I Fails Because Plaintiff Does Not Plausibly Allege an Illegal Conspiracy Under *Twombly***

Count I also fails because the Complaint does not meet the plausibility pleading requirement set forth in *Twombly*.  550 U.S. at 570.  Plaintiff's Count I, alleging an illegal conspiracy between Express Scripts, Cigna, and Evernorth to fix prescription drug prices fails to plausibly allege any illegal agreement between these entities to fix prices.  Even assuming an illegal conspiracy was possible between Cigna and its subsidiaries Express Scripts and Evernorth—and it is categorically not (*see supra* Section I.A.)—Plaintiff's failure to plead any facts plausibly suggesting an anticompetitive agreement among these entities still defeats Count I.

Plaintiff fails to allege "enough factual matter (taken as true) to suggest that an agreement was made" between Cigna, Evernorth, and Express Scripts to "fix" prescription drug prices. *Twombly*, 550 U.S. at 556.  Plaintiff's bare conclusory assertion that "Defendants Express Scripts, Cigna, and Evernorth have engaged in a combination . . . to fix and raise prices of numerous drugs" (Compl. ¶ 205) is the type of formulaic recitation that cannot satisfy *Twombly*'s plausibility standard.  *Twombly*, 550 U.S. at 555–57.  Beyond failing to allege any agreement, the Complaint does not plausibly allege that any Express Scripts Defendant acted with the unlawful objective to fix or otherwise control "numerous" prescription drug prices.  In fact, the Complaint barely contains allegations referencing Cigna or Evernorth at all.  (*See* ECF No. 42 at PAGEID 1779-80; ECF No. 42-1 at PAGEID 1791-93.)

At best, the allegations surrounding Count I involve non-collusive interactions between Express Scripts and unnamed manufacturers and the independent setting of list prices by those manufacturers.  For instance, Plaintiff contends "Express Scripts has structured its contractual relationships with Manufacturers around the concept of List Price," (Compl. ¶ 79); and that

Express Scripts has a "Master Agreement" with manufacturers that somehow advances the alleged conspiracy between Express Scripts and its corporate parents, (*Id.* ¶¶ 102-09). *But no Defendant in this case makes or sets the list price of drugs.* Rather, pharmaceutical manufacturers set the "list prices" for their products. (*Id.* ¶¶ 3, 14, 107.) The Complaint provides no facts that make it plausible to assume based on Plaintiff's allegations that Cigna, Evernorth, and Express Scripts had some agreement among themselves to somehow "fix" prices that the Complaint itself admits they do not control. In fact, Plaintiff does not even bother to allege parallel conduct between Cigna, Evernorth, and Express Scripts. Its only allegations related to Count I pertain to Express Scripts and its typical business interactions with manufacturers. And even if the Complaint did allege some parallel conduct by Cigna, Evernorth, and Express Scripts, mere allegations of parallel conduct "stops short of the line between possibility and plausibility of entitle[ment] to relief." *Twombly*, 550 U.S. at 557; *see In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (upholding dismissal where complaint alleged only "bare assertions of conspiracy and parallel conduct"); *Lowrey v. Trinity Health Corp.*, No. 2:07-cv-00143, 2008 WL 11351359, at *3 (S.D. Ohio Feb. 26, 2008) (Watson, J.) ("The threshold question is whether the parallel conduct could constitute an independent action.").

### C. Count I Fails Because the Complaint Does not Allege Facts Sufficient to Show an Unreasonable Restraint on Trade

The Valentine Act requires that a Plaintiff establish that Defendants' conduct amounts to an "unreasonable restraint[]" on trade. *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005). The "rule of reason" standard is the presumptive standard under which to evaluate such conduct, and the Complaint provides no basis to apply a different standard (i.e., there is no basis to believe Count I is a *per se* violation, such as bid rigging among

competitors on a bid). *Id.* To state a claim under the rule of reason, Plaintiff "must include in the complaint allegations demonstrating," among other things "'the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets'.'" *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 436 (quoting *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)). It must also allege market power, which is the "ability to raise prices above those that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984); *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 433 (affirming dismissal where plaintiff failed to show existence of market power); *Mohawk Rebar Serv., Inc. v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers Local Union No. 17*, No. 1:14-cv-00137, 2015 WL 5657252, at *8, *10 (N.D. Ohio Sept. 24, 2015) (dismissing Sherman and Valentine Act claims because complaint "does not allege how the defendants' actions 'harmed *competition* in the relevant market'" (emphasis included) (internal citation omitted)).

*No Relevant Market Allegations.* First, the Complaint does not allege *any* relevant market: it does not identify either a relevant geographic market or relevant product market. These shortcomings are fatal to a rule of reason claim. "The Supreme Court requires plaintiffs to identify the relevant product and geographic markets so the district court can assess 'what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market.'" *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 437 (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324 (1962)); *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955, 961 (6th Cir. 2004) ("The relevant market encompasses notions of geography as well as product use, quality, and description") (internal citations omitted).

Instead of defining a relevant geographic market, the Complaint jumps between various geographies. Several of Plaintiff's allegations relate to Ohio, others describe conduct spanning the entire United States, and still others relate to Switzerland. (*See e.g.*, Compl. ¶¶ 5, 20, 49-53, 60-72, 102-07, 131-37, 155-56 (concerning the U.S. PBM industry); *Id.* ¶¶ 73–87, 94-107, 110–20, 138, 200 (concerning national formularies and prices, or those in a number of different states); *Id.* ¶¶ 9, 10, 12-13, 16-18, 30-32, 71, 89, 139, 142-44, 148, 168-72, 194-95 (concerning Ohio); *Id.* ¶ 113 (concerning Arizona and Pennsylvania); *Id.* ¶¶ 27, 176-88 (concerning Switzerland).) This is insufficient to state a claim. *See Worldwide Basketball & Sport Tours, Inc.*, 388 F.3d at 962 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim"); *see also Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792, 803 (S.D. Ohio 2010) (explaining that, to avoid dismissal at the motion to dismiss stage, "[a]n antitrust plaintiff must define the relevant market within which the alleged anticompetitive effects of the defendant's actions occur") (internal quotations omitted).

Similarly, the Complaint makes no attempt to define a relevant product market, leaving Defendants and the Court to guess what product market must be analyzed to evaluate the competitive effects of the conduct: Is it a market for GPOs? Or a market for PBMs? Or a market for all prescription drugs? Or a market for certain drugs? Or a market for all pharmacies? Or a market for some pharmacies? Regardless, the Complaint itself is plainly insufficient in this regard and dismissal is warranted. *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 437 ("the court cannot determine the boundaries of the relevant product market and must dismiss the case for failure to state a claim"); *see Semertzides v. Bethesda N. Hosp.*, No. 1:14-cv-135, 2014 WL 2573073, at *5 (S.D. Ohio June 9, 2014), aff'd, 608 F. App'x 378 (6th Cir. 2015)

("Is the relevant service surgical procedures generally or is it limited to surgical adhesion surgery? The complaint does not say."), *aff'd*, 608 F. App'x 378 (6th Cir. 2015) (per curiam).

***No Market Power Allegations and No Plausible Allegations of Anticompetitive Effect.***
Given the Complaint's failure to even define a relevant market, it also does not allege that Defendants have "market power," which "is a necessary ingredient" in cases subject to the presumptive rule of reason standard. *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986); *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 437 (dismissing Complaint where the Court could not assess "whether the alleged unlawful acts have anticompetitive effects in that market"); *Care Heating & Cooling, Inc.*, 427 F.3d at 1014 ("the foundation of an antitrust claim is the alleged adverse effect on the market"). Likewise, the Defendants are left guessing as to what the alleged anticompetitive effects are—i.e., what are the injuries in terms of cost and on restrictions to output here? *See, e.g., Menasha Corp. v. News Am. Mktg. In-Store*, 354 F.3d 661, 663 (7th Cir. 2004) ("The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that matter under the federal antitrust laws."); *Wagner*, 732 F. Supp. 2d at 803 n.3 (dismissing antitrust counts where "the exercise of 'market power' by Defendants' cannot be inferred from the facts alleged"). These shortcomings are also fatal to Count I.

### D. <u>Count I Fails Because the Complaint Does Not Allege Antitrust Injury</u>

Plaintiff's Valentine Act claims separately fail because Plaintiff fails to establish an antitrust injury as a result of the alleged conspiracy—that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Nilavar*, 142 F. Supp. 2d at 869-70 ("Ohio courts have held that a plaintiff must allege an antitrust injury in order

to maintain an action under the Valentine Act"). To state an antitrust claim, a plaintiff must plead antitrust standing, which, among other things, requires establishing antitrust injury. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) ("[A]ntitrust injury . . . is a 'necessary, but not always sufficient,' condition of antitrust standing.") (citation omitted). Such antitrust injury must be "of the type the antitrust laws were intended to prevent" and "proximately caused by defendants' allegedly illegal conduct." *Care Heating & Cooling, Inc.*, 427 F.3d at 1014. Plaintiff fails to allege facts to establish either antitrust injury requirement here.

First, the injury alleged by Plaintiff—inflated drug prices—does not flow from any plausibly alleged harm to *competition* resulting from the alleged agreements among Cigna, Evernorth, and Express Scripts in Count I. In fact, the Complaint fails to allege what competition is reduced by the conduct alleged in Count I (much less in which relevant market or whether there is market power that might make such harm plausible) or how the alleged harm results from that reduction in competition. As such, the alleged injury by Plaintiff is not "of the type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489.

Second, Plaintiff fails to sufficiently allege antitrust injury because its purported injury is not proximately caused by any agreement among Cigna, Evernorth, and Express Scripts described in Count I, but rather is caused by allegedly inflated prescription drug prices implemented by drug manufacturers. The harm Plaintiff alleges boils down to higher list prices charged by drug manufacturers. (Compl. ¶¶ 14, 192–94, 210, 235.) Neither this allegation nor any allegation in Count I set forth any facts to establish an injury proximately resulting from any agreement among Cigna, Evernorth, or Express Scripts outlined in Count I. Indeed, as the Complaint acknowledges, Defendants do not set list prices. (*See id.* ¶¶ 3, 14, 107.)

Accordingly, Plaintiff has not sufficiently established antitrust injury, and thus, lacks antitrust standing to bring its Valentine Act claims.  *CH Liquid. Assoc. Liquid. Tr. v. Genesis Healthcare Sys.*, No. 5:18-cv-752, 2019 WL 13150910, at *8 (N.D. Ohio March 22, 2019) (failure to allege antitrust injury required dismissal of both Sherman and Valentine Act claims); *Guinn v. Mount Carmel Health*, No. 2:09-cv-226, 2012 WL 628519, at *7 (S.D. Ohio Feb. 27, 2012) (same).

### E.   *Illinois Brick* Bars Plaintiff's Ability to Seek Monetary Relief Under Count I

Under *Illinois Brick*, only direct purchasers have standing to sue for damages—including for restitution and disgorgement—under the antitrust laws.  431 U.S. at 745-46; *see also Kansas v. UtiliCorp. United, Inc.*, 497 U.S. 199, 207 (1990) (applying *Illinois Brick* to *parens patriae* claims).  This "direct purchaser requirement deprive[s] [indirect purchasers] of standing to pursue a claim under the Valentine Act" as well.  *Johnson v. Microsoft Corp.*, 2003-Ohio-7153, ¶ 17, 155 Ohio Ct. App. 3d 626, 635 (1st Dist. Hamilton 2003), *aff'd,* 2005-Ohio-4985, 106 Ohio St. 3d 278, 834 N.E.2d 791 (Ohio 2005).

Unlike direct purchasers, "[i]ndirect purchasers 'are not immediate buyers from the alleged antitrust violators,' but are those who buy goods through an intermediary such as a retailer or wholesaler."  *Free v. Abbott Labs., Inc.*, 176 F.3d 298, 298 n.1 (5th Cir. 1999) (quoting *UtiliCorp United, Inc.*, 497 U.S. at 207).  *Illinois Brick's* "bright-line rule . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue."  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019).

Here, Plaintiff's prayers for disgorgement and restitution on behalf of consumers in connection with Count I are tied to the allegedly overinflated prescription drug prices paid by those consumers.  (*See, e.g.,* Compl. ¶ 209 (Count I) ("Ohio purchasers of drugs who are uninsured, under-insured, or have co-pays or deductibles calculated on the basis of List Price of

19

the prescribed drugs have been injured because of the supracompetitive prices of these drugs set by this combination").)  But Plaintiff does not allege that those consumers purchased those prescription drugs from any Defendant.

As Plaintiff alleges, Express Scripts and Ascent are merely "middlem[e]n in the . . . [prescription] drug distribution process."  (*Id.* ¶ 176.)  There is no allegation in the Complaint that the State or the customers on whose behalf it purports to sue ever purchased a drug from any Defendant in this case, nor could there be—PBMs do not purchase, acquire, or dispense pharmaceutical medications.  As noted above, pharmacies acquire drugs from manufacturers or wholesalers, dispense those drugs, and seek reimbursement from PBMs according to rates set in contracts between PBMs and pharmacies.  The rebate negotiations that Express Scripts and Ascent undertake are not alleged to involve the PBM or Ascent purchasing or selling drugs themselves.  *See, e.g., In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 405 (D.R.I. 2019) (explaining that PBMs do not set prescription drug prices or pay prescription drug benefits, but rather, "act[] as an intermediary to facilitate payment for prescription drugs.").

Because Plaintiff does not allege that the consumers it is suing on behalf of purchased drugs directly from any Defendant, *Illinois Brick* deprives Plaintiff of standing to seek monetary relief on behalf of consumers under the Valentine Act.  431 U.S. at 745–46; *see also Series 17-03-615 v. Express Scripts, Inc.*, No. 3:20-cv-50056, 2023 WL 4850676, at *6 (N.D. Ill. July 28, 2023) (dismissing indirect purchaser claims against PBMs under *Illinois Brick*).

## II.   Count III Should be Dismissed Because Plaintiff Has Not Pled a Valid Antitrust Conspiracy Claim

Count III fares no better and fails for the following independent reasons:

- Count III fails because the Complaint does not allege facts sufficient to plead an illegal conspiracy under *Twombly*.

- Count III also fails because the Complaint does not set forth facts to support any of the required elements to show an unreasonable restraint under the applicable rule of reason: there are no market definition allegations, no plausible market power allegations, and no plausible allegations of anticompetitive effects.

- Count III also fails because it does not allege any antitrust injury.

In addition, to the extent Plaintiff claims in Count III that there is an illegal agreement between Express Scripts and Ascent, such an agreement cannot violate the antitrust laws under *Copperweld*.  Furthermore, similar to Count I, *Illinois Brick* also bars Plaintiff's ability to seek monetary relief for Count III.

**A.  Count III Should Be Dismissed Because Plaintiff Does Not Plausibly Allege an Illegal Conspiracy Under *Twombly***

Count III fails because the Complaint does not meet the plausibility pleading requirement set forth in *Twombly*.  *See* 550 U.S. at 545-46.  Plaintiff's Count III broadly asserts there is an illegal conspiracy between Express Scripts, Prime, Humana Pharmacy Solutions, Humana Inc., and Ascent (hereinafter collectively referred to as the "Count III Defendants") to fix the prices of "numerous" drugs.  (Compl. ¶ 227.)  But Plaintiff fails to allege "enough factual matter (taken as true) to suggest that an agreement was made" to "fix" any prescription drug prices.  *Twombly*, 550 U.S. at 556.

Plaintiff must allege either "direct evidence" or "circumstantial evidence" of an agreement among the Count III Defendants to fix drug prices.  For direct evidence, a plaintiff must allege "'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  Alternatively, circumstantial evidence consists of allegations of parallel conduct and "plus factors"—*i.e.*, "economic actions and outcomes that are largely inconsistent with unilateral

conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015). Here, the Complaint alleges *neither* direct *nor* circumstantial evidence from which the Court could draw a plausible inference of a price-fixing conspiracy in any drug, much less the alleged unspecified "numerous" drugs.

### i. *Plaintiff Does Not Allege Direct Evidence of a Conspiracy*

Direct evidence is "the smoking gun in a price-fixing case"—for example, "an admission by an employee of one of the conspirators." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010); *see also Hyland*, 771 F.3d at 318 ("direct evidence is tantamount to an acknowledgement of guilt") (internal quotations omitted).

Here, Plaintiff does not even attempt to plead any facts amounting to direct evidence of an agreement among any (much less all) Count III Defendants to fix drug prices. Accordingly, Plaintiff's price-fixing claim in Count III rises or falls on the circumstantial evidence alleged.

### ii. *Plaintiff Does Not Allege Circumstantial Evidence of a Conspiracy*

Circumstantial evidence consists of factual allegations from which one can plausibly infer an agreement to fix prices. When a court examines circumstantial evidence, it typically *starts* with whether plaintiffs allege parallel pricing by defendants. If parallel pricing is alleged, the court must then examine whether such alleged parallel behavior is the product of explicit collusion, or the result of lawful non-collusive circumstances, such as common reactions to common market conditions or "conscious parallelism." *See Twombly*, 550 U.S. at 554, 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 903-05 (affirming dismissal where complaint contained "bare assertions of conspiracy and parallel conduct").

Here, the Complaint's circumstantial evidence is insufficient to survive a motion to dismiss. Plaintiff does not allege any parallel conduct as to any drug, much less unspecified "numerous" drugs. Nor does Plaintiff allege any facts establishing "plus factors" that would support an inference that all Count III Defendants agreed with each other to fix prices in "numerous" unspecified drugs. *See Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869, 873 (6th Cir. 2012) (county's "conclusory say-so" could not "nudge this case over the line from mere parallel conduct to conspiracy" and save their Valentine Act claim).

**No Parallel Pricing.** There are no allegations of parallel pricing of drugs by Count III Defendants. Indeed, it is difficult to conceptualize such an allegation between the Count III Defendants because, as the Complaint acknowledges, such prices are set by drug manufacturers. (Compl. ¶¶ 3, 81-82, 87.) The Complaint does not even allege which drugs Plaintiff believes have been price fixed, much less that there was actual parallel pricing on those unspecified drugs. Without parallel pricing, Plaintiff cannot make out a circumstantial case of price fixing. *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 665 (6th Cir. 2022) (affirming dismissal where plaintiff could not show "based on circumstantial evidence: parallel conduct . . . and so-called 'plus factors' that plausibly suggest an agreement to restrain trade"); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228-29 (3d Cir. 2011) (affirming dismissal where "allegations fall far short of demonstrating parallel behavior"). Therefore, Count III should be dismissed.

To the extent Plaintiff claims there is parallel conduct by Express Scripts, Prime, and Humana Pharmacy Solutions with respect to their decision to join and participate in Ascent as participants and/or owners, (*see* ECF No. 73 at PAGEID 2601-03), that is not parallel pricing of "numerous" drugs. To the contrary, similar conduct—joining purchasing cooperatives—is

23

viewed positively under the antitrust laws because it increases competition by allowing participants to provide better pricing. *See, e.g., Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295 (1985) ("[P]urchasing cooperatives . . . are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects. Rather, such cooperative agreements would seem to be designed to increase economic efficiency and render markets more, rather than less, competitive") (internal citations omitted).

Moreover, it is not even parallel given the Complaint alleges that these entities joined Ascent at different times. *Twombly*, 550 U.S. at 556 n.4 ("complex and historically unprecedented changes in pricing structure *made at the very same time* by multiple competitors, and made for no other discernable reason, would support a plausible inference of conspiracy") (emphasis added); *Burtch*, 662 F.3d at 228 (allegations of parallel conduct "fall far short" where defendants were making decisions "at different time periods"); *Hogan v. Pilgrim's Pride Corp*., No. 16-cv-02611, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) ("[W]ithout more information about the particular [production] cuts that occurred and how these compared to competitors' cuts, the complaint's allegations do not establish parallel conduct.").

**No "Plus Factors" Sufficient to Infer a Price-Fixing Agreement.** Even if Plaintiff had sufficiently alleged parallel pricing by Defendants, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Indeed, any alleged parallel conduct must be combined with "plus factors" collectively illustrating that the "actions of the Defendants are not independent." *Hobart-Mayfield, Inc.*, 48 F.4th at 665-69 (upholding dismissal where plaintiff alleged parallel conduct but no plus factors, asking the Court to "make sweeping conclusions about the motives and actions of Defendants"); *In re Travel Agent*

*Comm'n Antitrust Litig.*, 583 F.3d at 905; *Lowrey*, 2008 WL 11351359, at \*3 (Watson, J.). No such plus factors have been sufficiently pled here.

For example, although Plaintiff's Count III could be read to suggest that Ascent provides an opportunity for the Count III Defendants to conspire, that is not enough under *Twombly*. (Compl. ¶¶ 188–91); *In re Travel Agent Com'm Antitrust Litig.*, 583 F.3d at 911 ("a mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement"). What's more, if mere Ascent participation constituted a conspiracy, then Plaintiff presumably would have added Ascent's other owners and/or participants, including Kroger. *Cf. Lowrey*, 2008 WL 11351359, at \*3 (Watson, J.) (granting motion to dismiss and noting that the "Complaint does not allege that other partners or members of [Defendant]" played a role in the alleged conspiracy).

Similarly, conclusory statements are not a plus factor. *Twombly*, 550 U.S. at 556–57. While Plaintiff makes the conclusory statement that "Defendants' combinations had the purpose of creating or carrying out restrictions in trade or commerce for the purpose of establishing the List Price of such drugs so as to preclude free competition in the sale of these drugs," (Compl. ¶ 228), "[a] general allegation of conspiracy . . . without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a cause of action." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979); *accord Twombly*, 550 U.S. at 589 ("[A] few stray statements . . . speak[ing] directly of agreement . . . are merely legal conclusions resting on [] prior allegations."). Likewise, Plaintiff's conclusory statement that Ascent "provides an effective price-fixing tool" at some unknown time for some unspecified drugs for Express Scripts, Prime, and Humana Pharmacy Solutions is not enough under *Twombly*. (Compl. ¶¶ 187–88.) Courts do not credit such

25

statements as "they do nothing more than state a legal conclusion . . . cast in the form of a factual allegation" concerning an anticompetitive agreement.  *City of Pontiac v. Blue Cross Blue Shield of Mich.*, No. 11-10276, 2012 WL 1079885, at *2 (E.D. Mich. Mar. 30, 2012).  Accordingly, the Court should dismiss Count III of the Complaint.

### B. Count III also Fails Because the Complaint Does not Allege Facts Sufficient to Show an Unreasonable Restraint

As explained above in Section I.C., a plaintiff must allege an "unreasonable restraint" to state a claim under the Valentine Act.  Count III does not do so.  As with Count I, Count III fails to state a claim because Plaintiff fails to allege facts plausibly showing a relevant market, market power, or an anticompetitive effect.  Count III also provides no basis to deviate from the presumptive rule of reason standard because it does not describe any of the narrow types of conduct that are *per se* prohibited.  *See Nw. Wholesale Stationers, Inc.*, 472 U.S. at 295 ("purchasing cooperatives. . . are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects").

The Complaint does not allege *any* relevant market.  This failing requires dismissal of Count III for the reasons explained in Section I.C above.  *See, e.g., Worldwide Basketball & Sport Tours, Inc.*, 388 F.3d at 962 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim"); *see also Wagner*, 732 F. Supp. 2d at 803 (explaining that, to avoid dismissal at the motion to dismiss stage, "[a]n antitrust plaintiff must define the relevant market within which the alleged anticompetitive effects of the defendant's actions occur") (internal quotations omitted).

Similarly, the Complaint does not allege any market power or an anticompetitive effect. (*See supra* Section I.C.)  While the Complaint alleges that certain Defendants participate in the Ascent group purchasing organization, that fact alone fails to show—or plausibly allege—any

anticompetitive effect. As noted above, courts have long recognized that GPOs, like Ascent, "are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects." *Nw. Wholesalers Stationers, Inc.*, 472 U.S. at 295 (applying rule of reason to buying cooperative); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 343 (7th Cir. 2022) (allegations that parties followed GPO agreement not enough to allege unlawful conspiracy); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1003 (9th Cir. 2010) (denying Section 1 claims related to GPO agreement); *St. Francis Med. Ctr. v. C.R. Bard, Inc.*, 657 F. Supp. 2d 1069, 1094 (E.D. Mo. 2009) ("[GPO's] economic impact is not immediately, or even after study, obvious"). Indeed, the allegation that Express Scripts and Prime, as PBMs, sought larger rebates (i.e., lower net prices) for their clients, through Ascent, than they otherwise could have achieved on their own is precisely the type of procompetitive behavior that the antitrust laws were designed to encourage. *Cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 879 (2007) (warning against adoption of "rules . . . [that] increase[] the antitrust system's total cost by prohibiting procompetitive conduct the antitrust laws should encourage.").

### C. Count III Also Fails Because the Complaint Does Not Allege Antitrust Injury

Plaintiff does not allege antitrust injury in connection with Count III, and therefore, as explained in *supra* Section I.D., Count III should be dismissed. Specifically, Plaintiff fails to: (1) allege an injury that flows from a harm to competition; and (2) allege any injury proximately caused by Defendants. *See Care Heating & Cooling, Inc.*, 427 F.3d at 1014 (antitrust injury must be "proximately caused by defendants' allegedly illegal conduct and 'of the type the antitrust laws were intended to prevent.'").

The injury alleged by Plaintiff in Count III is "supracompetitive prices" of unspecified drugs.  (Compl. ¶ 234.)  The Complaint does not allege this injury flows from any plausibly alleged harm to *competition* resulting from the alleged agreements among the Defendants in Count III.  Indeed, the Complaint fails to allege what competition is reduced by the conduct alleged in Count III (much less in which relevant market or whether there is market power that might make such harm plausible) or how their harm results from that reduction in competition.

The Complaint also does not allege facts to demonstrate this injury was proximately caused by Defendants; to the contrary, the Complaint alleges drug manufacturers—and not Defendants—set the prices of drugs.  (*See supra* Section I.D.)  Nor does the Complaint allege why the Count III Defendants' conduct of which Plaintiff complains, such as use of rebates, tiered-formularies, prior authorization, or other utilization requirements with manufacturers, could lead to antitrust injury when the State of Ohio (and many others) employ similar tactics.  As such, dismissal of Count III is appropriate.  *See Care Heating & Cooling, Inc.*, 427 F.3d at 1014 (dismissing complaint for failure to "prove that [plaintiff] suffered an antitrust injury as a result of defendants' contract or conspiracy").

### D. *Copperweld* Bars Count III's Allegations to the Extent it Alleges a Conspiracy Between Ascent and Express Scripts

To the extent Plaintiff claims in Count III that there is an illegal agreement between Express Scripts and Ascent, such an agreement cannot violate the antitrust laws under *Copperweld*.  Express Scripts is incapable of conspiring with Ascent due to common ownership. *Directory Sales Mgmt. Corp.,* 833 F.2d at 611.  As explained in Section I.A above, *Copperweld* extends beyond the parent-subsidiary relationship and also to companies, such as Express Scripts and Ascent, who both share Cigna as an ultimate corporate parent.  *Directory Sales Mgmt. Corp.,*

833 F.2d at 611. As such, *Copperweld* bars Count III's allegations of an illegal conspiracy between Express Scripts and Ascent.

### E. *Illinois Brick* Bars Plaintiff's Ability to Seek Monetary Relief For Count III

For the same reasons explained in Section I.E above, Plaintiff is barred from seeking monetary relief for Count III. Plaintiff's prayers for disgorgement and restitution on behalf of consumers in connection with Count III are tied to overinflated prescription drug prices paid by those consumers. (*See* Compl. ¶ 234.) But Plaintiff does not allege that those consumers purchased those prescription drugs from any Defendant. As a result, *Illinois Brick* deprives Plaintiff of standing to seek monetary relief on behalf of consumers under the Valentine Act. (*See supra* Section I.E.)

### III. Count IV Should be Dismissed Because Plaintiff Fails to Sufficiently Plead Violations of the Ohio Deceptive Trade Practices Act by Express Scripts

Similar to its federal corollary, the Lanham Act, "consumers are barred from bringing actions under R.C. Chapter 4165 [Ohio's Deceptive Trade Practices Act ("DTPA")]." *Torrance v. Rom*, 2020-Ohio-3971, ¶ 50, 157 N.E.3d 172, 188 (Ohio Ct. App. 8th Dist. Cuyahoga 2020); *accord POM Wonderful LLC v. The Coca-Cola Co.*, 573 U.S. 102, 107 (2014) ("Though in the end consumers also benefit from the [Lanham] Act's proper enforcement, the cause of action is for competitors, not consumers.").

Ohio's Attorney General attempts to circumvent the DTPA's standing requirements by bringing this action "in his capacity as *parens patriae*." (Compl. ¶ 246.) But the Complaint fails to identify a statutory basis for this claim or a quasi-sovereign interest, as required for *parens patriae* actions at common law. *See West Va. ex rel. McGraw Jr. v. Comcast Corp.*, 705 F. Supp.2d 441, 451 (E.D. Pa. 2010). And as such, Plaintiff's DTPA claim must be dismissed.

But even if the Attorney General could bring a DTPA action as *parens patriae* to address harms allegedly suffered by a particular group of consumers—and it cannot—Plaintiff's reliance on vague, conclusory allegations dooms its DTPA claim. *See, e.g., Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-cv-427, 2015 WL 12999664, at *7–8 (S.D. Ohio March 12, 2015) (Watson, J.); *cf. Scheetz v. Consumer Res. Corp.*, No. 2:07-cv-00207, 2008 WL 11350242, at *3 (S.D. Ohio June 23, 2008) (Waston, J.) (complaint's failure to "describe the contents of any email . . . plaintiffs consider unfair or deceptive and why they believe this is so . . . [beyond] preceding the allegations with the phrase 'upon information and belief . . . does little to satisfy the requirements of Rule 9(b)").

"Courts in Ohio analyze ODTPA claims in the same way that they analyze claims based on Section 43(a) of the Lanham Act." *Evanston Ins. Co. v. Certified Steel Stud Assoc., Inc.*, 787 Fed. App'x. 879, 885 (6th Cir. 2019); *see also Ashley Furniture Indus.*, 2015 WL 12999664, at *6 ("A claim under the ODTPA is treated the same as a claim for false advertising under the Lanham Act."). Ohio courts have repeatedly affirmed that, because the DTPA is "substantially similar to the federal Lanham Act," DTPA claims should be adjudicated using "the same analysis applicable to [Lanham Act] claims." *Enduring Wellness, LLC v. Roizen*, 2020 Ohio 3180, 2020 WL 3001027, at *7 (Ohio Ct. App. 8th Dist. Cuyahoga, June 4, 2020).[10] Thus, to

---

[10] *See, e.g., Michelson v. Volkswagen Aktiengesellschaft*, 2018-Ohio-1303, ¶ 16, 99 N.E.3d 475, 479 (Ohio Ct. App. 8th Dist. Cuyahoga 2018); *Heartland of Urbana OH, LLC v. McHugh Fuller Law Grp., P.L.L.C.*, 2016-Ohio-6959, ¶ 59, 72 N.E.3d 23, 37 (Ohio Ct. App. 2d Dist. Champaign 2016); *Bedford Auto Dealers Ass'n. v. Mercedes Benz of N. Olmsted*, No. 97080, 2012 WL 760626, at *3 (Ohio Ct. App. 8th Dist. Cuyahoga March 8, 2012); *Dawson v. Blockbuster, Inc.*, No. 86451, 2006 WL 1061769, at *4 (Ohio Ct. App. 8th Dist. Cuyahoga March 16, 2006); *Chandler & Assoc., Inc. v. Am.'s Healthcare Alliance, Inc.*, 125 Ohio Ct. App.3d 572, 709 N.E.2d 190, 195 (Ohio Ct. App. 8th Dist. Cuyahoga 1997); *Yocono's Restaurant, Inc. v. Yocono*, 100 Ohio Ct. App.3d 11, 651 N.E.2d 1347, 1350 (Ohio Ct. App. 9th Dist. Summit 1994); *Cesare v. Work*, 36 Ohio Ct. App.3d 26, 520 N.E.2d 586, 590 (Ohio Ct. App. 9th Dist. Summit 1987);

survive a motion to dismiss, Plaintiff must adequately allege that it is (1) "within the zone of interests protected by the law"; and (2) that there is "proximate causation" between Plaintiff's injuries and Express Scripts' actions. *Lexmark Intern., Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 129, 133 (2014). For a DTPA claim to be viable, a plaintiff must allege "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that [injury] occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

## A. Plaintiff Lacks Standing to Bring a DTPA Claim Against Express Scripts On Behalf of Ohio Plan Sponsors

Plaintiff's DTPA claim focuses exclusively on alleged "misrepresentations and misleading statements" made by Express Scripts to "Ohio Plan Sponsors," including "public entities that offer employee benefit plans that include prescription drug benefits." (*See generally* Compl. ¶¶ 241–45.) But it is clear that, as purchasers of PBM services, Plan Sponsors lack standing to bring such a claim. *See Lexmark*, 572 U.S. at 132 ("A consumer [including a business] who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act"); *see also Holbrook v. La.-Pacific Corp.*, 533 Fed. App'x. 493, 498 (6th Cir. 2013) (affirming lower court ruling that plaintiff "does not have standing to raise an ODTPA claim as a consumer."). Indeed, "a business misled by a supplier into purchasing an inferior product is . . . not under the Act's aegis." *Lexmark*, 572 U.S. at 132.

Vague references to "harm to the State's general economy and to a substantial segment of its natural person residents," (Compl. ¶¶ 246–47), cannot be framed in commercial terms

---

*Blankenship v. CFMOTO Powersports, Inc.*, 2011-Ohio-948, ¶ 27, 944 N.E.2d 769, 777–78 (Ohio Ct. C.P. Clermont Cnty. 2011).

sufficient to save Plaintiff's DPTA claim.  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804, 2019 WL 2468267, at *25 (N.D. Ohio Apr. 1, 2019), *adpt'd in part, overruled in part on other grounds by* 2019 WL 3737023, at *1 (N.D. Ohio June 13, 2019) (Indian Tribe's "real interest . . . is in the physical well-being of its citizens, and the fiscal health of its government," which "do[es] not fall within the zone of interests protected by the Lanham Act").  Nor can Plaintiff satisfy the DTPA's "commercial plaintiff" requirement "with accusations that the Defendants were 'unjustly enriched' by the alleged false advertising."  *McCleese v. Natorp's, Inc.*, No. 1:20-cv-118, 2021 WL 2270511, at *4 (S.D. Ohio June 3, 2021).

### B.  *Parens Patriae* **Actions are Subject to DTPA's Standing Requirements**

Plaintiff cannot surpass the DTPA's standing requirements by bringing the claim in its *parens patriae* capacity.  States can "acquire *parens patriae* standing . . . through a grant of statutory authority or by meeting the requirements of the common law."  *Comcast Corp.*, 705 F. Supp.2d at 451.  The DTPA does not contain any provisions specifically authorizing the Attorney General to initiate an action as *parens patriae,* and the Complaint's admission that the claim is brought to address alleged harms felt by a discrete group of Ohio citizens, Ohio Plan Sponsors, is fatal at common law.[11]

To bring a common law *parens patriae* action, Ohio "must be more than a nominal party" and "must express a quasi-sovereign interest" that is separate and distinct from the interests of a private party.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).  To establish an interest apart from the interests of a particular group of individual citizens, the State must show the relief sought would benefit Ohio residents generally, and not

---

[11] In contrast, both Ohio and federal antitrust laws, do contain such provisions.  *See Pa. v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125, 129 n.8 (4th Cir. 1983) (explaining that Hart-Scott-Rodino Act "statutory 'parens patriae' action is broader in scope than the common law action").

just "an identifiable group of individual residents."  *See Ohio v. GMAC Mortg., LLC*, 760 F.

Supp.2d 741, 749–50 (N.D. Ohio 2011).

Importantly, the *parens patriae* doctrine "does not confer standing upon a state simply to

represent the interests of any of its citizens who, for whatever reason, cannot represent

themselves; there must be an independent state sovereign interest at stake."  *U.S. v. Johnson*, 114

F.3d 476, 481 (4th Cir. 1997); *LG Display Co., Ltd. v. Madigan*, 665 F.3d 768, 771 (7th Cir.

2011) (same).  "[W]hile there is no definitive threshold on the proportion of the population of the

state that must be adversely affected by the challenged behavior, there must be an injury to more

than an identifiable group of individual residents."  *GMAC Mortg.*, 760 F. Supp.2d at 749–50

(noting that the fact Ohio's Attorney General "chose to act on behalf of a group of residents . . .

does not, by itself, automatically turn the action into an action that benefits all Ohio

consumers"); *accord In re Suwinkski*, 509 B.R. 568, 573 (Bankr. S.D. Ohio 2013) ("there must

be an injury to a substantial segment of its population").  As with Ohio Plan Sponsors, the

"substantial segment" of Ohio residents harmed by Express Scripts' alleged deceptions is an

identifiable, limited group of Ohio residents, i.e., Ohio beneficiaries of health plans that

contracted with Express Scripts for PBM services.  Plaintiff's decision to only sue one PBM for

violations of the DTPA further demonstrates that this action does not seek to address a quasi-

sovereign interest.  *GMAC Mortg.*, 760 F. Supp.2d at 750 (noting that Ohio would have been

more likely to establish *parens patriae* standing had it not "chosen to pursue only a single

mortgage company").

Here, Plaintiff is, by its own admission, "merely litigating as a volunteer the personal

claims of its citizens."  *Pa. v. N.J.*, 426 U.S. 660, 665 (1976); (*see* Compl. ¶ 246 ("The Attorney

General . . . bring[s] this action . . . to enjoin and remedy the wrongful and deceptive acts . . .

perpetrated upon Ohio Plan Sponsors").)  This is insufficient to sustain *parens patriae* standing.

A state plaintiff cannot convert the interests of private parties—here, Ohio Plan Sponsors—into

"sovereign interests . . . simply by virtue of the State's aiding in their achievement."  *Alfred L.*

*Snapp & Son, Inc.*, 458 U.S. at 602; *accord Harrison v. Jefferson Parish School Bd.*, No. 22-

30143, 2023 WL 5359049, at *6 (5th Cir. Aug. 22, 2023) (supposed quasi-sovereign interest was

"wholly derivative of the interests of JPSB's students"); *GMAC Mortg.*, 760 F. Supp.2d at 750

(Ohio cannot invoke the *parens patriae* doctrine simply for a "group of residents").  As with

Ohio Plan Sponsors, the "substantial segment" of Ohio residents harmed by Express Scripts'

alleged deceptions is an identifiable, limited group of Ohio residents, i.e., Ohio beneficiaries of

health plans that contracted with Express Scripts.

Finally, the Attorney General cannot evade the quasi-sovereign interest requirement by

simply referencing "some secondary benefits to the Ohio economy" from relief that "will

primarily benefit . . . specific Ohio [citizens]."  *GMAC Mortg.*, 760 F. Supp.2d at 751; *see also*

*Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305–06 (6th Cir. 2019) (no *parens patriae*

standing where "only injury alleged is injury to an identifiable group of Arizonans . . . and

Arizona has not fleshed out the indirect effects of this alleged injury on Arizona as a whole").

States are entitled to "'special solicitude' when they seek to vindicate their 'proprietary'

or 'quasi-sovereign' interests . . . This does not mean, however, that states have unbridled license

to sue," particularly when no plausible "quasi-sovereign interests" have been identified.  *Batalla*

*Vidal v. Duke*, 295 F. Supp.3d 127, 158 (E.D.N.Y. 2017) (rejecting plaintiffs' *parens patriae*

standing theory) (internal citation omitted).  The Court should thus reject Plaintiff's *parens*

*patriae* theory and dismiss the DTPA claim for lack of standing.

**C. Plaintiff's Conclusory Allegations are Insufficient to Support a DTPA False Advertising Claim**

Plaintiff's DTPA claims also fail because they are insufficiently pled. Plaintiff alleges that Express Scripts "***knowingly*** and ***willfully*** made repeated misrepresentations" and "false statements of fact to Ohio Plan Sponsors" regarding PBM services provided by Express Scripts. (Compl. ¶¶ 242–45.) (emphasis added). These are allegations sounding in fraud and, thus, subject to Rule 9(b)'s heightened pleading standard. *See Fraud*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 256 n.7 (6th Cir. 2012). Accordingly, Plaintiff must "at a minimum, . . . allege the time, place, and content of the alleged misrepresentation on which he or she relied . . . with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (citation omitted). Plaintiff's DTPA claim provides none of these details, and thus, must be dismissed.

Indeed, Plaintiff's scant allegations would fail even under Rule 8's pleading standards. *Williamson v. Rexam Beverage Can Co.*, 497 F. Supp.2d 900, 909 (S.D. Ohio 2007) ("Even if Rule 9(b) does not apply to Lanham Act claims, a plaintiff should plead the nature of alleged misrepresentations with some degree of particularity."). Plaintiff has not actually identified *any* statements, deceptive or otherwise, that Express Scripts made to Ohio Plan Sponsors. Thus, it is not possible to evaluate whether Plaintiff's DTPA claim concerns statements that are "literally false" or "literally true or ambiguous, but has the tendency to deceive consumers." *Campfield v. Safelite Grp., Inc.*, No. 2:15-cv-2733, 2019 WL 13079480, at *5 (S.D. Ohio March 28, 2019) (Waston, J.) (quoting *Innovation Ventures, LLC v. N.V.E. Inc.*, 694 F.3d 723, 735 (6th Cir. 2012)); *see also Torrance*, 2020-Ohio-3971, ¶ 56, 157 N.E.3d at 189 ("A well-pled complaint

must include factual allegations going to each element of the [ODTPA] claim, and conclusory statements without any factual allegations in support are insufficient."); *cf. Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 725–27 (N.D. Ohio 2009) (DTPA prohibits false advertising, not "mere puffery"). For the latter type of statements, a complaint must contain sufficient allegations to "support a plausible inference that the challenged advertisements in fact misled a significant number of reasonable consumers." *Campfield*, 2019 WL 13079480, at *6 (quoting *Wysong Corp. v. APN, Inc*., 889 F.3d 267, 271 (6th Cir. 2018)).

Here, the Complaint's sparse allegations provide no basis for concluding that Plan Sponsors, a highly sophisticated group of consumers advised by highly sophisticated consultants, were actually misled by Express Scripts regarding the quality of its PBM services and its relationship with manufacturers. *See generally Truveris, Inc. v. Skysail Concepts, LLC*, No. 1:21-cv-01262, 2022 WL 4537071 (N.D. Ohio Sept. 28, 2022) (discussing PBM selection process, including role of third-party consultants and lengthy RFPs). Indeed, the Complaint is devoid of *any* allegations actually describing the misleading statements Express Scripts allegedly made to Ohio Plan Sponsors. Absent such allegations, Plaintiff's DTPA claim must fail.[12]

---

[12] Plaintiff's failure to adequately allege the underlying bases for its DTPA claim leaves Express Scripts in the dark as to the applicable statute of limitations; for example, DTPA claims carry different statute of limitations depending on the underlying basis for the action. *Compare Lasmer Indus., Inc. v. AM Gen., LLC*, 741 F. Supp.2d 829, 839 (S.D. Ohio 2010) (one-year defamation statute of limitations for DTPA claim rooted in disparaging comments), *and Plumbing & Pipefitting Indus. Loc. 219 Pension Fund v. Buck Consultants, LLC*, No. 4:07-cv-1609, 2007 WL4287870, at *4 (N.D. Ohio Dec. 6, 2007) *aff'd sub nom. Loc. 219 Plumbing & Pipefitting Indus. Pension Fund v. Buck Consultants, LLC*, 311 F. App'x 827 (6th Cir. 2009) (four-year statute of limitations with no discovery tolling for DTPA claimed based on negligent misrepresentations).

IV.   **Count V Against Express Scripts Fails Because Plaintiff Has Not Adequately Pled a Claim**

### A. <u>Plaintiff Has Not Alleged Facts to Plead a Violation of R.C. 3959.20(C)</u>

The Complaint does not sufficiently plead a violation of R.C. 3959.20(C) because it does not allege facts showing prescription claims were adjusted inappropriately or any fees were imposed that were not able to be determined at the time of adjudication. Ohio law does not prohibit Express Scripts from auditing contracted pharmacies, nor does it prohibit Express Scripts from retroactively adjusting the amount reimbursed to a pharmacy for a particular claim pursuant to the terms of its contracts with those pharmacies. Instead, R.C. 3959.20(C)(1) states that "No . . . pharmacy benefit manager . . . shall *retroactively adjust a pharmacy claim* for reimbursement for a prescription drug unless the adjustment is the result of either of the following: (a) A pharmacy audit conducted in accordance with sections 3901.811 to 3901.814 of the Revised Code; (b) A technical billing error." Ohio Rev. Code § 3959.20(C)(1) (emphasis added). And R.C. 3959.20(C)(2) states that "No . . . pharmacy benefit manager . . . shall charge *a fee* related to a claim unless the amount of *the fee* can be determined at the time of claim adjudication." (emphasis added). Notably, the statute distinguishes between adjustments of a "pharmacy claim" on the one hand, and "fees" on the other.

First, the Complaint alleges no facts to support a conclusion that Express Scripts violated R.C. 3959.20(C)(1) because there are no facts alleged as to whether any of the purported adjustments to prescription claims (described as "clawbacks" at Compl. ¶¶ 160–67) are a result of audits or technical billing errors. In addition, the Complaint fails to identify any particular pharmacies impacted by these alleged adjustments or any particular claims that were adjusted. Rather, the Complaint merely alleges that there are some adjustments on some unidentified

claims at some unidentified pharmacies and concludes that is illegal.  This is precisely the type of formulaic recitation that cannot satisfy *Twombly*'s plausibility standard.  *Twombly*, 550 U.S. at 555–57.

Second, the Complaint alleges no facts to establish any "fees" were charged in violation of R.C. 3959.20(C)(2).  To be sure, the Complaint alleges there are adjustments to the "adjudicated claim" after the date of adjudication (Compl. ¶ 160), but then the Complaint simply concludes this adjustment is somehow a "fee."  (*Id.* ¶ 161; *see also id.* ¶¶ 162–63 (asserting alleged aggregated adjustments to claims payments is a "fee"); *id.* ¶¶ 164–68 (asserting alleged adjustments related to rates for claim reimbursement is a "fee")).  There are no facts alleged to support how an adjusted claim becomes a "fee" in violation of the statute.  An adjusted claim does not plausibly become a "fee" merely because Plaintiff says so in its Complaint.  Indeed, if adjusted "claims" were "fees" there would be no point to R.C. 3959.20(C)(1), as R.C. 3959.20(C)(2) would prohibit all such adjustments.  Plaintiff thus fails to support a claim in Count V.

### B.  Plaintiff has Not Alleged Facts to Support a Claim for Injunctive Relief Under Count V

Plaintiff's claim for injunctive relief under Count V also fails because Plaintiff does not plausibly allege facts to support any of the required factors for a permanent injunction, including "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Cleveland v. Cleveland Elec. Illuminating Co.*, 115 Ohio Ct. App. 3d 1, 12, 684 N.E.2d 343 (8th Dist. 1996) (listing similar factors); *State of Ohio v.*

*City of Cincinnati Citizen Complaint Auth.*, 2019-Ohio-5349, ¶ 19, 139 N.E.3d 947, 953 (Ohio Ct. App. 1st Dist. Hamilton 2019) ("The grant of a permanent injunction is an extraordinary remedy in equity where there is no adequate remedy available at law.") (citations omitted). Indeed, even if there were improper claims adjustments or fees charged to some pharmacies, monetary payments would presumably be adequate compensation for any injury. The Complaint fails to allege any facts to the contrary or any facts that could meet the four-factor permanent injunction test above. Accordingly, Plaintiff's claim in Count V for injunctive relief should be dismissed.

### V. Count VI Should be Dismissed Because Plaintiff has not Plausibly Alleged Facts to Establish the Elements of an Unjust Enrichment Claim

Plaintiff fails to allege facts sufficient to establish any of the elements necessary to plead an unjust enrichment claim, namely: "(1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *MVB Mortg. Corp. v. F.D.I.C.*, No. 2:08-cv-771, 2010 WL 654051, at *3 (S.D. Ohio Feb. 19, 2010).

As a dispositive point, Plaintiff fails to plausibly allege any benefit conferred by Ohio consumers upon the Moving Defendants. Here, Plaintiff alleges Defendants "have been unjustly enriched at the expense of uninsured and underinsured consumers in the State of Ohio, as well as at the expense of Ohio consumers whose out-of-pocket expenditures for prescription drugs are calculated on the basis of Manufacturers' List Prices." (Compl. ¶ 256.) But as explained in Sections I.E. and II.E., the State is premising its claim on the rights of indirect purchaser consumers who did not directly purchase any prescription drug—or any product or service at all—directly from any Moving Defendant. Ohio courts have held that an unjust enrichment claim is unavailable to such indirect purchasers who lack standing to circumvent the antitrust law

39

and seek damages under an unjust enrichment theory. *See, e.g.*, *Gearhart v. Express Scripts, Inc.*, 422 F. Supp.3d 1217, 1226-27 (E.D. Ky. 2019) (Consumer's unjust enrichment claim against Express Scripts failed "as a matter of law" because consumer did not pay Express Scripts directly or even speak to anyone at Express Scripts); *Becker v. Cardinal Health, Inc.*, 2021-Ohio-3804, ¶ 21, 179 N.E.3d 769, 777 (Ohio Ct. App. 10th Dist. Franklin 2021) ("[A]n indirect purchaser cannot assert a claim for unjust enrichment against a defendant without establishing a benefit had been conferred upon that defendant by the purchaser.") (internal citations omitted). Plaintiff's unjust enrichment claim thus fails on this basis alone. *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 22, 834 N.E.2d 791, 799 (Ohio 2005) (affirming dismissal of unjust enrichment claim because "no economic transaction occurred between [plaintiff] and [defendant], and, therefore, [plaintiff] cannot establish that [defendant] retained any benefit to which it is not justly entitled") (internal citations omitted).

Separately, Plaintiff has also not alleged that the Moving Defendants had knowledge of the purported benefit or that the Moving Defendants retained any benefit. Indeed, without any alleged payments from consumers to Moving Defendants, there can be no knowledge of such payments and no retention of such payments. Plaintiff's unjust enrichment claim should thus be dismissed. *See, e.g.*, *Ohio Edison Co. v. Direct Energy Business, LLC*, No. 5:17-cv-746, 2017 WL3174347, at *4 (N.D. Ohio July 26, 2017) (dismissing unjust enrichment claim where "Plaintiffs provide[d] no facts from which the court [could] infer more than the 'mere possibility' that Defendant had the requisite knowledge" of the alleged benefit).

## VI. Count VII Should be Dismissed Because Plaintiff Has Not Plausibly Alleged Facts to Establish the Elements of a Civil Conspiracy Claim

Plaintiff's final cause of action is for civil conspiracy (Count VII) and alleges "malicious combination and conspiracy" by all Defendants based upon "[t]he conduct described in this

40

complaint." (Compl. ¶ 258.)  Plaintiff's civil conspiracy count fails because—for similar reasons to those set forth throughout this motion—Plaintiff has not alleged the required elements.

To establish a civil conspiracy under Ohio law, a plaintiff must plead "the following elements: (1) a malicious combination; (2) between two or more people; (3) actual injury; and (4) the existence of an unlawful act independent from the actual conspiracy." *Lowrey,* 2008 WL 11351359, at *4 (Watson, J.).  The conspiracy "must be pled with some degree of specificity, and vague or conclusory allegations that are unsupported by material facts will not be sufficient to state a claim." *Spears v. Chrysler, LLC*, No. 3:08-cv-331, 2011 WL 540284, at *11 (S.D. Ohio Feb. 8, 2011) (citation omitted).  Here, Plaintiff fails to allege a malicious conspiracy, actual injury, and any underlying tort.

First, with respect to element one, a "malicious combination" requires a "common understanding or design, even if tacit, to commit an unlawful act." *Lowrey,* 2008 WL 11351359, at *4 (Watson, J.).  As detailed above in Section II, Plaintiff has not plausibly alleged an unlawful conspiracy to commit any alleged unlawful act.  Mere membership in an organization or process is not sufficient for a showing of malicious combination in the absence of "facts describing" specific conduct.  *Id.*  Plaintiff's allegations that Express Scripts is an owner of, or participant in, Ascent is therefore not enough to allege malicious combination.  Nor do the scant allegations as to Cigna and Evernorth connect them, as parent companies, to any conspiracy to "injur[e] uninsured and underinsured consumers" or "consumers whose out-of-pocket expenditures for prescription drugs are calculated on the basis of Manufacturers' List Prices," which no Defendant sets.  (Compl. ¶ 258.)

Further, Plaintiff has not plausibly alleged any unlawful, independent act.  "It has long been established that an underlying tort is required in order for a civil conspiracy claim to be

41

successful." *Hollar v. Phillip Morris, Inc.*, 43 F. Supp.2d 794, 810 (N.D. Ohio 1998) (quoting *Minarik v. Nagy*, 193 N.E.2d 280 (Ohio Ct. App. 8th Dist. Cuyahoga 1963)) (finding fraud "adequately pled" as the "predicate act"). As discussed throughout this Motion, the Complaint fails to allege an unlawful underlying act that could serve as a predicate for a civil conspiracy.

Finally, Plaintiff's civil conspiracy claim fails because Plaintiff has not alleged actual injury. Rather Plaintiff asserts only that Defendants had the "purpose and effect of injuring uninsured and underinsured consumers . . . as well as [*sic*] Ohio consumers whose out-of-pocket expenditures for prescription drugs are calculated on the basis of Manufacturers' List Prices." (Compl. ¶ 258.) As discussed above, the Complaint alleges drug manufacturers set prescription drug list prices, and thus any alleged actual injury is conclusory at best. As such, Count VII should be dismissed.

## VII. Cigna and Evernorth Should be Dismissed from this Action

The Complaint is notably sparse as to any facts about Cigna or Evernorth. Indeed, the Complaint contains no allegations connecting Cigna and Evernorth to the alleged unlawful conduct beyond the fact that they are parent companies of Express Scripts. Plaintiff's few independent references, (*see* ECF No. 42-1 at PAGEID 1791–92), to Cigna and Evernorth are "bare allegations without any reference to the 'who, what, where, when, how or why'" of the alleged conspiracy. *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 437 (citing *Twombly*, 550 U.S. at 564)). Plaintiff's "indeterminate assertions" lumping Cigna and Evernorth together with other defendants "represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 905 (citing *Twombly*, 550 U.S. at 565 n.10); *see also In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840,

906 (N.D. Ohio 2010) (dismissing corporate parents where complaint did "not sufficiently allege any concerted action on their part"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 972–73 (W.D. Tenn. 2004) (granting motion to dismiss and "declin[ing] to presume that a parent company participates in every decision or action of its subsidiary"). Cigna and Evernorth should thus be dismissed from this action even if any claims against other Defendants survive.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint.

Dated: September 20, 2023                    Respectfully submitted,

RULE GARZA HOWLEY LLP                    TAFT STETTINIUS & HOLLISTER LLP

Charles F. Rule                          */s/ David J. Butler*
Daniel J. Howley                         David J. Butler (0068455), Trial Attorney
Emily M. Renzelli                        41 South High Street, Suite 1800
Benjamin Z. Bergmann                     Columbus, Ohio 43215
Erica N. Baum                            Telephone: (614) 221-2838
1701 Pennsylvania Ave. NW, Suite 200     dbutler@taftlaw.com
Washington, D.C. 20006
Telephone: (202) 843-9280                Jeanne M. Cors (0070660)
rule@rulegarza.com                       425 Walnut Street, Suite 1800
howley@rulegarza.com                     Cincinnati, Ohio 45202
renzelli@rulegarza.com                   Telephone: (513) 381-2838
bergmann@rulegarza.com                   cors@taftlaw.com
baum@rulegarza.com

*Counsel for Ascent Health Services LLC, Express Scripts, Inc., The*
*Cigna Group, and Evernorth Health, Inc.*

43

## <u>CERTFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 20, 2023, a copy of the foregoing was

filed electronically. Notice of this filing will be sent to all parties in this case by operation of the

Court's CM/ECF system.  Parties may access this filing through the Court's system.


<u>*/s/ David J. Butler*</u>
David J. Butler (0068455)