**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

STATE OF OHIO, ex rel. DAVE YOST
ATTORNEY GENERAL OF OHIO

*Plaintiff*,

v.

ASCENT HEALTH SERVICES LLC;
EXPRESS SCRIPTS, INC.; CIGNA
GROUP; EVERNORTH HEALTH, INC.;
PRIME THERAPEUTICS LLC; HUMANA
PHARMACY SOLUTIONS, INC.;
HUMANA INC.

*Defendants*.

Civil Action No. 2:23-CV-1450

Judge Michael H. Watson
Magistrate Judge Chelsey M. Vascura

**PLAINTIFF STATE OF OHIO'S MEMORANDUM IN OPPOSITION TO DEFENDANT
PRIME THERAPEUTICS LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A
CLAIM**

Ohio's Attorney General filed this action to address an ongoing crisis impacting large

segments of the State's population. At the heart of that crisis is a series of heavily-shrouded

agreements and alliances orchestrated by certain pharmacy benefit managers ("PBMs") that

force the prices of prescription drugs ever upward, tragically leaving many Ohioans with the

choice between forgoing life-saving medications and financial ruin. Some of these agreements

take the form of pay-to-play schemes imposed by PBMs upon drug manufacturers; another is an

alliance created to enable competing PBMs to better conceal and further the aims of their

individual pay-to-play schemes. But regardless of the form that each such agreement or alliance

has taken, they have one thing in common – they are combinations formed and utilized for one or

more of the improper purposes enumerated in Ohio's antitrust law, the Valentine Act.

Defendant Prime Therapeutics LLC ("Prime") has formed, maintained, and participated in both types of combinations. And as described in detail in the State's complaint, it has violated Ohio law by doing so for multiple improper purposes.

Instead of explaining to this Court, however, why its combinations do not violate the Valentine Act – or at least why the State's complaint fails to give it adequate notice of how they do – Prime bobs and weaves to avoid any contact with the plain language of the primary statute under which this case was brought and the *actual* claims pled in the complaint. The motivation for this strategy is clear. It allows Prime to ignore nearly 50 pages of detailed factual allegations in the complaint that describe the combinations comprising Prime's (and other PBMs') pay-to-play arrangements with manufacturers and the unlawful purposes for which they are operated. It allows Prime to turn a blind eye to the complaint's allegations of the improper purposes of the competitor collaboration known as Ascent Health Services, instead proclaiming broadly that group purchasing organizations are always procompetitive. It allows Prime to claim that the Ohio Attorney General – the chief law enforcement officer of the State – has no authority to enforce Ohio's Valentine Act because Prime believes his "real beef" is high drug prices and thus he must really be seeking damages for indirect purchasers, even though the complaint contains no such request.

A plaintiff does, indeed, have the burden of pleading its claims in a manner that gives a defendant notice of the case against it. But a defendant has the obligation to respond to the complaint *actually* filed. Prime has not done so. Its motion to dismiss should be rejected.

I.    **ARGUMENT**

A.  **The State's complaint – when analyzed under the proper standards of pleading a Valentine Act claim – far exceeds the threshold for a well-pled complaint.**

Prime devotes much of its motion to expounding upon all of the ways in which the State's complaint fails to meet federal antitrust pleading standards.  Its arguments would merit careful consideration if the complaint had been brought under federal law.  But it was not.  That simple fact creates a fatal flaw in Prime's request that the complaint be dismissed.

1.  **Prime's assertion of the legal standard applicable in this case ignores the plain language of the Valentine Act.**

As a preface to its Argument, Prime describes the legal standard that it urges this Court to adopt in analyzing the sufficiency of the State's complaint.  Prime Motion, ECF No. 76 at PageID 2639–40.  It bases that standard on *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), and its progeny.  While *Twombly* undoubtedly stands as relevant precedent for cases pleading conspiracy under the federal antitrust laws, this action was brought in *state* court to enforce *state* law.  It is wrong to suggest that *Twombly* somehow voided the Ohio legislature's plain instructions on how a Valentine Act claim must be pled.

Ohio Revised Code §1331.09 provides the following unambiguous guidance on the standards by which the sufficiency of a Valentine Act complaint must be judged:

> In an indictment for an offense provided for in sections 1331.01 to 1331.14, inclusive, of the Revised Code, it is sufficient to state the purpose or effects of the trust or combination, and that the accused is a member thereof, or acted with or in pursuance of it or aided or assisted in carrying out its purposes, without giving its name or description, or how, when, and where it was created.

R.C. §1331.09.  While the word "indictment" may give the modern reader pause to wonder if the mandates of that section apply solely to criminal actions brought under the Valentine Act, at least one Ohio court has held that R.C. §1331.09 applies equally to civil and criminal actions.  In

*Goode v. Ohio Valley Druggists' Ass'n,* 16 Ohio Dec. 586 (C.P. Hamilton Cty. 1906), the Court analyzed the proper application of the predecessor to R.C. 1331.09 – Section 5, 93 O.L. 144 – which was the same in all relevant respects as the current statutory language.[1] In upholding the sufficiency of the complaint, the Court clarified that Section 5 provided the standard by which to assess the pleading of a civil Valentine Act claim, stating that: "What is here held sufficient for the purposes of a criminal prosecution, applies in all its force to a civil action." *Goode*, 16 Ohio Dec. at 587. No Ohio court has held otherwise.

Thus, the required elements of a sufficient claim under the Valentine Act – either civil or criminal – are: (1) that defendant is a member of a combination; and (2) that the purpose or effects of the combination are among those listed as improper in the Act. In ruling upon a motion seeking dismissal of a complaint for failure to plead those elements, "[t]he allegations of the complaint must be taken as true, and those allegations and any reasonable inferences drawn from them must be construed in the nonmoving party's favor." *Ohio Bureau of Workers' Comp. v. McKinley,* 130 Ohio St. 3d 156, 159 (2011).

Ohio courts have recognized the unambiguous pleading standard contained within Ohio's Valentine Act and have rebuffed attempts to expand it. In *State v. Ice Delivery Co.,* 17 Ohio Dec. 515 (CP Hamilton Cty. 1907), the Court considered the sufficiency of an indictment that alleged the existence of an unlawful ice trust operating in Ohio. Refusing to dismiss the State's case, the Court relied upon Section 5 (now R.C. 1331.09), saying:

> Whether the trust did or did not carry out any, a part or all of the purposes
> referred to, or the manner in which it carried any or all of them out by

---

[1] "Laning 7590 (B. 4427-5) or simply "Section 5", in effect when *Goode* was decided, read as follows: "In any indictment for any offense named in this act, it is sufficient to state the purpose or effects of the trust or combination. And that the accused is a member of, acted with or in pursuance of it, or aided or assisted in carrying out its purposes, without giving its name or description, or how, when and where it was created."

> overt acts is entirely immaterial. The fact that the indictment does not aver
> the particular manner in which the trust controlled the price of ice or the
> means by [**32] which it proposed to do so does not, in view of the
> language of Sec. 5 (93 O. L. 144), viz.: "In any indictment for any offense
> named in this act, it is sufficient to state the purpose or effects of the trust
> or combination," make it defective. If we construe the law correctly, it is
> not necessary for the trust to do any overt act beyond the organization of
> the conspiracy or combination, nor for the individual members of the trust
> to do anything more than to be a member of it.

*Id.* at 528.

Similarly, in *State v. Crystal Ice Mfg. & Cold Storage Co.,* 17 Ohio Dec. 640 (C.P.

Franklin Cty. 1906), the court explained:

> The offense under the statute is the unlawful combination of skill and acts
> for this purpose. The particular means to be employed to accomplish the
> unlawful purposes may not have been agreed upon and are not in my
> opinion essential to the statement of an offense under the statute. The gist
> of the offense is the formation of a combination for such purpose.

*Id.* at 643. *See also Needles v. Bishop & Babcock Co.,* 14 Ohio Dec. 445, 447–48 (C.P. Franklin

Cty. 1904 (a Valentine Act complaint need not show "evil intent or actual injury to the public").

While some more recent Ohio cases have dismissed claims under the Valentine Act based

on the application of federal pleading standards (*see, e.g., Eichenberger v. Graham,* 2013-Ohio-

1203 (10th Dist. App. 2013) (lack of allegations of antitrust injury and "adverse affect [sic] on

the market as a whole"); *Schweitzer v. Riverside Methodist Hosps.,* 108 Ohio App. 3d 539, 544–

45 (10th Dist. App. 1996) (complaint must allege antitrust injury, "impact on the competition as

a whole within the relevant market…", and market power), no such decision has considered and

expressly rejected Revised Code §1331.09. Rather, those decisions are silent on the issue.

Revised Code §1331.09 has not been repealed by the Ohio legislature, nor has it been

held inapplicable or unenforceable by any court. Therefore, it provides the unambiguous

standard by which the State's complaint in this case must be judged. And as the Ohio Supreme

Court has declared: "…when the meaning of a statute is unambiguous and definite, it must be

applied as written and no further interpretation is necessary." *State ex rel. Prade v. Ninth Dist. Court of Appeals,* 151 Ohio St. 3d 252, 255 (2017); *see also Bevan & Assocs LPA v. Yost,* 929 F. 3d 366, 375 (6ᵗʰ Cir. 2019) (unambiguous statutory language "'must be applied as written' and not be subject to 'further interpretation'"). But even if the *Twombly* plausibility threshold were overlayed onto the pleading standards of Revised Code §1331.09, the result is unchanged. As sections I.A.2 and I.A.3 below demonstrate, the complaint more than plausibly alleges that Prime is a member of the specified combinations; and that the purpose or effects of those combinations are among those listed as improper in the Act.

### 2. Count II clearly alleges Prime's participation in pay-to-play combinations for improper purposes.

The State's complaint alleges, in Count II, that Prime has used its position in the highly-complex pharmaceutical distribution system to coerce drug manufacturers into rebate agreements that have the purpose and effect of restraining trade or commerce, fixing and raising the prices of prescription drugs, and precluding free competition in the sale of these drugs. Complaint, ECF No. 12 at PageID 1356–57, paragraphs 216–17, 221. These allegations alone satisfy the requirements of Revised Code §1331.09 for pleading a sufficient Valentine Act claim. *See Goode,* 16 Ohio Dec. at 587 ("[i]t is sufficient to state [defendants'] wrongdoing in the language of the act, with the further allegation that they are done in pursuance of said illegal combination.").

But the complaint does not stop there. It goes on to allege the nature of the injury caused to specified classes of Ohioans by Prime's unlawful combinations in the form of supracompetitive drug prices. Complaint, ECF No. 12 at PageID 1357, paragraph 220. It alleges deceptive tactics utilized by Prime to further the operation and purposes of the combinations. *Id.* at paragraph 221. And it incorporates by reference the factual allegations earlier in the complaint

regarding Prime's "black box rebate and discount operations," its "ongoing pricing and rebate schemes" (paragraph 27), and the manner in which these pricing and rebate schemes are executed through "formulary exclusion [or demotion] tactics" (paragraphs 73–76). Complaint, ECF No. 12 at PageID 1315, 1325.

Prime's lengthy exposition on Sherman Act pleading requirements – product and geographic market definition, market power, and anticompetitive effects – is inapposite. It rests on the following statement from *Johnson v. Microsoft Corp.,* 834 N.E. 2d 791, 795 (Ohio 2005): "[d]ue to the similarity of these provisions, Ohio has long followed federal law in interpreting the Valentine Act." Prime Motion, ECF No. 76 at PageID 2641. But *Johnson* does not create a mandate that federal law be applied. Rather, it observes that Ohio courts often do so. Moreover, the quoted passage from *Johnson* expressly bases the applicability of federal antitrust precedent to Valentine Act cases on the "similarity" of the statutory provisions at issue – Ohio Revised Code §1331.08 and Section 4 of the federal Clayton Act (regarding standing to bring an antitrust claim under state and federal law, respectively). *Johnson,* 834 N.E. 2d at 795. Indeed, the language of those two sections are, in all material respects, identical. *Id. at* 794, fn 1.

On the contrary, there is no corollary to Revised Code §1331.09 in the Sherman Act. By definition, therefore, the statutes cannot be "similar" in that respect. The notion that the above-quoted language from *Johnson* signaled the Ohio Supreme Court's intention to invalidate the plain, unambiguous text of the Valentine Act where it differs materially from, or has no counterpart in, the federal antitrust statutes is simply not credible.

### 3. Count III contains detailed allegations of the existence and improper purposes of the Ascent combination and Prime's participation in it.

Prime levies all the same criticisms about the failure to follow federal pleading standards against Count III of the complaint. And for the foregoing reasons, those criticisms again ring

hollow. Count III alleges the existence of the combination known as Ascent Health Services (paragraph 227), that Prime was and is a participant in it (paragraph 227), and that the purposes or effects of the combination were to restrain trade, to "fix, harmonize, and raise" drug prices, to preclude free competition in the sale of prescription drugs, and to exclude from formularies any manufacturer that refused to increase rebates and thus list prices (paragraphs 227–31). Complaint, ECF No. 12 at PageID 1358. Those allegations clearly satisfy the standard set forth in Revised Code §1331.09 for pleading a Valentine Act claim.

Count III *exceeds* the statutory pleading standards by alleging that specified categories of Ohio consumers have been injured by the acts of Prime and its co-conspirators that have resulted in supracompetitive prescription drug prices (paragraph 234), and by alleging that Prime has engaged in deceptive acts designed to conceal and maintain the operations of the combination (paragraph 235). *Id.* at PageID 1359. Further, incorporated by reference into Count III are eighteen paragraphs of detailed allegations regarding the formation of Ascent and the improper purposes for which it is operated by Prime and its competitors, the recruitment of additional competitors to join the combination, the harm caused by the combination, and even including quotes from Prime's CEO about the effectiveness of Ascent as a vehicle for increasing and harmonizing prices. *Id.* at PageID 1347–51.

When assessed under the proper standard for determining the sufficiency of a Valentine Act complaint, Count III easily passes muster.

**B. Prime's assault on the authority of the Attorney General to seek the equitable remedy of disgorgement is contrary to Ohio statutes and unsupported by relevant case law.**

Prime begins its brief explanation of why the Ohio Attorney General has no authority to seek an equitable remedy in this case with a curious statement. It claims that: "The State

8

purports to bring its antitrust claims against Prime on behalf of 'Ohio purchasers' who allegedly paid 'supracompetitive prices' for prescription drugs, Complaint, ECF No. 12 at PageID 1315, resulting in 'ill-gotten gains' for Prime and other defendants." *See id.* at PageID 1359. Prime Motion, ECF No. 76 at PageID 2651. The plain language of the complaint says otherwise.

The State brought this case "…in its sovereign and quasi-sovereign capacity on relation of the Ohio Attorney General as the chief law enforcement officer of the State of Ohio." Complaint, ECF No. 12 at PageID 1317. It is well-established that a state has a sovereign interest in enforcing its own laws and has the concomitant standing to do so. *Alfred L. Snapp & Son v. P.R.,* 458 U.S. 592, 601 (1982). This sovereign law enforcement authority is codified in multiple sections of the Ohio Revised Code, including R.C. §109.81(A) that mandates: "The attorney general shall act as the attorney at law in any antitrust case for the state." Ohio Rev. Code § 109.81(A). *See also* Ohio Rev. Code § 109.02 (stating that "[t]he attorney general is the chief law officer of the state"); Ohio Rev. Code §1331.11 (authorizing the Attorney General to institute and prosecute actions on behalf of the State to "restrain and enjoin" violations of Ohio's antitrust laws).

In addition to sovereign authority, state attorneys general have standing at common law to bring actions as *parens patriae* in cases where a quasi-sovereign interest is at stake. *Snapp,* 458 U.S. at 602 (acknowledging that *parens patriae* standing based on quasi-sovereign interests has been recognized since 1900). Quasi-sovereign interests include the economic or physical well-being of a "sufficiently substantial segment" of the state's population. *Id.* at 607. It is these quasi-sovereign interests that underlie the Attorney General's *parens patriae* standing to bring this case, as set forth in detail in Paragraph 40 of the complaint. Complaint, ECF No. 12 at PageID 1317–18 (citing State's interest in: ensuring that residents pay competitive prices;

ensuring that Ohio employers pay competitive prices in connection with providing employee benefits; preventing harm to lives and health of citizens; and preventing harm to the general economy).

Prime does not address or even acknowledge these quasi-sovereign interests, but rather seems intent on defeating a claim that the State did not bring – one for damages suffered by individual Ohioans. Admittedly, R.C. § 109.81(A) codifies a portion of the Attorney General's common law *parens patriae* standing by expressly confirming his authority to represent "natural persons" in the State in actions to recover antitrust damages on their behalf. But he has not opted to do so in this action.

Moreover, the codification of that discrete portion of the Attorney General's common law *parens patriae* standing did not restrict or eliminate the totality of his longstanding common law *parens patriae* authority. The Ohio Supreme Court has held that it is "quite well established that the General Assembly has the power to abrogate or modify the principles of the common law and the exercise of the power *must be manifested by express language*." *Smith v. United Properties,* 2 Ohio St. 2d 310, 313 (1965) (emphasis added). Revised Code § 109.81(A) evidences no such legislative intent and contains no such express language. The Attorney General, therefore, retains the full complement of his authority at common law to act as *parens patriae* when quasi-sovereign interests are threatened, including the authority to seek equitable relief for violations of the law. *See, e.g., In re Suwinski,* 509 B.R. 568 (2013) (upholding Ohio Attorney General's *parens* standing to pursue fraud-based nondischargeability claim and injunctive relief against Chapter 7 debtor); *Holden v. Heckler,* 584 F. Supp. 463 (N.D. Ohio 1984) (holding that Ohio had *parens patriae* standing to intervene on behalf of thousands of residents improperly denied disability benefits).

10

Here, the Attorney General has exercised his sovereign and quasi-sovereign authority as the State's chief law enforcement official to bring an action seeking, in part, redress for violations of the law in the form of the equitable remedy of disgorgement. Complaint, ECF No. 12 at PageID 1364 (Paragraph O). Revised Code §109.81(A) confirms this authority by mandating that "[t]he attorney general shall do all things necessary" to conduct an antitrust case for the State "…including the bringing of an action for equitable relief…." Yet, Prime contends that disgorgement is a mere "label" – implying that it is a means for the State to execute an end-run around *Johnson v. Microsoft*'s prohibition on indirect purchaser damages actions. Prime Motion, ECF No. 76 at PageID 2651.

Disgorgement, however, is neither a fiction nor a fabrication. Ohio law recognizes disgorgement as a form of equitable relief that the Attorney General may pursue in redressing violations of the Valentine Act. *State ex rel. Dann v. Am. Int'l Group, Inc.,* Case No. 633857, 2008 Ohio Misc. LEXIS 320 at *10–11 (Ct. Com. Pl. July 30, 2008); *see FTC v. Vyera Pharms.,* LLC, 479 F. Supp. 3d 31, 51–52 (S.D.N.Y. 2020) (stating that Ohio Rev. Code § 109.81 allows Ohio to request equitable monetary relief such as disgorgement for its Valentine Act claims). The United States Supreme Court has confirmed unequivocally the equitable nature of the disgorgement remedy, distinct from an action for damages, saying that it is "a remedy tethered to a wrongdoer's net unlawful profits" designed to restore "the status quo, thus situating the remedy *squarely within the heartland of equity*." *Liu v. SEC,* 140 S. Ct. 1936, 1943 (2020) (emphasis added; quotation marks and citation omitted).

Prime's arguments as to why the Attorney General has no authority to bring an action for damages on behalf of Ohio consumers are irrelevant as the complaint asserts no such claim. Moreover, its attempt to recast the State's request that it disgorge the wrongful proceeds of its

11

unlawful acts as a claim for damages is contrary to law. In his concurring opinion in *Snapp,* Justice Brennan cautioned against overriding a state's assessment of its need to proceed as *parens patriae* to protect its citizens, saying:

> [A] State is no ordinary litigant. As a sovereign entity, a State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention. I know of nothing – except the Constitution or overriding federal law – that might lead a federal court to superimpose its judgment for that of a State with respect to the substantiality or legitimacy of a State's assertion of sovereign interest.

*Snapp,* 458 U.S. at 612.

To the extent that Prime's Motion attempts to substitute its judgment for that of the State of Ohio regarding what interests it chooses to protect and what remedies it chooses to pursue, it is improper and should be given no weight.

**C. A claim alleging a combination in violation of the Valentine Act is not barred by the statute of limitations when the combination is ongoing as of the filing of the complaint.**

Prime argues in its motion to dismiss that any claim based on conduct occurring more than four years prior to the filing of the complaint on March 27, 2023 is barred by the statute of limitations. Prime Motion, ECF No. 76 at PageID 2652. Taken at face value, that proposition would allow Prime and its co-Defendants to escape liability for continuing wrongdoing simply because it arises out of a master agreement originally negotiated more than four years ago. Courts recognize, however, that in antitrust cases such an outcome would be particularly unjust. In *Hometown Health Plan v. Aultman Health Foundation,* 2009 Ohio Misc. LEXIS 550 (Tuscarawas Cty C.P. 2009), the Court found that "[i]n antitrust litigation, the statute of limitations 'runs from the most recent injury caused by the defendants' activities rather than from the violation's inception.'" *Id.* at *18 (quoting *Exhaust Unlimited, Inc. v. Cintas Corp.,* 326 F. Supp. 2d 928, 931 (S.D. Ill. 2004)). This "continuing violation" exception to antitrust statutes of

limitation "is one in which the plaintiff's interests are repeatedly invaded. When a continuing antitrust violation is alleged, a cause of action accrues each time the plaintiff is injured by an act of the defendants." *DXS, Inc. v. Siemens Med. Sys., Inc.,* 100 F. 3d 462, 467–68 (6th Circ. 1996).

Here, the ongoing rebate negotiations with manufacturers, the continued cloaking of transactions in secrecy to hamstring the competitive process, and the ongoing escalation of pharmaceutical list prices as a result of the pay-to-play process, are all examples of ways in which the interests of the State and its citizens are being "repeatedly invaded." The complaint alleges plainly and simply: "Defendants' actions as described in this Complaint are continuous and inflict continuing and accumulating harm." Complaint, ECF No. 12 at PageID 1354 (paragraph 202). These allegations – taken as true – negate Prime's claimed entitlement to a free pass to violate the Valentine Act because the creation of any given combination occurred prior to March 27, 2019.

**D. The State's complaint alleges ample facts to support its claim that Prime has been unjustly enriched at the expense of the Ohio consumers whose prescription benefits it administers.**

The Ohio Supreme Court has recognized the following required elements for an unjust enrichment claim: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Hambleton v. R.G. Barry Corp.,* 12 Ohio St. 3d 179, 183 (1984). *Hambleton* makes clear that unjust enrichment is not a contract claim, but rather an equitable claim on an implied contract (or quasi-contract). *Id.* (citing *Hummel v. Hummel,* 133 Ohio St. 520, 525 (1938)). It is designed to remedy the fundamental inequity of a defendant retaining a valuable benefit to which it is not entitled, not to compensate the party that bestowed the benefit for damages suffered. *Hughes v. Oberholtzer,*

162 Ohio St. 330, 335 (1954).  It is this principle of basic fairness and equity that the State, in its capacity as *parens patriae,* seeks to advance.

In its motion to dismiss, however, Prime appears to advocate for a new, higher standard – a strict privity of contract requirement that Ohio courts have never before imposed.  Specifically, Prime contends that the State's unjust enrichment claim fails because "[t]he Complaint does not allege that any of these Ohioans purchased any product or service from Prime."  Prime Motion, ECF No. 76 at PageID 2653.  Because it claims not to have sold a product or service *directly* to the classes of Ohioans specified in the complaint, Prime disclaims all responsibility for the windfall it has obtained at their expense.

Ohio courts have acknowledged, however, that privity between the parties is not required under the unjust enrichment doctrine.  *Pioneer Bank v. Flynn,* 1981 Ohio App. LEXIS 14532 at *5 (12th Dist. App. 1981).  *Pioneer Bank* relied upon the Ohio Supreme Court's decision in *Indian Hill v. Atkins,* 153 Ohio St. 562 (1950) for this proposition.  In *Indian Hill,* one municipality sued another for return of personal property taxes erroneously paid by a taxpayer to the defendant municipality, seeking return of the funds under an implied contract/unjust enrichment theory.  Defendant argued that the claim could not stand, as plaintiff Indian Hill had not followed the statutory formalities needed for contracts between two municipal entities.  The Court rejected the argument, pointing out that unjust enrichment is not based upon a direct and/or express contractual relationship between the parties.  *Id.* at 570.  Indian Hill had not paid money to the other municipality, nor had the two entered into a contract or engaged in any direct economic transaction, and yet the Court found that the complaint made out a colorable unjust enrichment claim.  *Id.*

14

Prime cites the Ohio Supreme Court's requirement, articulated in *Johnson v. Microsoft,* of an "economic transaction" that conveys a benefit from plaintiff to defendant in an unjust enrichment claim.  Prime's attempt to elevate the "economic transaction" described in *Johnson* to a direct exchange of money for services with no intermediaries simply misstates the law.  In *Randleman v. Fid. Nat. Title Ins. Co.,* 465 F. Supp. 2d 812, 823–825 (N.D. Ohio 2006), for example, plaintiff homebuyers brought an unjust enrichment claim against a title insurer with whom they had no direct dealings, but who had been engaged by their mortgage lenders.  The court found that, despite the absence of direct contact, the homebuyers were essentially customers of the title company.  *Id.* at 825.  Thus, it found that there was a sufficient "transactional nexus" between the plaintiffs and defendant title company to support the proposition that plaintiffs had conferred a benefit (excessive title premiums) directly on defendant.  *Id.*

Similarly, in *Paikai v. General Motors Corp.,* 2009 U.S. Dist. LEXIS 8538 (E.D. Calif. 2009), an Ohioan purchased a GM car from an authorized GM dealer and later brought suit against GM alleging improper denial of warranty coverage.  The court accepted the argument that GM had wrongfully retained the funds plaintiff had paid to the dealer for warranty coverage because GM failed to provide repairs to the vehicle, applying *Johnson v. Microsoft* as follows:

> The court disagrees with defendant's contention that because plaintiff alleged that it bought the car "indirectly" through a dealer, plaintiff has not pled that GM received a benefit. The case upon which defendant relies, <u>Johnson v. Microsoft Corp.,</u> 106 Ohio St. 3d 278, 2005 Ohio 4985, 834 N.E.2d 791 (Ohio 2005), merely states that "an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant *without establishing that a benefit had been conferred upon that defendant by the purchaser." Id.* at 799 (emphasis added).

*Paikai,* 2009 U.S. Dist. LEXIS 8538 at *15–17.

Unlike the defendant in *Johnson v. Microsoft,* who sold its operating system to a Gateway retailer for preinstallation into a Gateway computer that was later sold *without Microsoft's knowledge or involvement* to Johnson, Prime and the other the PBM Defendants in this case sit squarely in the middle of the drug distribution system, orchestrating each and every transaction. *See, e.g.,* Complaint, ECF No. 12 at PageID 1311. As alleged in detail in the complaint, PBMs such as Prime do not simply hand off a product they manufacture to a retailer or other intermediary. For the consumers covered by the plans it administers, Prime *is* the intermediary. It is actively involved in administering each pharmacy counter transaction between its network pharmacies and its covered lives. It influences virtually every aspect of the process of getting prescription drugs from the manufacturer to the consumer. *See id.* 12 at PageID 1318 (para. 43) (Prime provides PBM Services to Ohio employee benefit plans); *Id.* at PageID 1320 (para. 49) (defining PBM Services to include creating retail pharmacy networks that determine whether consumers can get prescriptions filled, designing the list of drugs that will be covered by a plan, and negotiating drug prices).

Despite Prime's assertions to the contrary, the complaint sets forth more than sufficient allegations to demonstrate the "transactional nexus" between Prime and the consumers for whom it administers prescription drug benefits. And flowing from that transactional nexus are the "ill-gotten gains" realized by Prime and other Defendants, as alleged in paragraphs 221 and 235 of the complaint, that result from the supracompetitive list prices consumers have been forced to pay. These ill-gotten gains are the benefits conferred upon Prime that it claims the complaint fails to specify. Prime's argument here ignores the plain language of the complaint and should be rejected.

16

**E.  The detailed allegations of the State's complaint state a sound civil conspiracy claim against Prime and its co-conspirators**

Ohio law does not allow a person or entity to participate in, aid, or adopt the wrongful acts of another and escape responsibility by remaining a "bit player" in the overall scheme.  The Ohio Supreme Court is unequivocal on this point, holding in one such case:

> All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's act done for their benefit, are equally liable.

*Williams v. Aetna Fin. Co.,* 83 Ohio St. 3d 464, 476 (1998) (citing Prosser & Keeton on Torts (5 Ed. 1984) 323, Section 46).  And yet, Prime claims that the nearly four and a half pages of detailed allegations regarding Prime's collaboration with its competitor Express Scripts leave it unable to decipher a plausible civil conspiracy claim against it.  It rests that assertion, in part, on the fact that its "participation in Ascent was driven by a need to stay competitive."  Prime Motion, ECF No. 76 at PageID 2654.  But noticeably absent from the above-quoted holding of *Williams* is any safe-harbor for smaller, weaker, less efficient, or less competitive conspirators.

Civil conspiracy exists where an agreement between two or more persons to participate in an unlawful act (or a lawful act in an unlawful manner) inflicts an injury caused by an overt act committed by at least one party and in which the overt tortious act was done in furtherance of a common scheme.  *Halberstam v. Welch,* 705 F. 2d 472, 477 (D.C. Cir. 1983).  Paragraphs 174–191 of the State's complaint set forth plainly how Prime and its co-conspirators committed acts that satisfy each and every element of that test.  Complaint, ECF No. 12 at PageID 1347–51.

For example, Paragraph 181 explains how Prime joined with Express Scripts and Ascent to consolidate and enhance the illegal rebate scheme described in earlier paragraphs of the complaint.  Complaint, ECF No. 12 at PageID 1349.  Paragraph 186 describes Prime and Express Scripts' joint efforts to recruit more competitors to join Ascent in order to enhance their

17

combined leverage and more effectively impose their pay-to-play schemes on manufacturers.  *Id.* Paragraph 188 explains how Prime, Express Scripts, and Ascent used Ascent to "harmonize and increase drug prices," a plainly unlawful purpose under the Valentine Act.  *Id.* at PageID 1350. Paragraph 191 quotes from Prime's CEO in a public statement confirming this "alignment" of prices with competitors after the "crystallizing event" of creating Ascent.  *Id*. at PageID 1351.

Prime cites the Sixth Circuit's decision in *Spadafore v. Gardner,* 330 F.3d 849 (6 Cir. 2003), for the proposition that "vague or conclusory" allegations are insufficient to support a civil conspiracy claim.  The opinion in *Spadafore,* however, also contains the following important caveat:

> Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Id.* at 854 (quoting *Hooks v. Hooks,* 771 F.2d 935 (6th Cir. 1985)).  The above-referenced paragraphs of the State's complaint check every box – the joining together to form Ascent was a single plan; Prime and Express Scripts shared a common goal of concealing and enhancing their unlawful rebate scheme; both the formation of Ascent and the recruitment of additional competitors to it were overt acts in furtherance of the conspiracy; and the creation and operation of Ascent has caused injury to significant numbers of Ohioans.

Far from vague or conclusory, the complaint's detailed allegations in these paragraphs depict Prime as an active and willing participant in a scheme designed to advance the shared unlawful objectives of its fellow conspirators.  Its motion to dismiss the State's civil conspiracy count is not well-taken and should be denied.

18

**F. The complaint's prayer for injunctive relief is well-pled.**

As described in the foregoing pages, the Attorney General initiated this action as a law enforcement proceeding aimed at – first and foremost – halting violations of the Valentine Act that are threatening the health, well-being, and financial stability of scores of Ohioans. It should come as no surprise, then, that the prayer for relief seeks to enjoin these harmful behaviors. Complaint, ECF No. 12 at PageID 1362–64.

Near the end of its Motion to Dismiss, Prime asks this Court to dismiss the State's prayer for injunctive relief as to Prime for failure to meet the pleading standards applicable to permanent injunctions. Prime cites scant support for its position, and the support it does cite is misapplied.

The Federal Rules of Civil Procedure require that a complaint contain only a demand for the relief sought. Fed. R. Civ. P. 8(a)(3). At the motion to dismiss stage, "[a] [c]ourt is not required to rule on the merits of the injunctive relief demand." *Velez v. Cuyahoga Metro. Hous. Auth.,* No. 1:13CV1022, 2014 U.S. Dist. LEXIS 27480, at *17 (N.D. Ohio Mar. 3, 2014); *Prof'l Investigating & Consulting Agency, Inc. v. Suzuki,* No. 2:11-cv-01025, 2014 U.S. Dist. LEXIS 116683, at *10–11 (S.D. Ohio Aug. 21, 2014) (declining to address the merits of the injunctive relief demand at the motion to dismiss stage).

The State has properly satisfied Fed. R. Civ. P. 8(a)(3) by providing a straightforward demand for injunctive relief. Complaint, ECF No. 12 at PageID 1362–63. Prime incorrectly focuses on the merits of the ultimate award of injunctive relief rather than "what is legally necessary in order to sufficiently plead a demand for injunctive relief." *Velez,* 2014 U.S. Dist. LEXIS 27480, at *17.

Notably, Prime does not cite to a single Sixth Circuit case requiring a plaintiff to plead facts proving all four elements of permanent injunctive relief in its complaint. On the contrary,

"[t]he courts in this circuit … look to Federal Rule of Civil Procedure 8(a)(3) to determine whether a request for an injunction is sufficient at the pleading stage, not to Rule 8(a)(2)." *Alexander v. Terry Law Firm, P.C. 401(k) Profit Sharing Plan,* No. 2:16-cv-91, 2016 U.S. Dist. LEXIS 153868, at *20 (E.D. Tenn. Nov. 7, 2016).  The two cases Prime cites in support of its argument speak only to the elements a plaintiff must *ultimately prove* to obtain injunctive relief.

Further, Prime's 12(b)(6) motion to dismiss is centered on a failure to state a claim upon which relief may be granted.  But injunctive relief is a remedy—not a claim.  At this stage, the State is not required to prove the merits of its requested remedy.  But even if the State were required to plead more than a request for injunctive relief, it has done so.  The complaint sets forth numerous facts demonstrating that irreparable harm is occurring because of Prime's acts.  Complaint, ECF No. 12 at PageID at 1351–54 (describing, at length, how the collusive conduct of all Defendants—including Prime—has resulted in ongoing harm to Ohioans and will continue to harm Ohioans).  By pleading facts sufficient to show irreparable harm, the State has clearly shown that its right to injunctive relief is more than speculative.

## II.    CONCLUSION

Prime's Motion rests largely upon one foundational principle – that neither the text of the Valentine Act nor Ohio decisions construing its unambiguous language – apply.  But that foundation crumbles when tested by the reality that the Ohio Supreme Court has never ruled that the will of the Legislature and its clear pronouncements should be ignored.  Taken as true and judged by the unambiguous standards of the Valentine Act, the State's complaint far exceeds the threshold for a viable claim.  Prime's Motion should be denied.

Dated: November 3, 2023

20

Respectfully submitted,

DAVE YOST
Ohio Attorney General (0056290)
SHAWN BUSKEN (0083585)
Deputy First Assistant Attorney General

_/s/ Jennifer L. Pratt_
JENNIFER L. PRATT (0038916)
Director of Major Litigation
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Telephone: (614) 752-8237
Fax: (614) 466-5087
Jennifer.Pratt@OhioAGO.gov

Beth A. Finnerty (0055383)
Section Chief, Antitrust Section
Edward J. Olszewski (0082655)
Assistant Section Chief, Antitrust Section
Thomas J. Collin (0023770)
Principal Assistant Attorney General, Antitrust Section
Sarah Mader (0102270)
Assistant Attorney General, Antitrust Section
30 East Broad Street, 26th Floor
Columbus, Ohio
Telephone; (614) 466-4328
Fax: (614) 995-0266
Beth.Finnerty@OhioAGO.gov
Edward.Olszewski@OhioAGO.gov
Thomas.Collin@OhioAGO.gov
Sarah.Mader@OhioAGO.gov

*Counsel for the State of Ohio, ex rel., Attorney General Dave Yost*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 3, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. Notice of this filing will be sent to all other parties not represented by counsel via regular U.S. Mail.

*/s/ Jennifer L. Pratt*
Jennifer L. Pratt
Counsel for Plaintiff the State of Ohio
