# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

STATE OF OHIO, ex rel. DAVE YOST
ATTORNEY GENERAL OF OHIO

*Plaintiff*,

v.

ASCENT HEALTH SERVICES LLC;
EXPRESS SCRIPTS, INC.; THE CIGNA
GROUP; EVERNORTH HEALTH, INC.;
PRIME THERAPEUTICS LLC; HUMANA
PHARMACY SOLUTIONS, INC.;
HUMANA INC.

*Defendants*.

Civil Action No. 2:23-CV-1450

Judge Michael H. Watson
Magistrate Judge Chelsey M. Vascura

**PLAINTIFF STATE OF OHIO'S OPPOSITION TO DEFENDANTS ASCENT HEALTH SERVICES LLC, EXPRESS SCRIPTS, INC., THE CIGNA GROUP, AND EVERNORTH HEALTH, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

I.   COUNT I STATES CLAIMS AGAINST EXPRESS SCRIPTS, CIGNA, AND EVERNORTH FOR
     VIOLATION OF THE VALENTINE ACT. ................................................................. 2

     A.   Express Scripts, Cigna, and Evernorth Are Legally Capable of Conspiring
          with One Another for Purposes of the Valentine Act, and Count I Alleges an
          Antitrust Conspiracy. ...................................................................................... 2

          1.   The Valentine Act reaches an intracorporate conspiracy, and Count I states
               a claim against Express Scripts, Cigna, and Evernorth. ............................. 3

          2.   *Copperweld* does not determine whether Defendants have violated the
               Valentine Act. ................................................................................................ 5

          3.   Even if *Copperweld* were followed, Express Scripts is an independent
               actor capable of conspiring with Cigna and Evernorth. ............................. 8

     B.   *Twombly* Has No Application to the Complaint, Because the Valentine Act
          Specifies in Section 1331.09 What Constitutes an Adequate Pleading in an
          Enforcement Action by the Attorney General. .............................................. 9

          1.   Section 1331.09 of the Valentine Act specifies what pleading is sufficient
               to state an enforcement proceeding claim, and the Complaint states a
               violation of the Act in conformity with Section 1331.09. ......................... 9

          2.   Even if *Twombly* were deemed to apply, the Complaint plausibly alleges a
               combination of capital, skill, or acts among Express Scripts, Evernorth,
               and Cigna for one or more unlawful purposes under Section
               1331.01(C)(1). ............................................................................................ 10

     C.   Count I Alleges a Violation of the Valentine Act. ....................................... 11

          1.   The Complaint adequately alleges a violation of the Valentine Act by
               conforming to the requirements of Section 1331.09. ............................... 12

          2.   Even if the Court were to apply Sherman Act Section 1 standards for
               testing a rule of reason claim under the Valentine Act, the Complaint is
               sufficient. .................................................................................................... 12

          3.   The antitrust injury defense has no application to this enforcement
               proceeding by the Attorney General. ....................................................... 16

          4.   The *Illinois Brick* doctrine is irrelevant to this enforcement proceeding by
               the Attorney General. ................................................................................ 17

II.  COUNT III STATES CLAIMS AGAINST DEFENDANTS FOR VIOLATION OF THE VALENTINE
     ACT. ................................................................................................................. 18

     A.   *Twombly* Has No Application to this Enforcement Proceeding, and Count III
          Alleges an Illegal Conspiracy under the Valentine Act. ............................. 18

      B.      **Count III Alleges a Combination among Defendants and a Per Se Illegal Conspiracy between Express Scripts and Prime Therapeutics in Violation of the Valentine Act.** ......................................................................................... 20

      C.      **The Antitrust Injury Defense Has No Application to this Enforcement Proceeding by the Attorney General.** ......................................................... 22

      D.      ***Copperweld* Has No Application to a Claim under the Valentine Act, and Express Scripts and Ascent Are Capable of Conspiring.** ................................ 22

      E.      **The *Illinois Brick* Doctrine Is Irrelevant to this Enforcement Proceeding by the Attorney General.** .............................................................................. 23

**III.**     **COUNT IV STATES A CLAIM AGAINST EXPRESS SCRIPTS FOR VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT.** ......................................................................... 23

      A.      **The Attorney General Has Standing to Bring a DTPA Action against Express Scripts on behalf of Ohio Plan Sponsors.** ........................................................ 23

      B.      **The Attorney General Can Bring a *Parens Patriae* Action against Express Scripts for Violation of the DTPA.** .......................................................... 24

      C.      **The Complaint Alleges a Violation of the DTPA by Express Scripts.** ........... 28

           1.     Allegations of a violation of the DTPA do not sound in fraud and are not subject to heightened pleading requirements. .......................................... 28

           2.     Count IV identifies false and deceptive statements of Express Scripts. .... 29

**IV.**     **COUNT V STATES A CLAIM AGAINST EXPRESS SCRIPTS FOR VIOLATION OF O.R.C. 3959.20(C).** .............................................................................................. 30

      A.      **The Complaint Alleges Facts Stating a Violation of Section 3959.20(C) by Express Scripts.** ................................................................................ 30

      B.      **The Attorney General Has Adequately Demanded Injunctive Relief.** ........... 32

**V.**     **COUNT VI STATES A CLAIM FOR UNJUST ENRICHMENT.** .............................................. 32

**VI.**     **COUNT VII STATES A CLAIM FOR CIVIL CONSPIRACY.** ................................................. 34

**VII.**    **CIGNA AND EVERNORTH SHOULD NOT BE DISMISSED FROM THIS ACTION.** ................... 36

**VIII.**  **CONCLUSION.** ................................................................................................. 36

## Introduction

The Attorney General brings this enforcement proceeding against Ascent Health Services LLC ("Ascent"), Express Scripts, Inc. ("Express Scripts"), The Cigna Group ("Cigna"), and Evernorth Health, Inc. ("Evernorth") (collectively, "Defendants") for violations of Ohio statutory and common law in the provision of pharmacy benefit manager services. Defendants have moved to dismiss the Complaint. The Motion to Dismiss ("Motion"), ECF No. 78 at PageID 2686, stands on the wrong law and ignores facts alleged in the Complaint.

Relying on Sherman Act case law, Defendants argue that Counts I and III fail to state a claim. This is not a Sherman Act case, and it is not a private damages action. It is an enforcement proceeding by the State of Ohio, and Counts I and III state claims for violation of the Valentine Act and forfeiture under Section 1331.03 of the Act.

Express Scripts argues that Count IV fails to state a claim under the Deceptive Trade Practices Act, but Count IV states a claim for false and deceptive representations violating the Act. Express Scripts argues that Count V should be dismissed for failure to state a claim for violation of Section 3959.20(C) of the Ohio Revised Code, prohibiting reimbursement clawbacks, but it ignores both the text of the statute and the facts alleged. Count V states a claim for violations of Section 3959.20(C).

Defendants argue that Count VI fails to allege facts to support a claim for unjust enrichment, and they argue that Count VII fails to allege facts to establish a claim for civil conspiracy. The facts alleged and the applicable law support both claims, and the Motion must be denied as to Counts VI and VII.

## I.    COUNT I STATES CLAIMS AGAINST EXPRESS SCRIPTS, CIGNA, AND EVERNORTH FOR VIOLATION OF THE VALENTINE ACT.

Defendants marshal an array of arguments for dismissal of Count I.  They contend that it is barred by *Copperweld* because Express Scripts, Cigna, and Evernorth are incapable of conspiring.  They contend that a conspiracy has not been alleged sufficiently to satisfy *Twombly*. They object that facts have not been alleged to show an unreasonable restraint of trade.  They contend that the Complaint fails to allege antitrust injury and that, in any event, *Illinois Brick* bars monetary relief.  The arguments are all groundless, and we address them in order.

### A.    Express Scripts, Cigna, and Evernorth Are Legally Capable of Conspiring with One Another for Purposes of the Valentine Act, and Count I Alleges an Antitrust Conspiracy.

Relying on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), Defendants insist that Count I should be dismissed because "Express Scripts is a wholly-owned subsidiary of Evernorth, which is a wholly-owned subsidiary of Cigna."  Memorandum in Support of Motion to Dismiss (hereinafter, "Brief") ECF No. 78 at PageID 2698.  This is not what the Complaint alleges.  It alleges that Express Scripts is a subsidiary of Evernorth, not a wholly-owned one.[1]  Complaint for Disgorgement, Injunctive Relief and Declaratory Judgment ("Complaint"), ECF No. 12 at PageID 1318, ¶ 42.  Regardless of Defendants' effort to rewrite the Complaint, the *Copperweld* holding has no relevance to this proceeding, because the Valentine Act applies to an intracorporate conspiracy.  Even if it were assumed, for purposes of argument, that *Copperweld* were controlling, the result would be the same, because there is no allegation that Express Scripts is wholly-owned by either Cigna or Evernorth.

---

[1] "Express Scripts is a subsidiary of Evernorth Health, Inc. . . ., which is a wholly-owned subsidiary of Cigna Group . . . ."  Complaint, ECF No. 12 at PageID 1318, ¶ 42.

1. **The Valentine Act reaches an intracorporate conspiracy, and Count I states a claim against Express Scripts, Cigna, and Evernorth.**

The Valentine Act recognizes an intracorporate conspiracy, contrary to the Sherman Act. There is no need to resort to interpretations of the Sherman Act by the United States Supreme Court to determine what constitutes a conspiracy under the Valentine Act. The intracorporate conspiracy defense was rejected in *State ex rel. Denman v. National Cash Register Co.*, 13 Ohio C.C. (n.s.) 73 (Cir. Ct. Franklin Cty. 1910). The appeals court in Franklin County there considered a motion by a corporation to strike from a petition charging it with a criminal violation of the Act "the averment that *it has conspired with its officers, directors, stockholders and agents.*" *Id.* at 77 (italics added). The defendant contended that "a corporation cannot enter into a conspiracy with those officers and agents in charge of its affairs." *Id.* The court held that a corporation and its officer or agent can be deemed separate parties to a conspiracy under the Act and "counted in computing the necessary number of two or more to constitute a conspiracy." *Id.* It reasoned that "[a]ny other rule would make a conviction impossible in most of these cases, for it would only be necessary for the corporation to employ as its agent any of the individuals, firms, or *other corporations* to carry out the purposes and intention of the conspiracy. . . . *Id.* at 78 (emphasis added).

The Summit County Court of Appeals offered a contrary view in dicta in *Daily Monument Co. v. Crown Hill Cemetery Ass'n*, 114 Ohio App. 143, 152 (9th Dist. 1961), stating that there was no combination under the Valentine Act between a nonprofit cemetery association and its officers. The statement was irrelevant, however, to the court's holding that the plaintiff had no standing to sue the defendants in the first place, and there is no holding in conflict with *National Cash Register Co.* The plaintiff, a vendor of cemetery markers and memorials, sued the association and its officers to enjoin a regulation requiring cemetery lot owners to purchase memorials from the

association at fees set by the association.  Relying on Chapter 1721 of the Ohio Revised Code, governing the conduct of nonprofit cemetery associations, the court held that the only persons with standing to sue over the fees were lot owners or those in privity of contract with them.  *Id.* at 151. Because the plaintiff had no standing to sue, there was no need to consider its Valentine Act claim, and the court's observation that there was no evidence in the record to support the claim was extraneous.

The Ohio Supreme Court has never addressed the intracorporate conspiracy doctrine as applied to the Valentine Act, and *National Cash Register* is the only appellate holding on the subject.  The decision is authoritative for a federal court interpreting an Ohio statute.  *See, e.g., Holbrook v. Louisiana-Pacific Corp*., 533 F. App'x 493, 497 (6th Cir. 2013) (holding that, in the absence of a ruling by the Ohio Supreme Court on whether consumers have standing to sue under the Deceptive Trade Practices Act, the federal court would treat a decision by a Court of Appeals on the issue as dispositive).  This is not a diversity case, and there is no occasion to engage in predictions about what law Ohio courts would apply.  A federal court, even under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), is obligated to follow the decision of an intermediate appellate court in the absence, as here, of a controlling decision by a state's supreme court.  *See West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237–38 (1940) (where the decision of a state intermediate appellate court is on point, "the federal court is not free to apply a different rule however desirable it may believe it to be, and even though it may think that the state Supreme Court may establish a different rule in some future litigation.").  Count I thus properly alleges a Valentine Act conspiracy among Express Scripts, Cigna, and Evernorth, regardless of whether Express Scripts is wholly-owned by Evernorth or Cigna.

2.     _**Copperweld does not determine whether Defendants have violated the Valentine Act.**_

Defendants insist that *Copperweld* dooms Count I.  They assert that a claim under the Valentine Act "*must be construed* in accordance with the Sherman Act" Brief ECF No. 78 at PageID 2698 (emphasis added), but the cases they cite contain no such statement.  The Ohio Supreme Court has followed, in applying the Valentine Act, the federal courts' interpretation of the Sherman Act (*see, e.g.*, *Johnson v. Microsoft Corp*., 106 Ohio St. 3d 278, 281 (2005) ("Ohio has long followed federal law in interpreting the Valentine Act)), but there is no requirement in the statute that it do so.  The Ohio Supreme Court has never held, contrary to Defendants' assertion, that a court *must apply* Sherman Act case law in deciding a Valentine Act case.

The Sherman Act does not determine what conduct the Valentine Act reaches, and *Copperweld* does not determine Count I.  The Ohio General Assembly did not pattern the Valentine Act after the Sherman Act, and statements to the contrary in Ohio Supreme Court decisions all rely on erroneous *dicta* in *List v. Burley Tobacco Growers' Co-op. Ass'n*, 114 Ohio St. 361 (1926).  The Court stated in *List* that the Valentine Act was "generally conceded to have been patterned after the Sherman Anti-Trust Act," citing no authority.  *Id.* at 369.  It stated, also in a *dictum*, that "it has been seriously urged that when the Valentine law was enacted in Ohio the Ohio Legislature adopted the judicial construction already placed upon the federal act by the federal courts, and that the interpretation is treated as incorporated therein," also citing no authority.  *Id.* at 370.  Each statement is objectively false, as the absence of any authority signals.  Subsequent decisions have, nonetheless, uncritically repeated and relied upon them.  *See, e.g.*, *Johnson*, 106 Ohio St.3d at 281 (the Valentine Act was "'patterned after the Sherman Antitrust Act, and as a consequence this court has interpreted the statutory language in light of federal judicial construction' of the federal antitrust statutes" (quoting *C.K. & J.K., Inc. v. Fairview Shopping Center Corp*., 63 Ohio St.2d 201, 204 (1980)).

Contrary to *List*, the Valentine Act was not patterned after the Sherman Act, and the General Assembly would have had no reason to treat federal court constructions of the Sherman Act as incorporated into the Valentine Act.  Since the operative provisions of the Valentine Act were all derived from Texas's 1889 antitrust statute, not the Sherman Act, the General Assembly emphatically *did not follow* the Sherman Act.

The Valentine Act's provision establishing liability for joint conduct in restraint of trade, Section 1331.01, differs dramatically from Section 1 of the Sherman Act (15 U.S.C. § 1).[2]  A

---

[2] Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  (15 U.S.C. § 1.)  As relevant here, Section 1331.01(C) of the Valentine Act provides as follows:

> (1) "Trust" is a combination of capital, skill, or acts by two or more persons for any of the following purposes:
>
> (a) To create or carry out restrictions in trade or commerce;
>
> (b) To limit or reduce the production, or increase or reduce the price of merchandise or a commodity;
>
> (c) To prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, produce, or a commodity;
>
> (d) To fix at a standard or figure, whereby its price to the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce, or commerce intended for sale, barter, use, or consumption in this state;
>
> (e) To make, enter into, execute, or carry out contracts, obligations, or agreements of any kind  by which they bind or have bound themselves not to sell, dispose of, or transport an article or commodity, or an article of trade, use, merchandise, commerce, or consumption below a common standard figure or fixed value, or by which they agree in any manner to keep the price of such article, commodity, or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of an article, commodity, or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, purchasers, or consumers in the sale or transportation of such article or commodity, or by which they agree to pool, combine, or directly or indirectly unite any interests which they may have connected with the sale or transportation of such article or commodity, that its price might in any manner be affected;

comparison of the Sherman Act,[3] passed in 1890, with the Valentine Act,[4] passed in 1898, shows that the General Assembly borrowed from the Sherman Act only its provision for a private right of action[5] and its definition of "persons,"[6] ignoring every other provision, including Section 1. The liability and other operative provisions of the Valentine Act were, in fact, all derived from the Texas antitrust statute, passed in 1889.[7]  A side-by-side comparison of the Valentine Act and the 1889 Texas statute shows that the Valentine Act was borrowed, almost *verbatim*, from the Texas statute.  *See California ex rel. Van De Kamp v. Texaco, Inc*., 46 Cal. 3d 1147, 1156 n.8 (1988) ("It is widely recognized that the 1889 Texas act served as the model for a number of state acts that followed it," including Ohio.).  Given that the Valentine Act draws none of its substantive content from the Sherman Act, the General Assembly could not conceivably have intended, contrary to *List*, that the Act would depend for its meaning upon federal court interpretations of the Sherman Act.

The Ohio Supreme Court in *List* did get one matter right, however.  It correctly observed that a comparison of the Sherman Act and the Valentine Act "shows that *the Ohio law is in much*

---

\*\*\*

(4)  A trust as defined in this division is unlawful and void.

[3] Sherman Act, ch. 647, 26 Stat. 209 (1890).  The original text is reproduced in Exhibit 1 to the accompanying Declaration of Thomas J. Collin.

[4] Act of April 19, 1898, 93 v. 143.  The original text is reproduced in Exhibit 2 to the accompanying Declaration of Thomas J. Collin.

[5] Section 7 in the original version of the Sherman Act.  It now appears as Section 4(a) of the Clayton Act (15 U.S.C. § 15(a)).  Section 11 of the original version of the Valentine Act borrowed from Section 7 of the 1890 version of the Sherman Act.  The private right of action now appears in Section 1331.08 of the Valentine Act.

[6] Section 8 in the original version of the Sherman Act.  Section 12 of the original version of the Valentine Act borrowed from Section 8 of the 1890 version of the Sherman Act.  The definition now appears in Section 1331.01(A) of the Valentine Act.

[7] Act of March 30, 1889, ch. 117, 1889 Tex. Gen. Laws 141.  The original text of the 1889 statute is reproduced in Exhibit 3 to the accompanying Declaration of Thomas J. Collin.

*broader and stronger terms than the federal enactment.*"  *List*, 114 Ohio St. at 369 (emphasis added).  In interpreting the much broader and stronger Valentine Act, federal court decisions applying the Sherman Act should thus, contrary to the *dicta* in *List*, have "little or no precedential weight."  *O'Brien v. Leegin Creative Leather Prods., Inc.*, 294 Kan. 318, 342 (2012) (holding that "federal precedents interpreting, construing, and applying federal statutes have little or no precedential weight when the task is interpretation and application of a clear and dissimilar Kansas [antitrust] statute").  In interpreting California's Cartwright Act, which, in common with the Valentine Act, was derived from the Texas 1889 statute (*see Texaco, Inc.*, 46 Cal.3d at 1160 n.14), the California Supreme Court stressed that Sherman Act case law is not probative:  "[J]udicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent, given *the different genesis of the provision under review*."  *Id.* at 1164 (italics added).  Similarly, the Valentine Act drafters' intent cannot be divined from federal court interpretations of the Sherman Act, "given the different genesis" of the Valentine Act.  The United States Supreme Court's interpretation of the Sherman Act in *Copperweld* does not, thus, dictate whether Count I states a claim for conspiracy under the Valentine Act.

**3.**     **Even if *Copperweld* were followed, Express Scripts is an independent actor capable of conspiring with Cigna and Evernorth.**

The Complaint has no allegation that Express Scripts is a wholly-owned subsidiary of either Evernorth or Cigna, and the absence of any such allegation forecloses reliance on *Copperweld*.  The Supreme Court held in *Copperweld* that a wholly-owned subsidiary and its parent corporation were a unitary actor for Sherman Act purposes.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) ("We hold that Copperweld and its wholly owned subsidiary Regal are incapable of conspiring with each other for purposes of § 1 of the Sherman Act.").  The Court did not address whether a subsidiary that is not wholly-owned, like

8

Express Scripts, is incapable of conspiring with a corporation, like Cigna or Evernorth, that owns fewer than all of its outstanding shares of stock.

*Copperweld* thus provides no shield for Express Scripts.  Even if its holding were followed, Express Scripts is legally capable of conspiring with either Cigna or Evernorth, or both.

> **B.    *Twombly* Has No Application to the Complaint, Because the Valentine Act Specifies in Section 1331.09 What Constitutes an Adequate Pleading in an Enforcement Action by the Attorney General.**

Defendants argue that the Complaint must be dismissed because it "does not meet the plausibility pleading requirement" in *Twombly*.  Brief, ECF No. 78 at PageID 2700–01.  According to Defendants, the Complaint "provides no facts that make it plausible to assume . . . that Cigna, Evernorth, and Express Scripts had some agreement among themselves to somehow 'fix' prices." *Id.* at PageID 2701.  Defendants have ignored the Valentine Act.  Section 1331.09 of the Act specifies what an enforcement pleading must contain, and the Complaint satisfies Section 1331.09. *Twombly* does not override or supplant this statutory provision.  Even if the Complaint were tested under *Twombly*, however, the allegations plausibly plead an unlawful conspiracy.

> **1.    <u>Section 1331.09 of the Valentine Act specifies what pleading is sufficient to state an enforcement proceeding claim, and the Complaint states a violation of the Act in conformity with Section 1331.09.</u>**

*Twombly* can have no application where, as here, the statute under which the State of Ohio is suing itself specifies pleading requirements for an enforcement action.  The United States Supreme Court considered in *Twombly* what was required under Rule 8(a)(2) of the Federal Rules of Civil Procedure to state a Sherman Act Section 1 conspiracy claim in a civil action.  Rule 8(a)(2) requires that a pleading contain a "short and plain statement . . . showing that the pleader is entitled to relief," and the Court held that a Section 1 plaintiff must plausibly allege a conspiracy to satisfy the requirement.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  In this Valentine

Act enforcement proceeding, Section 1331.09 of the Ohio Revised Code specifies what statement is needed to show that the Attorney General is entitled to relief:

> In an indictment for an offense . . . [under the Act], it is sufficient to state the purpose or effects of the trust or combination, and that the accused is a member thereof, or acted with or in pursuance of it or aided or assisted in carrying out its purposes, without giving its name or description, or how, when, and where it was created.

Although Section 1331.09 refers to an indictment, it applies equally to a complaint in a civil matter. *Goode v. Ohio Valley Druggists' Ass'n*, 16 Ohio Dec. 586, 587 (C.P. Ct. Hamilton Cty. 1906) ("What is here [Section 5 of the Valentine Act, now Section 1331.09] held sufficient for the purposes of a criminal prosecution, applies in all of its force to a civil action.").

Section 1331.09 spells out what the Attorney General must state to show entitlement to relief, as Rule 8(a)(2), Fed. R. Civ. P., requires. Pleading requirements applicable to claims under federal statutes, like the Sherman Act, cannot displace or supplant this Valentine Act directive. As shown immediately below in the discussion of *Twombly* (page 11 *infra*), the Complaint complies with the requirements of Section 1331.09: It states (1) the purpose or effects of the trust or combination and (2) that Express Scripts, Cigna, and Evernorth are members of it or acted with or in pursuance of it or aided or assisted in carrying out its purposes – exactly as Section 1331.09 directs.

**2.** **Even if *Twombly* were deemed to apply, the Complaint plausibly alleges a combination of capital, skill, or acts among Express Scripts, Evernorth, and Cigna for one or more unlawful purposes under Section 1331.01(C)(1).**

Even if it were assumed, for purposes of argument, that the Complaint were subject to *Twombly* pleading requirements, it more than adequately alleges a plausible conspiracy among Express Scripts, Cigna, and Evernorth in violation of the Valentine Act.

The Complaint alleges that Cigna and Evernorth in their own capacities participate in Express Scripts' business and operations. Complaint, ECF No. 12 at PageID 1324, ¶ 66. Evernorth

and its employees "are directly involved" in the sale of Express Scripts' PBM services to plan sponsors. *Id.* Express Scripts, Cigna, and Evernorth have engaged in a combination to fix drug prices, *id.* at PageID 1355, ¶ 205, and for the purpose of carrying out restrictions in trade or commerce and of establishing the list price for drugs, *id.,* ¶ 206. The Complaint alleges that their collaboration restrained trade in multiple ways:

- The collusive conduct of Express Scripts, Cigna, Evernorth, and other defendants has denied Ohio consumers the benefits of free and unrestricted competition by, among other means, forming and carrying out agreements with manufacturers to fix prices for prescription drugs. Complaint, ECF No. 12 at PageID 1351–52, ¶ 193.

- The collusive conduct of Express Scripts, Cigna, Evernorth, and other defendants has denied Ohio plan sponsors the benefits of free and unrestricted competition by, among other means, forming and carrying out agreements with manufacturers to fix the prices of prescription drugs. *Id.* at PageID 1352, ¶ 194.

- The collusive conduct of Express Scripts, Cigna, Evernorth, and other defendants, in combination with the exercise of market power by Express Scripts, has harmed competitive pharmaceutical markets in Ohio by destroying transparency and eliminating information needed for efficient operation and allocation of resources. *Id.* at PageID 1353, ¶ 198.

The Complaint alleges active cooperation among Express Scripts, Cigna, and Evernorth to restrain trade, and Defendants' argument that the Complaint does not even allege parallel conduct among them, Brief, ECF No. 78 at PageID 2701, is refuted by the text of the Complaint, much of which Defendants have conveniently overlooked.

### C. Count I Alleges a Violation of the Valentine Act.

Defendants state that this Valentine Act case is subject to evaluation under the rule of reason. Brief, ECF No. 78 at PageID 2701. They contend that the Complaint fails to state a claim under the Valentine Act, however, because it does not allege any relevant product or geographic market, *id*. at PageID 2702–03, and alleges no market power on the part of Defendants or

anticompetitive impact from Defendants' conduct, *id.* at PageID 2704. Defendants have ignored the pleading standard in Section 1331.09 and have neglected to read the Complaint.

1.     <u>**The Complaint adequately alleges a violation of the Valentine Act by conforming to the requirements of Section 1331.09.**</u>

Transactions sought to be prohibited under the Valentine Act were those which were unlawful at common law. *List v. Burley Tobacco Growers' Co-op. Ass'n*, 114 Ohio St. 361, 377 (1926). The Act is "declaratory of the common law" and was passed to prevent the "abuses of combination and co-operation" which were unlawful under "settled principles of the common law." *Id.* at 378. The proof here will show that Defendants have violated the Valentine Act, but the Act does not require detailed factual allegations in the Attorney General's pleading initiating an enforcement proceeding like this one.

To facilitate enforcement of the Act, the General Assembly spelled out, in what is now Section 1331.09, what the Attorney General must plead to state a claim of violation. As shown above (pages 9–10 *supra*), the Complaint meets the pleading requirements of Section 1331.09, and there is no need to detail the metes and bounds of markets or the impact of a defendant's anticompetitive actions in the pleading initiating an enforcement proceeding by the Attorney General. The State of Ohio has, thus, adequately alleged a violation by Defendants of the Valentine Act, and the Court is not free to add requirements to the text of the statute or interpret it in a way that conflicts with its clear language. Where, as here, "the meaning of a statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Educ.*, 74 Ohio St.3d 543, 545 (1996).

2.     <u>**Even if the Court were to apply Sherman Act Section 1 standards for testing a rule of reason claim under the Valentine Act, the Complaint is sufficient.**</u>

Even if Defendants' argument were accepted that federal court interpretations of the Sherman Act determine whether a rule of reason violation is established under the Valentine Act,

the Complaint states a claim for violation of the Valentine Act. For a rule of reason case under

Section 1 of the Sherman Act, a complaint is adequate if the plaintiff alleges

> "evidence of market structure" (i.e., market power and relevant markets . . .) and .
> . . "exclusionary effect" (i.e., foreclosure of a competitor from a market . . .) – "both
> of which can ordinarily be obtained without access to the defendant's own records
> – [and] indicate that an antitrust violation is plausible."

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020) (quoting Herbert Hovenkamp,

*The Rule of Reason*, 70 Fla. L. Rev. 81, 90 (2018)). At the pleading stage, a plaintiff may satisfy

"the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive

effects in the relevant markets." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 100 (3rd

Cir. 2010).

The Sixth Circuit looks for the following allegations in determining whether a rule of

reason case has been adequately stated:

> "(1) the defendants [agreed] or conspired among each other; (2) the [agreement] or
> conspiracy produced adverse, anticompetitive effects within relevant product and
> geographic markets; (3) the objects of conduct pursuant to that contract or
> conspiracy were illegal; and (4) the plaintiff was injured as a proximate result of
> the conspiracy."

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip*., 48 F.4th 656,

664 (6th Cir. 2022) (quoting *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue

Shield*, 552 F.3d 430, 436 (6th Cir. 2008)). Under these pleading standards, the Complaint states a

Section 1 rule of reason violation.

*The Complaint alleges relevant product and geographic markets.* Defendants contend that

the Complaint alleges neither a geographic market nor a product market: "[T]he Complaint does

not allege *any* relevant market." Brief, ECF No. 78 at PageID 2702 (emphasis in original). The

statement suggests that Defendants may have confined their attention to reading headings and sub-

headings and ignored the text.  The affected market is clearly staked out.  It is the market in Ohio dominated by Express Scripts – the market for PBM services.

The Complaint alleges that Express Scripts markets PBM services to Ohio health insurers and employers and, in doing so, has falsely represented that it will achieve prescription drug cost savings.  Complaint, ECF No. 12 at PageID 1311, ¶ 13.  It alleges that Express Scripts dominates over its rivals in the delivery of PBM services in nearly every metropolitan statistical area in Ohio, *id.* at PageID 1324, ¶ 71, pointing to a 60% market share in at least two MSAs and more than 40% in numerous others.  PBM services include rebate negotiation, retail pharmacy network management, and claims adjudication.  *Id.*  Express Scripts has used its market power to prevent competition for PBM services.  *Id.* at PageID 1351, ¶ 192.  For nearly 40% of Ohioans covered by commercial insurance, Express Scripts provides PBM services, controlling which drugs will be covered by insurance, what part of the price of the drugs will be covered, and how much pharmacies will be reimbursed for filling prescriptions for the drugs.  *Id.* at PageID 1311, ¶ 12.

*The Complaint alleges anticompetitive effects and Express Scripts' market power in the Ohio market for PBM services.*  Defendants contend that there is no allegation that they have market power and that they "are left guessing" as to anticompetitive effects.  Brief, ECF No. 78 at PageID 2704.  They should read the Complaint.  It amply alleges both anticompetitive effects and market power.

The Complaint alleges that Express Scripts, in combination with Cigna and Evernorth, has secured control over elements of the prescription drug distribution chain sufficient to give it the ability to artificially elevate prices to the consumer, constrict availability of drugs offered by manufacturers to pharmacies, and choke off reimbursements to pharmacies for drugs dispensed to consumers.  This top-to-bottom control of the distribution chain by Express Scripts – as the largest

PBM in Ohio, Complaint, ECF No. 12 at PageID 1324, ¶ 71 – has produced damaging *anticompetitive effects*.

- By leveraging its control over formulary placement, Express Scripts has extracted higher rebates from manufacturers, Complaint, ECF No. 12 at PageID 1327, ¶ 84, thereby enabling it to increase the price of drugs to consumers and drive up the price charged to plan sponsors for PBM services, Complaint, ECF No. 12 at PageID 1328, ¶ 87.

- Less powerful PBMs have been foreclosed by Express Scripts from competing for the business of plan sponsors through Express Scripts' control over formulary placement, thereby restraining the market for PBM services. *Id.* at PageID 1327, ¶¶ 85–86.

- Express Scripts has exercised its market power to drive up the out-of-pocket prices of prescription drugs for Ohio consumers whose purchases are not covered by insurers or other third-party payors and for those whose co-pays are calculated based upon a percentage of list prices of the prescription drugs they purchase. *Id.* at PageID 1351, ¶ 192.

The Complaint alleges that Express Scripts has exercised its power in the PBM services market to harm competition, not just in the market for PBM services, but also in the market for the retail sale of prescription drugs. With nearly 40% of the market for PBM services in Ohio, Express Scripts' market power may be inferred. *See, e.g*, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (affirming FTC holding that toy retailer with 40% of the traditional toy market and 20% of the national wholesale market had market power). There is no need to infer market power, however, because the Complaint alleges that Express Scripts has used its market power to effectuate an array of anticompetitive abuses. It has used its *market power*:

- To insulate itself from competitive pressures and foreclose smaller PBMs from competing effectively. Complaint, ECF No. 12 at PageID 1327, ¶¶ 85–86.

- To force name-brand drug manufacturers to set higher list prices, in return for favorable placement of their products on Express Scripts' formulary. *Id.* at PageID 1311, ¶ 14.

- To maintain the opacity of its negotiations with manufacturers, thereby resulting in increased drug prices.  *Id.* at PageID 1336, ¶126; 1353, ¶ 198.

- To refuse to negotiate with retail pharmacies over contract terms, *id.* at PageID 1343, ¶ 156, thereby blocking any possible negotiation over the financial terms that could have a beneficial effect for the consumer and effectively dictating price and terms to retail pharmacies for prescription drug sales, *id.* at PageID 1347, ¶ 173.

- To extract supracompetitive revenue from retail pharmacies by use of reimbursement clawbacks, *id.* at PageID 1344, ¶¶ 157–59, thereby diverting customers of independent pharmacies to Express Scripts' mail order business, causing the failure of some pharmacies, and contributing to creation of "pharmacy deserts" in some Ohio communities, *id.* at PageID 1346, ¶¶ 170–71; 1353, ¶ 199.

- To restrain and prevent competition in the market for PBM services and in the market for the retail sale of prescription drugs, causing higher out-of-pocket prices for drugs.  *Id.* at PageID 1351, ¶ 192.

Thus, even if federal court case law were applied in determining whether a rule of reason claim had been adequately pled under the Valentine Act, the Complaint alleges just such a violation by the Defendants.

**3.    The antitrust injury defense has no application to this enforcement proceeding by the Attorney General.**

Defendants argue that the Complaint must be dismissed because the Attorney General has not alleged facts to show that their conduct has caused antitrust injury, relying on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977).  Brief, ECF No. 78 at PageID 2704–06.  The antitrust injury doctrine has no application to this proceeding.  The Attorney General is not bringing an action for damages as a result of injury to persons or property.  The Supreme Court in *Brunswick* required a private plaintiff suing for treble damages under Section 4 of the Clayton Act (15 U.S.C. § 15) to prove that its injury flows from conduct that is unlawful under the antitrust laws, *Brunswick*, 429 U.S. at 489, but this is not a *Brunswick* case.

Unlike *Brunswick*, this is not a damage action brought under the federal antitrust laws, and it is not a damage action under the Valentine Act. It is an action for equitable and injunctive relief and forfeiture, Complaint, ECF No. 12 at PageID 1308, ¶ 1, and the Attorney General has statutory authority to bring it. There is no requirement, unlike that for a plaintiff in a private treble damages action, that the Attorney General must first demonstrate injury to specific persons or property. Section 1331.03 of the Valentine Act authorizes forfeiture upon proof of a violation of the Act, without any requirement that the Attorney General demonstrate injury to persons or property. *See, e.g.*, *Needles v. Bishop & Babcock Co.*, 14 Ohio Dec. 445, 448 (C.P. Ct. Franklin Cty. 1904) (holding that, for a petition to state a cause of action for violation of the Valentine Act, "it is not necessary that evil intent or actual injury to the public be shown"). Section 109.81(A) of the Ohio Revised Code authorizes the Attorney General to bring an action for equitable relief, similarly, without any requirement of proof of injury to persons or property.

4.      **The *Illinois Brick* doctrine is irrelevant to this enforcement proceeding by the Attorney General.**

Defendants contend that the Attorney General cannot recover damages, including "for disgorgement and restitution," on behalf of consumers for "overinflated drug prices paid by those consumers." Brief, ECF No. 78 at PageID 2706. They argue that *Illinois Brick* and *Johnson v. Microsoft Corp.* bar recovery of damages sustained by indirect purchasers. Defendants are missing the mark.

This is not a *parens patriae* action to recover damages, and there are no allegations in the Complaint to suggest that it is. This enforcement proceeding seeks purely equitable relief, and the indirect purchaser doctrine has no application. *See, e.g.*, *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (holding that *Illinois Brick* does not bar an indirect purchaser from seeking injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26));

*Pecover v. Electronics Arts Inc*., 633 F. Supp. 2d 976, 979–80 (N.D. Cal. 2009) (holding that *Illinois Brick* "only bars antitrust claims for damages by indirect purchasers" and not a claim for injunctive relief). Contrary to Defendants' claim, there is no prayer for restitution. While restitution might be deemed a form of damages recovery, as it seeks to deliver monetary relief to consumers to compensate them for losses flowing from a defendant's wrongful conduct, no such relief is sought in this proceeding. The Attorney General seeks disgorgement, not restitution, and disgorgement is an equitable remedy. Section 109.81(A) of the Ohio Revised Code has been expressly held to permit the Attorney General to seek disgorgement under the Valentine Act. *See State ex rel. Dann v. American Int'l Group, Inc*., 2008 Ohio Misc. LEXIS 320, at *10–11 (C. P. Ct. Cuyahoga Cty. July 30, 2008). Disgorgement seeks to secure forfeiture of revenue unlawfully gained by a defendant, not compensation to the defendant's victims.

## II. COUNT III STATES CLAIMS AGAINST DEFENDANTS FOR VIOLATION OF THE VALENTINE ACT.

Defendants object to Count III on many of the same grounds advanced for dismissal of Count I. They contend that a conspiracy has not been alleged sufficiently to satisfy *Twombly*, and they contend that facts have not been alleged to show an unreasonable restraint of trade. They urge that *Copperweld* bars any claim of conspiracy between Express Scripts and Ascent, and they repeat their no-antitrust-injury and *Illinois Brick* objections. In common with the objections to Count I, these are all meritless.

### A. *Twombly* Has No Application to this Enforcement Proceeding, and Count III Alleges an Illegal Conspiracy under the Valentine Act.

Defendants contend that Count III should be dismissed because the Complaint does not allege evidence "from which the Court could draw a plausible inference of a price-fixing conspiracy." Brief, ECF No. 78 at PageD 2709. Relying on *Twombly*, Defendants argue that the

Complaint fails even to allege parallel conduct, much less evidence that would permit inference of a conspiracy. *Id.* at PageID 2710–12.

Section 1331.09 of the Valentine Act specifies what pleading is sufficient to state a claim, and the Complaint states a violation of the Act in conformity with Section 1331.09. (Page 10 *supra*.) *Twombly* has no application where the antitrust statute upon which the State is suing itself specifies pleading requirements for an enforcement action. (*Id.*)

Even if it were assumed that *Twombly* could apply, however, the Complaint plausibly alleges a combination of capital, skill, or acts among Express Scripts, Prime Therapeutics, Humana Pharmacy Solutions, Humana, and Ascent for one or more unlawful purposes under Section 1331.01(C)(1) of the Valentine Act:

- The Complaint alleges that Express Scripts and Prime Therapeutics use Ascent "as a vehicle to share pricing," Complaint, ECF No. 12 at PageID 1309, ¶ 7, and that Express Scripts, Prime Therapeutics, and Humana Pharmacy Solutions share drug pricing and rebate information through Ascent and thereby "fix rebate prices" among themselves, *id.*

- Express Scripts, Prime Therapeutics, and Ascent customers have exploited Ascent as a "vehicle" to aggregate and access each other's pricing, discount, rebate, and negotiations information, *id.* at PageID 1315, ¶ 28, and they have thereby been able "to act in concert to harmonize their Manufacturer negotiations and demands," eliminating competition between themselves and ensuring continued profits from "supracompetitive drug prices," *id.* at PageID 1315, ¶ 29.

- By agreeing with Express Scripts to acquire an ownership interest in Ascent, Prime Therapeutics was able to "harmonize its prices and terms with those of its rival Express Scripts" with respect to both manufacturers and retail pharmacies. *Id.* at PageID 1350, ¶ 189. Joint ownership of Ascent by Express Scripts and Prime Therapeutics "has allowed these two rivals . . . to 'align' their prices and terms with ease, eliminating competition between them." *Id.* at PageID 1351, ¶ 191.

- Express Scripts, Prime Therapeutics, Ascent, Humana Pharmacy Solutions, and Humana have engaged in a combination of capital, skill, or acts to create or carry out restrictions in trade or commerce "to fix, harmonize, and raise prices of numerous drugs. *Id.* at PageID 1358, ¶ 227.

19

Contrary to Defendants' contentions, these are neither allegations of benign parallel conduct nor empty boilerplate. They explicitly spell out Defendants' joint conduct in violation of the Valentine Act. They satisfy *Twombly* and far exceed what is required to plead a Valentine Act claim under Section 1331.09.

**B.     Count III Alleges a Combination among Defendants and a Per Se Illegal Conspiracy between Express Scripts and Prime Therapeutics in Violation of the Valentine Act.**

Defendants challenge Count III on the same grounds as Count I. They repeat objections to the sufficiency of the allegations of a rule of reason violation in Count I. They contend that Count III fails because there is no allegation of a relevant market and no allegations of anticompetitive effects or market power. Brief, ECF No. 78 at PageID 2713. They also contend that a group purchasing organization such as Ascent is not "likely to result in predominantly anticompetitive effects." *Id.* at PageID 2714 (quoting *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 295 (1985)).

With respect to Defendants' relevant market, anticompetitive effects, and market power objections, they are all addressed in the response to Count I (pages 13–16 *supra*), and that discussion will not be repeated here. The Complaint adequately alleges a rule of reason violation under the Valentine Act by Express Scripts and Ascent, even if Sherman Act case law were followed.

Defendants contend that the fact that they participate in a group purchasing organization, Ascent, "fails to show – or plausibly allege – any anticompetitive effect." Brief, ECF No. 78 at PageID 2713–14. They cite cases for the proposition that group purchasing organizations can be procompetitive. They have studiously omitted any cases on the misuse of purchasing cooperatives

to exchange information among competitors, and the authorities they cite have no bearing on the allegations in Count III.

In fact, the conspiracy allegations detailed above (pages 19–20 *supra*) considerably exceed those needed to establish a violation of the Valentine Act under the rule of reason.  They show a price-fixing conspiracy between direct competitors – Express Scripts and Prime Therapeutics – and they demonstrate how membership in a purchasing cooperative can be used by competitors to carry out conduct that is per se illegal:

> Competitor collaborations may provide an opportunity for participants to discuss and agree on anticompetitive terms, or otherwise to collude anticompetitively, as well as a greater ability to detect and punish deviations that would undermine the collusion.  Certain marketing, production, and *buying collaborations, for example, may provide opportunities for their participants to collude on price, output, customers, territories, or other competitively sensitive variables.*

UNITED STATES DEP'T OF JUSTICE AND FEDERAL TRADE COMM'N, ANTITRUST GUIDELINES FOR COLLABORATIONS AMONG COMPETITORS § 3.31(b) (2000) (emphasis added).

The Complaint alleges precisely the kind of anticompetitive abuse identified by the enforcement agencies in the GUIDELINES – use of a buying cooperative (Ascent) as a device by which participants (Express Scripts and Prime Therapeutics) can collude on price.  Using Ascent as their joint agent in negotiating prices with manufacturers, Complaint, ECF No. 12 at PageID 1315, ¶¶ 28–29, Express Scripts and Prime Therapeutics function as a buying cartel able to depress and stabilize prices paid to suppliers.  Agreement among competing buyers on prices to be paid to suppliers is per se illegal under Section 1 of the Sherman Act.  *E.g., Mandeville Island Farms, Inc. American Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) ("It is clear that the agreement [among refiners to pay uniform prices to suppliers of sugar beets] is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured under

21

the treble damage claim are sellers, not customers or consumers." (footnotes omitted)).  The result would be no different under Section 1331.01(C)(1)(a) and (b) of the Valentine Act.

### C. The Antitrust Injury Defense Has No Application to this Enforcement Proceeding by the Attorney General.

Defendants contend that Count III should be dismissed because the Complaint does not allege antitrust injury.  Brief, ECF No. 78 at PageID 2716.  The same argument is advanced as a basis for dismissal of Count I, and the response to the argument (pages 16–17 *supra*) applies equally here.  It is groundless.

### D. *Copperweld* Has No Application to a Claim under the Valentine Act, and Express Scripts and Ascent Are Capable of Conspiring.

Defendants assert that Express Scripts is incapable of conspiring with Ascent "due to common ownership."  Brief, ECF No. 78 at PageID 2715.  Since, they assert, "Cigna is the ultimate corporate parent" of both Express Scripts and Ascent, *Copperweld* bars any claim that Express Scripts and Ascent conspired.  *Id*.  Defendants mistake the law and misstate the Complaint.

First, *Copperweld* has no application to a claim under the Valentine Act, as detailed above (pages 3–8 *supra*) in the discussion of Defendants' arguments in support of dismissal of Count I.

Second, Ascent is *not* wholly owned by Cigna.  There is no such allegation in the Complaint, and Defendants' statement to the contrary, Brief, ECF No. 78 at PageID 2715, is invention.  The Complaint alleges that Express Scripts invited Prime Therapeutics in 2019 "into Ascent's ownership," Complaint, ECF No. 12 at PageID 1309, ¶ 7, and that Prime Therapeutics "joined Ascent's ownership" on or about December 19, 2019, *id.* at PageID 1348, ¶ 177.  Thereafter, Ascent was under "their ownership and control."  *Id.* at PageID 1349, ¶ 186.  This is joint ownership, not sole ownership by Cigna.  Even if *Copperweld* were deemed to apply to Count III, it would not, thus, bar a claim of conspiracy against Express Scripts and Ascent, because Ascent is not wholly-owned by Cigna.  It is owned in part by Prime Therapeutics, and *Copperweld*

reaches only conspiracy claims against a wholly-owned subsidiary and its parent corporation (page 8–9 *supra*).

### E. The *Illinois Brick* Doctrine Is Irrelevant to this Enforcement Proceeding by the Attorney General.

Defendants repeat the argument made in response to Count I that the Attorney General cannot, because of *Illinois Brick*, seek monetary relief for Count III. Brief, ECF No. 78 at PageID 2716. For the reasons discussed above (pages 17–18 *supra*) detailing why the argument is groundless as directed at Count I, it is equally groundless as directed at Count III.

### III. COUNT IV STATES A CLAIM AGAINST EXPRESS SCRIPTS FOR VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT.

Express Scripts objects to Count IV, stating violations of the Deceptive Trade Practices Act ("DTPA"), on multiple theories. It contends that the Attorney General lacks standing to bring an action under the DTPA, because Ohio Plan Sponsors are not "consumers" and that he cannot sue on their behalf. It contends that, insofar as this is a *parens patriae* action, it cannot be maintained on behalf of anyone less than Ohio residents generally. And it contends that, on the merits, Count IV fails to state a claim for violation of the DTPA. The objections are groundless, and the Motion should be dismissed as to Count IV.

### A. The Attorney General Has Standing to Bring a DTPA Action against Express Scripts on behalf of Ohio Plan Sponsors.

Express Scripts argues that the Attorney General lacks standing to bring an action against it on behalf of Ohio Plan Sponsors because they are consumers. Consumers have no standing to sue under the DTPA, and, Express Scripts reasons, the Attorney General has no ability to sue under the statute on their behalf. Brief, ECF No. 78 at PageID 2718.

Express Scripts' entire argument under Count IV stands on the erroneous and explained premise that Ohio Plan Sponsors are "consumers" for purposes of the DTPA. There is nothing in

the Brief to indicate where this premise comes from, and the conclusion is unavoidable that it is simply a convenient hypothesis. The Complaint identifies Plan Sponsors, however, as "commercial health insurers" and "employers who offer prescription drug benefit plans to their employees." Complaint, ECF No. 12 at PageID 1320, ¶ 49. Ohio Plan Sponsors are decidedly not consumers for purposes of the DTPA. There is no definition of "consumer" in the DTPA, but the Consumer Sales Practices Act defines a consumer as a person who engages in a "consumer transaction" with a supplier (Ohio Rev. Code § 1345.01(D)), and a "consumer transaction" is a sale or lease of goods or services "to an individual for purposes that are primarily personal, family, or household" (Ohio Rev. Code § 1345.01(A)).

The purpose of the DTPA is "'to protect the interests of a purely commercial class against unscrupulous commercial conduct.'" *Michelson v. Volkswagen Aktiengesellschaft*, 99 N.E.3d 475, 479 (Ohio Ct. App. 8th Dist. 2018) (quoting *Dawson v. Blockbuster, Inc.*, 2006-Ohio-1240, ¶ 24 (Ct. App. 8th Dist. 2006)). And, as alleged in the Complaint, the interaction of an Ohio Plan Sponsor with Express Scripts is precisely such "a purely commercial endeavor, and not a consumer transaction." *Torrance v. Rom*, 157 N.E.3d 172, 189 (Ohio Ct. App. 8th Dist. 2020). As participants in commercial endeavors, Ohio Plan Sponsors have standing to sue Express Scripts under the DTPA. *See id.* ("Given the commercial nature of his endeavor, Torrance has standing to pursue a claim under the ODTPA based on allegations that the appellees' deceptive trade practices influenced his initial decision to personally invest" in certain properties.)

**B. The Attorney General Can Bring a *Parens Patriae* Action against Express Scripts for Violation of the DTPA.**

Express Scripts argues that the State of Ohio, through the Attorney General, cannot sue to enforce the rights of Ohio Plan Sponsors under the DTPA as *parens patriae*. Brief, ECF No. 78 at PageID 2719–21. It contends that a *parens patriae* action can be maintained only for the benefit

of Ohio residents generally and not for the benefit of a specific group, such as Ohio Plan Sponsors. *Id.* at PageID 2719–20. Since the State has no "quasi-sovereign interest" in enforcing the DTPA as to this group, Express Scripts insists that Count IV must be dismissed. *Id.* at PageID 2721. It misstates the law.

The State of Ohio has standing to sue Express Scripts, because the DTPA gives it standing. Express Scripts has ignored the text of the DTPA, which gives to a "person" who is likely to be damaged by the commission of a deceptive trade practice the right to bring a civil action against the actor for injunctive relief. Ohio Rev. Code § 4165.03(A)(1). The statute defines a "person" to include "an individual, corporation, *government*, *governmental subdivision*…or any other legal or commercial entity." Ohio Rev. Code § 4165.01(D) (emphasis added). The Complaint alleges that Express Scripts' wrongful and deceptive acts have resulted in harm to the State's general economy and, unless enjoined, will likely continue to result in harm to the economy. Complaint, ECF No. 12 at PageID 1360, ¶¶ 246, 247. As a person likely to be harmed by Express Scripts' wrongful and deceptive conduct in violation of the DTPA, the State of Ohio, through the Attorney General, thus has explicit standing to sue Express Scripts.

Entirely separate from the right to sue under the DTPA, the State has standing to bring an action against Express Scripts under its *parens patriae* authority. Relying heavily upon a single federal district court decision analyzing whether to remand a case to state court (*Ohio v. GMAC Mortgage LLC*, 760 F. Supp. 2d 741 (N.D. Ohio 2011)), Express Scripts misunderstands *parens patriae* authority and misleads the Court about it.

Citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982), Express Scripts contends that Ohio must have, in order to bring a *parens patriae* action, a "quasi-sovereign interest" separate from that of a private party and that it must show that "the relief sought would

benefit Ohio residents generally." Brief, ECF No. 78 at PageID 2719. It is correct that a quasi-sovereign interest must be shown, but there is no requirement that the relief must benefit Ohio residents generally or that "there must be an injury to more than an identifiable group of individual residents." *Id.* at PageID 2720, quoting *Ohio v. GMAC Mortgage LLC*, 760 F.Supp.2d 741, 749 (N.D. Ohio 2011). The proper inquiry, instead, is whether the defendant's conduct has injured a substantial segment of the population of the State. Count IV alleges both (1) a quasi-sovereign interest of the State in protecting its citizens from Express Scripts' violation of the DTPA and (2) that Express Scripts' conduct has harmed a substantial segment of the population.

*Quasi-sovereign interest.* Express Scripts asserts that the Attorney General has failed to show any quasi-sovereign interest, because this action will only bring "'some secondary benefits to the Ohio economy' from relief that 'will primarily…benefit specific Ohio [citizens].'" Brief, ECF No. 78 at PageID 2721, quoting *GMAC Mortgage LLC*, 760 F.Supp.2d at 751. Express Scripts has every incentive to trivialize the impact of its false and deceptive representations on the economy and citizens of Ohio, but doing so does not change the fact that Ohio has a quasi-sovereign interest in enforcement of the DTPA. Every state "has a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). Inherent in the concept of quasi-sovereign interest is "protection of the public interest," and one of the most basic of such interests is "protection of . . . citizens from fraudulent and deceptive practices." *Kelley v. Carr*, 442 F. Supp. 346, 357 (W.D. Mich. 1977), *aff'd in part & rev'd in part on other grounds*, 691 F.2d 800 (6th Cir. 1980). Securing an "honest marketplace" – something which is threatened by Express Scripts' false and deceptive actions – is a well-established quasi-sovereign interest. *Illinois v. SDS West*

*Corp.*, 640 F. Supp. 2d 1047, 1050 (C.D. Ill. 2009); *State of New York by Abrams v. Gen. Motors Corp.*, 547 F. Supp. 703, 705–06 (S.D.N.Y. 1982).

    <u>*Injury to a substantial segment of the population.*</u>  Contrary to Express Scripts' contention, there is no requirement that a *parens patriae* action benefit Ohio residents generally.  The inquiry is whether the State "has alleged injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.  This has been referred to as a "numerosity requirement" (*Ohio AG v. Suwinski*, 509 B.R. 568, 574 (S.D. Ohio 2013)), and it has been satisfied when the number of Ohio consumers benefiting from a *parens patriae* action totaled 92.  *Id.*  The United States Supreme Court in *Alfred L. Snapp & Son* held that substantiality was satisfied when .03% of Puerto Rico's population was affected by the challenged conduct.  *Alfred L. Snapp & Son*, 458 U.S. at 599, 607.  A court must consider both the direct and indirect effects of harm when determining if a substantial segment of the population has been injured, and the indirect benefits of barring violations of the DTPA by Express Scripts accrue to the population of Ohio at large. *See District of Columbia v. JTH Tax LLC*, 2023 U.S. Dist. LEXIS 3016, at *13 (D.D.C. Jan. 9, 2023) (holding that even though conduct directly affected only .2% of the population of the District of Columbia, its indirect effects impacted "a broader portion of the state's population and the general welfare of the public . . ., [and a]llowing Defendant to continue deceiving District residents would undermine the integrity of D.C. law, weaken the marketplace, and enable other residents to be harmed in the future.")  Here, the Complaint alleges that Express Scripts has made false and deceptive representations to Ohio Plan Sponsors as well as Covered Patients themselves. Complaint, ECF No. 12 at PageID 1340, ¶ 142.  Since Express Scripts provides PBM services for nearly 40% of Ohioans covered by commercial insurance, *id.* at PageID 1311, ¶ 12, there can be no question that its false and deceptive statements affected a substantial segment of the population.

### C. The Complaint Alleges a Violation of the DTPA by Express Scripts.

Express Scripts contends that the allegations of false and deceptive representations sound in fraud and are, thus, subject to the heightened pleading standard of Rule 9(b), Fed. R. Civ. P. Brief, ECF No. 78 at PageID 2722. It asserts that the Complaint fails to allege fraud with particularity. Alternatively, Express Scripts argues that the allegations are not even sufficient under Rule 8, Fed, R. Civ. P. (*Id.*) It objects that the Complaint does not identify any statements made by Express Scripts to Ohio Plan Sponsors and that it is therefore unable to evaluate whether the statements were false or actually misled Ohio Plan Sponsors. Brief, ECF No. 78 at PageID 2722–23. The objections are groundless.

### 1. Allegations of a violation of the DTPA do not sound in fraud and are not subject to heightened pleading requirements.

A claim under the DTPA does not sound in fraud, and Count IV adequately alleges a violation by Express Scripts. A DTPA claim is subject to the notice pleading requirements of Rule 8(A)(1) of the Ohio Rules of Civil Procedure. *See Torrance v. Rom*, 157 N.E.3d 172, 188 (Ohio Ct. App. 8th Dist. 2020) (applying Rule 8(A), Ohio R. Civ. P., to evaluate sufficiency of allegations of violation of DTPA). A well-pled complaint must include "factual allegations going to each element of the claim," *id.*, and the Complaint amply meets this requirement. Ohio courts analyze claims under the DTPA based on federal court interpretations of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), *e.g.*, *Bold Home Prods., LLC v. CarbonKlean, LLC*, 2023 U.S. Dist. LEXIS 5975, at *25 (S.D. Ohio Jan. 11, 2023) ("Ohio courts analyze ODTPA claims like claims based on Section 43(a) of the Lanham Act . . ."), and there is no need to allege fraud in order to state a claim for violation of Section 43(a). *See, e.g.*, *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958) (holding that, under § 43(a), "there is no requirement that the falsification occur wilfully and with intent to deceive" (footnote omitted)); *Ames Publishing Co. v. Walker-*

*Davis Publishing Co.*, 372 F. Supp. 1, 24 (E.D. Pa. 1974) ("[T]here is no need to show that any false description or representation is wilful or intentional.").  Contrary to Express Scripts' contention, a claim under the DTPA does not require the heightened pleading necessary for a fraud claim.

### 2.  Count IV identifies false and deceptive statements of Express Scripts.

Express Scripts argues that the Attorney General "has not actually identified *any* statements, deceptive or otherwise, that Express Scripts made to Ohio Plan Sponsors," Brief, ECF No. 78 at PageID 2722 (italics in original), and, in the absence of any such identification, Express Scripts insists that it is impossible to evaluate whether statements are false or have a tendency to deceive.  Express Scripts has apparently not read the Complaint.  Here is what the Complaint alleges as to specific false and deceptive statements made by Express Scripts:

Express Scripts has made statements to Ohio Plan Sponsors and the public about its ability to place the most cost-effective drugs on its Formularies for the benefit of Plan Sponsors and their employees, and the statements are patently false, as Express Scripts knowingly omits any mention of its coercion of List Price hikes by Manufacturers and its frequent denial of Formulary placement to the most cost-effective drugs.  Complaint, ECF No. 12 at PageID 1339, ¶ 138.  The statements include the following:

- On its website, it promotes its services to Ohio Plan Sponsors as an effective tool to help them find the best possible combination of lower costs and healthy outcomes for their employees, stating "From ensuring quality care while managing cost, to keeping up with emerging therapies and technology, we're here for you." Complaint, ECF No. 12 at PageID 1339, ¶ 139.

- On its website, it states that its Formulary development processes have been constructed "to ensure that clinical considerations are paramount and fully taken into account *before* cost considerations." *Id.* at PageID 1339, ¶ 139 (emphasis in original).

- Express Scripts issued a statement in 2021 to *Managed Healthcare Executive* claiming that clinical appropriateness of a drug, not its cost, "is our foremost consideration." *Id.* at PageID 1340, ¶ 141.

- Concealing its elevation of dollars over drug quality and efficacy, Express Scripts stated in a document distributed in 2022 to members of an Ohio public employee retirement plan that it chose drugs on the Formulary in consultation with a team of healthcare providers and that the drugs represent "the prescription therapies believed to be a necessary part of a quality treatment program." *Id.* at PageID 1340, ¶ 142.

**IV.    COUNT V STATES A CLAIM AGAINST EXPRESS SCRIPTS FOR VIOLATION OF O.R.C. 3959.20(C).**

Express Scripts seeks dismissal of Count V, which alleges that its use of after-the-fact clawbacks to curtail reimbursements to pharmacies violates Section 3959.20(C) of the Ohio Revised Code. It does so based on arguments divorced from allegations in the Complaint and a misreading of the statute. The Motion should be denied as to Count V.

**A.    The Complaint Alleges Facts Stating a Violation of Section 3959.20(C) by Express Scripts.**

Express Scripts objects to Count V because, as to Section 3959.20(C)(1), it is not alleged whether any of the retroactive adjustments were the result of an audit or technical billing error. Brief, ECF No. 78 at PageID 2734. According to Express Scripts, such an adjustment would not violate the statute. Express Scripts also objects that the Complaint does not identify any pharmacy affected or any particular claim that was adjusted. It argues that the Complaint fails to satisfy *Twombly*, because the allegations are merely a "formulaic recitation." *Id.* at PageID 2725.

As to Section 3959.20(C)(2), Express Scripts argues that Count V fails to state a claim, because it does not allege how an adjustment to an adjudicated claim can become a fee prohibited by the statute. *Id*.

*Section 3959.20(C)(1).* The statute prohibits retroactive adjustment of a claim for reimbursement unless it is the result of either an audit (§ 3959.20(C)(1)(a)) or a technical billing

error (§ 3959.20(C)(1)(b)).  Express Scripts argues that Count V fails to state a claim because the Complaint does not explicitly plead that clawbacks were not the result of an audit or billing error. The Complaint alleges that the clawbacks violated Section 3959.20(C)(1), Complaint, ECF No. 12 at PageID 1346, ¶ 169, and this allegation eliminates any possibility that the clawbacks fell within either exception to the statute.  There is no implication that they were simply benign *ex post facto* corrections.

With respect to Express Scripts' objection that no specific pharmacy or claim is alleged to have been affected by a clawback, the absence of any such allegation does not make the factual allegations a "formulaic recitation."  The Complaint alleges that Express Scripts exacts post-adjudication clawbacks both as to specific claims, *id.* at PageID 1344, ¶ 160, and on a lump-sum basis, *id.* at PageID 1344–45, ¶ 162.  It alleges that Express Scripts has regularly and frequently done so in its dealings with Retail Pharmacies in its network, *id.* at PageID 1344, ¶ 159, and it describes how it collects the clawback, either by requiring payment or by reducing its next payment to the Retail Pharmacy, *id.* at PageID 1344, ¶ 139.

*Section 3959.20(C)(2).*  The Complaint alleges that a clawback is a "fee" prohibited by Section 3959.20(C)(2).  It is unlawful because the amount of the fee cannot be determined at the time of claim adjudication.  Complaint, ECF No. 12 at PageID 1344–46, ¶¶ 161, 163, 167, 169. There is no allegation that clawbacks are the result of either an audit or a technical billing error, and the Complaint is perfectly clear that the clawbacks are both retroactive adjustments of reimbursement claims, *id.* at PageID 1345, ¶ 165, and fees related to a claim, the amount of which cannot be determined at the time of claim adjudication.

Express Scripts objects that the Complaint does not explain how a claim adjustment can become a "fee" under the statute, Brief, ECF No. 78 at PageID 2725, but the objection assumes

that post-claim adjudication adjustments are lawful in the usual case. The opposite is true. Post-claim adjudication adjustments are *always* unlawful unless they result from an audit or technical billing error.

### B. The Attorney General Has Adequately Demanded Injunctive Relief.

Express Scripts contends that the claim in Count V for injunctive relief should be denied because the Complaint does not allege facts to support entry of a permanent injunction. *Id.* It argues that the Complaint fails to allege that the State has suffered irreparable injury, that monetary damages are inadequate, that the equities favor entry of an injunction, and that the public interest would not be disserved by a permanent injunction. *Id.*, citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The argument is groundless. At the pleading stage, as here, there is no requirement that a complaint set out facts to support a claim for injunctive relief. Rule 8(a)(3), Fed. R. Civ. P., requires only that a complaint contain "a demand for the relief sought." The Complaint requests a permanent injunction, Complaint, ECF No. 12 at PageID 1361, ¶ 252, and this is sufficient. *See, e.g., Velez v. Cuyahoga Metro. Housing Auth.*, 2014 U.S. Dist. LEXIS 27480, at *17 (N.D. Ohio March 3, 2014) (holding that, at the motion to dismiss stage, a "[c]ourt is not required to rule on the merits of the injunctive relief demand"); *see also Alexander v. Terry Law Firm, P.C. 401(k) Profit Sharing Plan*, 2016 U.S. Dist. LEXIS 153868, at *20 (E.D. Tenn. Nov. 7, 2016) ("The courts in this circuit, however, look to Federal Rule of Civil Procedure 8(a)(3) to determine whether a request for an injunction is sufficient at the pleading stage, not to Rule 8(a)(2).").

## V. COUNT VI STATES A CLAIM FOR UNJUST ENRICHMENT.

Defendants urge that Count VI, claiming unjust enrichment, be dismissed because the Complaint does not allege (1) any benefit conferred by Ohio consumers upon Defendants, Brief, ECF No. 78 at PageID 2726, (2) knowledge by Defendants of the purported benefit, or (3) that

they retained any benefit, *id.* at PageID 2727. Defendants are wrong on all three grounds, which we address in order.

Defendants contend that the State of Ohio has premised this claim on the rights of consumers who did not directly purchase prescription drugs from any Defendant, and they argue that indirect purchasers lack standing to assert an unjust enrichment claim. Brief, ECF No. 78 at PageID 2726–27. Since there was no economic transaction between Ohio consumers and Defendants, the claim fails, they reason. There is no need, however, for a direct buyer-seller relationship where the economic link between the consumer and a third party is obvious. *See, e.g., Ohio Edison Co. v. Direct Energy Bus., LLC*, 2017 U.S. Dist. LEXIS 117025 at *7–8 (N.D. Ohio 2017); *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 823–825 (N.D. Ohio 2006) (finding a sufficient transactional nexus for an unjust enrichment claim between plaintiff homebuyers and a title insurer with whom they had had no direct dealings); *Paikai v. General Motors Corp.*, 2009 U.S. Dist LEXIS 8538 (E.D. Calif. 2009) (allowing an Ohio car purchaser to bring an unjust enrichment claim against car manufacturer for wrongfully retaining funds the car purchaser had paid to the car dealer for warranty coverage). Here, Defendants control or otherwise affect pricing on a vast array of prescription drugs distributed to Ohio consumers, and it is exactly Defendants' intimate entanglement in the supply of drugs to consumers that makes this unjust enrichment claim meritorious.

In any event, this is not an indirect purchaser action to recover damages. Unjust enrichment is an equitable claim, *see, e.g., Hummel v. Hummel*, 133 Ohio St. 520, 525 (1938), and the State of Ohio brings this claim in its capacity as *parens patriae*. The action is brought to remedy the fundamental inequity of a defendant retaining a valuable benefit to which it is not entitled, not to compensate consumers.

33

Defendants contend there is no allegation that they are aware of the benefit conferred upon them by Ohio consumers, Brief, ECF No. 78 at PageID 2727, but the Complaint amply alleges that the Defendants, especially Express Scripts, are directly involved in pricing and distribution of prescription drugs to Ohio consumers.  Express Scripts controls which drugs will be covered by insurance, what portion of the price of the drugs will be covered, and how much pharmacies will be reimbursed for filling prescriptions for the drugs.  Complaint, ECF No. 12 at PageID 1311, ¶ 12; 1320, ¶ 49; 1324, ¶ 71.  Since Express Scripts "sits in a powerful and lucrative position at the center of the prescription drug distribution system," *id.* at PageID 1311, ¶ 12, it borders on the fatuous to argue that the Complaint alleges no awareness by Defendants of the benefits they receive from Ohio consumers.

Equally groundless are Defendants' contention that the Complaint lacks any allegation that they retained any of the benefits conferred by Ohio consumers.  Brief, ECF No. 78 at PageID 2727.  There is no suggestion that they are engaged in a not-for-profit enterprise for improvement of the general welfare.  The Complaint alleges, instead, that they have enriched themselves at the expense of Ohio consumers.  It further alleges that they have leveraged their control over formulary placement to force higher rebates from manufacturers, Complaint, ECF No. 12 at PageID 1327, ¶ 84, thereby enabling them to increase the price of drugs to consumers and drive up the prices charged to plan sponsors for PBM services, *id.* at PageID 1328, ¶ 87.  It alleges that they have exercised their market power to drive up the price of prescription drugs to Ohio consumers, *id.* at PageID 1351, ¶ 192, and that the Defendants have been unjustly enriched at the expense of Ohio consumers, *id.* at PageID 1362, ¶ 256.

## VI.    COUNT VII STATES A CLAIM FOR CIVIL CONSPIRACY.

Defendants argue that Count VII fails to state a claim for civil conspiracy and must be dismissed.  They contend that there is no allegation of (1) a combination to commit an unlawful

34

act, (2) an unlawful act independent of the conspiracy, or (3) actual injury. Brief, ECF No. 78 at PageID 2728–29. In support, they advance groundless arguments already addressed earlier in this Opposition to the Motion.

Defendants contend that no malicious combination has been alleged, asserting that "mere membership" in an organization or process will not suffice. *Id.* at PageID 2728. According to Defendants, allegations that Express Scripts is an owner of, or a participant in, Ascent do not establish any such combination, and allegations as to Cigna and Evernorth do not connect them to any conspiracy to injure consumers. *Id.* As shown above, however, Express Scripts and Ascent conspired with Prime Therapeutics to fix drug prices (pages 20–22 *supra*), and Cigna and Evernorth conspired with Express Scripts (pages 10–11 *supra*) to fix drug prices. Defendants' claims to the contrary will not write these allegations out of the Complaint.

Defendants purport to find no allegation of any unlawful independent act, but they overlook price fixing. Defendants are correct that joint conduct is, alone, not actionable, Brief, ECF No. 78 at PageID 2728, but the Complaint alleges more than innocuous collaboration in furtherance of some salutary public good. It alleges a price-fixing conspiracy among Express Scripts, Cigna, and Evernorth in Count I and a price-fixing conspiracy among Express Scripts, Prime Therapeutics, Ascent, Humana, and Humana Pharmacy Solutions in Count III – all to drive up the price of prescription drugs to the detriment of Ohio consumers. The unlawful act is violation of the Valentine Act.

With respect to actual injury, Defendants insist that none is alleged. Since the Complaint alleges only that they conspired with the "purpose and effect of injuring" Ohio consumers of prescription drugs, they reason that there is no cognizable actual injury. Brief, ECF No. 78 at PageID 2729. If Defendants are claiming that injury caused Ohio consumers by a price-fixing

cartel is beyond the reach of Ohio law, the claim is absurd. If the claim is that, because of the antitrust injury doctrine, the Attorney General has no authority to sue Defendants for injury to the public, it is groundless. As already shown above (page 16–17 *supra*), the antitrust injury doctrine has no application to this proceeding, and there is, in any event, no need to allege specific intent or actual injury to the public to state a claim for violation of the Valentine Act. *See, e.g.*, *Needles v. Bishop & Babcock Co.*, 14 Ohio Dec. 445, 448 (C.P. Ct. Franklin Cty. 1904) (holding that, for a petition to state a cause of action for violation of the Valentine Act, "it is not necessary that evil intent or actual injury to the public be shown").

## VII.   CIGNA AND EVERNORTH SHOULD NOT BE DISMISSED FROM THIS ACTION.

In the concluding section of the Brief, Cigna and Evernorth argue that the Complaint does not adequately link them to the conspiracies alleged and that, under *Twombly*, they should be dismissed as Defendants. Brief, ECF No. 78 at PageID 2729–30. This is an abbreviated rehash of arguments made earlier in the Brief, and there is no need to repeat here why they are groundless. As shown above (pages 10–11 *supra*), the Complaint alleges their active involvement in the price-fixing conspiracy alleged in Count I, and Count I states a claim against them for violation of the Valentine Act.

## VIII.   CONCLUSION.

The Complaint states claims against Express Scripts, Cigna, Evernorth, and Ascent for anticompetitive, deceptive, and otherwise unlawful conduct, both in combination and, for Express Scripts, individually, that has harmed the citizens and economy of the State of Ohio. Their actions violate Ohio statutory and common law, and the Motion must be dismissed in its entirety.


Dated: November 3, 2023

Respectfully submitted,

DAVE YOST
Ohio Attorney General (0056290)
SHAWN BUSKEN (0083585)
Deputy First Assistant Attorney General


   */s/ Jennifer L. Pratt*
JENNIFER L. PRATT (0038916)
Director of Major Litigation
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Telephone: (614) 752-8237
Fax: (614) 466-5087
Jennifer.Pratt@OhioAGO.gov
Beth A. Finnerty (0055383)
Section Chief, Antitrust Section
Edward J. Olszewski (0082655)
Assistant Section Chief, Antitrust Section
Thomas J. Collin (0023770)
Principal Assistant Attorney General, Antitrust Section
Sarah Mader (0102270)
Assistant Attorney General, Antitrust Section
30 East Broad Street, 26th Floor
Columbus, Ohio
Telephone; (614) 466-4328
Fax: (614) 995-0266
Beth.Finnerty@OhioAGO.gov
Edward.Olszewski@OhioAGO.gov
Thomas.Collin@OhioAGO.gov
Sarah.Mader@OhioAGO.gov


*Counsel for the State of Ohio, ex rel., Attorney General Dave Yost*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. Notice of this filing will be sent to all other parties not represented by counsel via regular U.S. Mail.

  _/s/ Jennifer L. Pratt_
Jennifer L. Pratt
Counsel for Plaintiff the State of Ohio
